**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **In Re:**<br><br>**ZOM HOLDING, INC.,**<br>**ZOM ASSOCIATES, INC.**<br>**ZH DEVELOPMENT I, LLC,**<br><br>**Debtors.** [1] | **Lead Case No.: 6:26-bk-08509-GER**<br><br>**Chapter 11**<br><br>**(Joint Administration Requested)**<br><br>**Case No. 6:26-bk-08511**<br>**Case No. 6:26-bk-08515** |

**DECLARATION OF NEIL LURIA IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Neil Luria, declare as follows:

1. I am the Chief Restructuring Officer ("CRO") of the Debtors in the above-captioned bankruptcy cases (the "Chapter 11 Cases"), which were filed on October 30, 2026 (the "Petition Date"). I have served in that capacity for ZOM Holding, Inc. ("ZHI") since January 27, 2026. I have served as CRO of ZOM Associates, Inc. ("ZAS") and ZH Development I, LLC ("ZH Dev", together with ZHI and ZAS, the "Debtors") since October 16, 2026.[2]

2. I submit this declaration (the "Declaration") to assist the Court and parties in interest in understanding the events and circumstances that led to the commencement of the Chapter 11 Cases, and in support of the motions and other "first day" pleadings (collectively, the "First Day Motions"). I am authorized to submit this Declaration on behalf of the Debtors.

3. These Chapter 11 Cases are the Debtors' last attempt to save their business and employees' jobs. The protracted dispute that led to these Cases began in 2022—after the purchase

[1] The Debtors in these Chapter 11 Cases and the last four digits of their EINs are ZOM Holding, Inc. (8703), ZH Development I, LLC (1156), and ZOM Associates, Inc. (0836). The Debtors' address is 1511 East State Road 434, Suite 1005, Winter Springs, FL 32708.

[2] ZHI is the sole shareholder of ZAS and the member and manager of ZH Dev.

of assets out of an Arizona bankruptcy case by ZT Property Acquisition, LLC, a non-debtor and indirect subsidiary of ZHLP (as defined below). At that time, and after no notice or demand, Gray Services LLC and Gray Development LLC sued ZHI in Arizona. After years of litigation, a twelve-day jury trial, and post-verdict litigation, Gray (as defined below) obtained their judgment in May. Following the judgment, ZHI immediately pursued its appellate remedies and engaged in extensive negotiations with Gray, including a formal mediation, all while continuing to discuss this situation with its lenders to avoid a default under its guaranties. Despite months of negotiations, the parties could not reach resolution. From the initiation of the Gray Litigation (as defined below) to now, ZHI has continued operating in the ordinary course providing management services to ZHLP and Stonebridge (as defined below) and remaining in good standing for its hundreds of millions of dollars in guaranty claims. After careful consideration with the Independent Directors (as defined below), I determined that it was in the best interest of all stakeholders for the Debtors to file the Chapter 11 Cases and sell their operations and assets, including any claims and causes of action.

4. This Declaration is divided into four parts. Part I describes my experience, qualifications, and the Debtors' current leadership. Part II provides an overview of the Debtors' history, structure, and operations. Part III describes the legal, financial, and operational challenges that led to filing the Chapter 11 Cases. Part IV provides a summary of the First Day Motions and the factual basis for the relief sought in the First Day Motions.

## Part I
## Experience, Qualifications, and Current Leadership

5. I am Co-Head of the restructuring and financial advisory practice at GBH SOLIC Holdco, LLC ("SOLIC"). SOLIC is a restructuring and financial advisory firm specializing in advising clients regarding financial restructuring, turnaround, and general business matters affecting clients' profitability. SOLIC has offices in Winter Park, Florida, Georgia, and Illinois. It

is my understanding that the Debtors selected SOLIC because of SOLIC's extensive experience in the field of business reorganizations under chapter 11 of the Bankruptcy Code.[3]

6. SOLIC has widespread experience in providing restructuring and financial advisory services in reorganization proceedings. SOLIC's professionals have represented various stakeholders in distressed situations over the last 25 years. Furthermore, I have previously served as the Chief Restructuring Officer in chapter 11 bankruptcies including, for example, (a) Tamarac 10200 and Unipharma, LLC, Case No. 20- bk-23346-PDR (Bankr. S.D. Fla. 2020); (b) Sharity Ministries, Inc., Case No. 21-11001 (Bankr. Del. 2021); (c) Louisiana Medical Center and Heart Hospital, Case No. 17-10353 (Bankr. E.D. La. 2017); (d) PBI Regional Medical Center, Case No. 06-16186 (Bankr. D.N.J 2006); (e) Pottsville Operations, LLC, *et al.*, Case No. 24-70418-JAD (Bankr. W.D. Pa. 2024); (f) The Villages Health System, LLC, Case No. 25-04156 (Bankr. M.D. Fla. 2025); (g) Taylor, Bean & Whitaker Mortgage Corp., Case No. 09-07047 (Bankr. M.D. Fla. 2009); (h) Ocala Funding, LLC, Case No. 12-0945240 (Bankr. M.D. Fla. 2012). I have also served as the liquidating trustee of numerous entities including, for example, Mortgage Lenders Network USA and Orthodontic Centers of America and as the Chief Restructuring Officer and Chief Executive Officer of various other distressed companies that have been restructured outside of bankruptcy.

7. After interviewing multiple candidates for the role of Chief Restructuring Officer, the Debtors engaged SOLIC to provide my services as CRO and certain additional support staff.

8. In January 2026, the former directors of ZHI resigned and two independent directors were appointed—Mr. Colin Adams and Ms. Anna Phillips (the "Independent Directors"). Mr. Adams and Ms. Phillips are the sole directors of ZHI. The Independent Directors have strong

[3] All references to the "Bankruptcy Code" herein refer to 11 U.S.C. §§101-1532.

credentials and experience in the restructuring field and were not associated with ZHI prior to their appointment.

9. As of the Petition Date, the Debtors' leadership team consists of the following individuals:

| Name | Role |
| --- | --- |
| Greg West | Chief Executive Officer |
| Neil Luria | Chief Restructuring Officer |
| Jonathan Young | Chief Financial Officer |
| Matthew Adler | Chief Investment Officer |
| Colin Adams | Independent Director of ZHI |
| Anna Phillips | Independent Director of ZHI |

10. In my capacity as CRO, I am familiar with the Debtors' businesses, day-to-day operations, and financial affairs. I have control over the Debtors, and I am duly authorized by the Independent Directors to make all decisions and take all actions related to these Chapter 11 Cases. Except as otherwise indicated, the facts set forth in this Declaration are based upon (i) my personal knowledge, (ii) my review of relevant documents and records created and maintained by the Debtors in the ordinary course of business, (iii) information provided to me by employees and consultants working under my supervision with personal knowledge of the veracity of such information, and/or (iv) my opinion based on experience, knowledge, and information concerning the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

## Part II
## The Debtors' History, Structure, and Operations

11. The Debtors are part of an organization that specializes in the construction and management of multifamily and senior living communities. The Debtors operate using the name "ZOM" and "ZOM Living." ZOM has earned a reputation for award-winning excellence in



136578.000001\4916-3397-5771.1

multifamily design and development through decades of projects, undertaken with numerous premier institutional partners and pension funds and all grounded in the same high standard of design.

12. ZHI was formed in Florida in 1996[4] and has traditionally served as the holding company for a real estate development business. ZAS was formed in 2009 in Florida as an employment company to support the business. ZH Dev was formed in 2011 in Delaware as one of the developer entities for the business. The Debtors' primary office is in Winter Springs, Florida, but the Debtors also have offices or share office space in Arizona, Texas, North Carolina, and Massachusetts. An organizational chart for the Debtors is attached as **Exhibit A** to this Declaration.

13. From its inception, the Debtors' business model was to develop real estate projects with a lender and equity investor. The company would retain a small interest in the project and act as the developer on the project. Generally, after the Debtors developed and completed the project, it was sold to a third party.

14. In 2016, certain of ZHI's direct and indirect equity holders started exploring options to restructure the business to create a more efficient tax structure for new development projects. ZOM Holding, LP ("ZHLP") was formed in Florida in 2017 as the holding company for such new business development projects.[5] ZHLP also acquired four of ZHI's investments in four development partnerships as well as ZHI's preacquisition costs. ZHLP purchased these assets for: (a) a $5 million upfront cash payment from ZHI to ZHLP, (b) a $16 million unsecured loan in

[4] ZHI is currently 100% owned by FLOR Holding USA, Inc. ZHI 100% owns the other two Debtors: ZH Dev and ZAS. ZOM Partners, LP has a variable profits interest in ZH Dev that changes based on certain employment contracts. ZOM Partners, LP has no control or authority over ZH Dev.

[5] While ZHI and ZHLP share some, but not all, indirect equity holders, ZHI and ZHLP do not share a common parent entity.

favor of ZHI, which ZHLP paid in full by the end of 2021, and (c) future obligations under the partnership investments and all risk of loss associated with preacquisition costs.

15. Since the commencement of the tax restructuring process, the Debtors continued to operate and receive development and construction management fees. Debtors also provide certain services to ZHLP, and ZHLP pays the Debtors fees for those services pursuant to that certain Management Services Agreement. Specifically, ZHI and ZAS provide (a) employees and day-to-day services needed to assist ZHLP in its operations, including accounting services, information technology services, and other administrative functions and (b) the right to use the "ZOM" "ZOM Living" and "ZOM Senior Living" names covered by multiple federal trademarks held by ZHI.

16. ZHI has two remaining projects (known as MetWest in Tampa, FL and Hazel & Azure in Arlington, VA) where it may receive development fees if certain incentives are met. In recent years, ZHI and ZHLP served as co-guarantors on multiple commercial real estate projects. Currently, ZHI and ZHLP remain co-guarantors on five real estate projects located in Round Rock, TX, Arlington, VA, Miami, FL, and Cary, NC. ZHLP continues to develop real estate projects and, upon information and belief, ZHLP or one of its subsidiaries serves as the sole guarantor on multiple real estate projects without ZHI as a co-guarantor.

17. As of the Petition Date, the Debtors have 31 employees performing critical functions for the Debtors, with some employees performing services for ZHLP under the fee structure discussed above and some performing services for another non-debtor entity Stonebridge REIM Inc. Stonebridge reimburses the Debtors for payroll and pays an accounting management fee in return for these services.

18. The Debtors' assets consist primarily of its top-tier workforce, trademarks, insurance policies, office equipment, décor, furniture, development interests, and causes of action.

19. As of the Petition Date, ZHI was a party to a prepetition secured credit facility consisting of a line of credit obtained from ZHLP with a principal balance of $3,773,819 (the "ZHLP Loan Facility"). The ZHLP Loan Facility originated on February 4, 2026, and several subsequent advances were made under the Facility (on March 12, May 7, May 28, June 25, July 31, September 10, and October 21). The amounts due and owing under the ZHLP Loan Facility are secured by a security interest in all assets of ZHI. Other than the ZHLP Loan Facility, the Debtors have no other material secured debt.

20. The Debtors have no known unpaid tax liabilities and no known and liquidated unpaid claims that would qualify as priority claims under Section 507 of the Bankruptcy Code, other than wages and benefits owed to employees that are the subject of a First Day Motion.

21. The Debtors' unsecured debt consists of the outstanding judgment from the Gray Litigation (defined below), hundreds of millions of dollars in guaranty obligations and bond indemnity obligations related to ongoing projects as well as certain payables to vendors. The Debtors estimate total unsecured claims to be approximately $541 million.

## Part III
## Events Leading to the Chapter 11 Cases

22. The events leading to these Chapter 11 Cases ironically stem from a sale in a previous bankruptcy case filed in the District of Arizona.

23. In May 2019, approximately two years after initiating the tax restructuring process, Bruce Gray contacted ZHI about an opportunity to develop four parcels of property in Arizona (the "Arizona Properties"). The Arizona Properties were owned by four single purpose entities (the "Gray SPEs") and encumbered by substantial debt. The lender had already instituted foreclosure proceedings on the Arizona Properties before Gray ever contacted ZHI with this development opportunity. In connection with their discussions, ZHI executed a contract with Gray

Services LLC[6] titled Mutual Confidentiality and Non-Circumvention Agreement (as amended, the "Non-Circumvention Agreement"). Under the Non-Circumvention Agreement, Gray provided certain information to ZHI that Gray deemed to be confidential and/or proprietary and subject to the terms of the Non-Circumvention Agreement.

24. Later in 2019, the Gray SPEs and an indirect subsidiary of ZHLP, ZT Development, LP, entered into a purchase and sale agreement for the Arizona Properties. Ultimately, ZT Development LP terminated the purchase and sale agreement for the Arizona Properties in April of 2020 as it was allowed to do under these terms. Shortly after the valid termination, the Gray SPEs filed bankruptcy cases in the Bankruptcy Court for the District of Arizona (jointly administered under Case No. 2:20-bk-04130-MCW) (the "Arizona Bankruptcy Cases" and the "Arizona Bankruptcy Court").

25. Mr. Bruce Gray and his companies, Gray Services, LLC and Gray Development LLC, were not debtors in the Arizona Bankruptcy Cases but participated in the Arizona Bankruptcy Cases as creditors and parties in interest, and with respect to Mr. Gray, as a manager of the Gray SPEs.

26. The Arizona Bankruptcy Court eventually converted the Arizona Bankruptcy Cases to cases under Chapter 7 (at the lender's request). Thereafter, another entity affiliated with ZHLP, ZT Property Acquisition LLC, purchased the Arizona Properties through the Arizona Bankruptcy Case free and clear of all liens, claims, and encumbrances by an agreement with the Chapter 7 Trustee of the Arizona Bankruptcy Case. The purchase price was $82 million. A copy of the sale order from the Arizona Bankruptcy Case is attached to this Declaration as **Exhibit B** (the "Arizona

[6] Upon information and belief, Gray Services LLC is associated with Bruce Gray and has several affiliated entities. For the purpose of this declaration, I will use the term "Gray" to refer to Mr. Gray and his entities as a whole and specific Gray entities where necessary.

Bankruptcy Sale Order"). The Arizona Bankruptcy Court entered the Arizona Bankruptcy Sale Order on November 25, 2020, and ultimately closed the Arizona Bankruptcy Cases on October 1, 2021.

27. Almost two years after entry of the Arizona Bankruptcy Sale Order and six years after the tax restructuring process described above, Gray sued ZHI in Arizona state court (Case No. CV-2022-010650 in Maricopa County Superior Court, the "Gray Litigation"). No prior demand was made on ZHI. The entity that actually purchased the Arizona Properties, ZT Property Acquisition LLC, was not a party to the Gray Litigation. Gray sought damages against ZHI for breach of contract, unjust enrichment, and breach of the implied duty of good faith and fair dealing based on the Non-Circumvention Agreement and sale of the Arizona Properties to ZT Property Acquisition LLC.

28. After Gray filed the Gray Litigation, ZT Property Acquisition LLC moved to reopen the Arizona Bankruptcy Cases and, among other things, sought clarification of the Arizona Bankruptcy Sale Order. ZT Property Acquisition LLC argued that Gray was attempting to use the Gray Litigation to challenge or undermine the Arizona Bankruptcy Sale Order.

29. Gray, through counsel, expressly represented to the Arizona Bankruptcy Court that ZT Property Acquisition LLC was not formed until after execution of the Non-Circumvention Agreement (and therefore not bound by the Non-Circumvention Agreement) and was not a defendant in the Gray Litigation presumably to avoid any action by the Arizona Bankruptcy Court from enforcing the Arizona Bankruptcy Sale Order that authorized the sale of the Arizona Properties to ZT Property Acquisition LLC free and clear of all liens, claims and encumbrances including any such liens claims and encumbrances asserted by Gray.[7]

[7] Transcript of Hearing before the Arizona Bankruptcy Court, January 7, 2025, pp. 46-47, attached as **Exhibit E.**

30. While the Arizona Bankruptcy Court ultimately denied specific injunctive relief, the Arizona Bankruptcy Court entered an order dated September 12, 2025, and specifically found that it was "*difficult to understand how damages might arise under the [Non-Circumvention Agreement] if it was impossible for the Gray entities to develop and build on the subject properties once they were sold out of the Bankruptcy estates free and clear of any liens or interests.*" (emphasis provided). A copy of the Arizona Bankruptcy Court's clarification order is attached to this Declaration as **Exhibit C** (the "Arizona Bankruptcy Clarification Order").

31. After several years of litigation, a jury trial, and post-trial practice, Gray Services, LLC and Gray Development LLC obtained a final judgment against ZHI for $308,552,331.50, plus interest, on May 12, 2026. A copy of the judgment is attached to this Declaration as **Exhibit D** (the "Gray Judgment"). The Gray Judgment was based upon a finding of breach of contract and breach of duty of good faith and fair dealing by ZHI. Despite the Arizona Bankruptcy Sale Order and the fact that ZHI was not the purchaser (nor part of the same organizational structure as the purchaser) of the Arizona Properties, the damages awarded by the jury represented profits Gray said they would have earned by developing the Arizona Properties (which they did not own).

32. ZHI timely appealed to the Arizona Court of Appeals, Division One, Case No. 1 CA-CV 26-058 (the "Appeal"). ZHI filed its opening brief on September 30, 2026. Gray's brief is due on December 9, 2026. ZHI raises two independent grounds for outright reversal and several other errors that would each independently require a new trial. First, ZHI argues that Gray failed as a matter of law to prove lost-profit damages with reasonable certainty. Second, ZHI argues that Gray recovered profits from rights they never owned. Finally, ZHI argues that there are four independent errors that each require a new trial: (i) damages were measured from May 2019, the month the Non-Circumvention Agreement was signed, even though there was no evidence of any

breach at that time; (ii) the trial court erroneously admitted Gray's expert testimony on lost profits, allowing the jury to hear expert opinions based on the speculative assumptions; (iii) the trial court improperly excluded the Arizona Bankruptcy Clarification Order from evidence; and (iv) the trial court erred by refusing ZHI's requested instruction telling the jury that Gray never owned the parcels or the right to develop them. ZHI will separately file a motion in these Chapter 11 Cases seeking to lift the stay and authority to continue pursuit of the Appeal of the Gray Judgment in Arizona.

33. Since May of 2026 and simultaneously with the appellate process, the parties engaged in lengthy and extensive pre-bankruptcy settlement discussions with Gray and among themselves to resolve these issues short of a bankruptcy filing but were unable to achieve a resolution. Specifically, ZHI and ZHLP produced thousands of pages of documents to Gray, had multiple informal settlement conferences among themselves and with Gray, and attended a full-day mediation on July 28, 2026, with an experienced mediator Antonio Piazza. After the formal mediation in July there were further negotiations for months until the parties reached an impasse. On October 1, 2026, Gray recorded the Gray Judgment in Seminole County, Florida, seeking to domesticate it in Florida under Florida Statutes Sections 55.01-55.509.

34. Gray seeks to enforce the Gray Judgment in Florida. With that enforcement, immense harm would occur to the Debtors' other creditors and employees. Although a bankruptcy filing will cause the Debtors to default under their guaranty obligations, there will be a bankruptcy court supervised process to sell the Debtors' assets, and those guaranty obligations may be assumed through that process. This process will allow the Debtors to maximize value for the benefit of all creditors. By exercising remedies outside of the bankruptcy process, any remaining value for creditors would be destroyed.

35. Following my appointment and in connection with the settlement negotiations, ZHI, through SOLIC, also began to investigate possible claims that ZHI might have against ZHLP and potential insiders of the Debtors on theories related to repayment of certain transfers and successor liability. SOLIC conducted an analysis of the Debtors' books and records to analyze potential avoidable transfers, including interviews with employees to understand the nature of those transfers and to identify other potential claims between the companies. ZHI has made demand on ZHLP for these claims, and ZHLP contests these claims. I also considered that there may be possible claims against professionals related to the Arizona Bankruptcy Cases and the Gray Litigation that resulted in the Gray Judgment ("Professional Claims"). ZHI has executed tolling agreements related to some of the Professional Claims.

36. The Debtors filed these Chapter 11 Cases to maintain their day-to-day operations uninterrupted while pursuing the following key objectives: pursuing a sale of their assets, including all claims and causes of action for the benefit of all stakeholders, and pursuing the Appeal of the Gray Judgment. Without a bankruptcy filing, the Debtors' employees would lose their jobs and the value of the assets would deteriorate, including claims against ZHLP. For example, ZHI guaranteed performance on certain ZHLP loans. If ZHI defaults on those guarantees, it would cross-default the loans, significantly reducing any value of ZHLP. This bankruptcy filing will allow the Debtors to maximize the value of the Debtors' assets through a court-approved sale process.

37. As of the Petition Date, the Debtors are in the process of finalizing a stalking horse asset purchase agreement with the DIP Lender (or its designee) (in such capacity, the "Stalking Horse Bidder") for substantially all of their assets. The Debtors have commenced these Chapter 11 Cases to consummate a sale transaction with the Stalking Horse Bidder or a third-party bidder

who submits a higher or otherwise better bid for the Debtors' business and assets. In the coming days, the Debtors anticipate filing a motion seeking entry of an order approving a court-supervised twelve-week bidding and sale process for substantially all of the Debtors' assets and authorizing the Debtors to enter into a stalking horse asset purchase agreement with the Stalking Horse Bidder. The sale process is designed to encourage open and competitive bidding with the milestones in the Debtors' DIP Facility. During the marketing period, the Debtors and their advisors will prepare and populate a data room, update diligence and solicitation materials, contact prospective acquirers, distribute teasers and confidential information memoranda, and provide potential bidders an opportunity to conduct due diligence. Based on my experience, I believe the proposed schedule appropriately balances the need to move expeditiously with the objective of providing interested parties sufficient time to evaluate the assets and formulate value-maximizing bids. I believe the proposed sale process will enable the Debtors to obtain a value maximizing sale transaction that is in the best interests of the Debtors and their stakeholders.

## Part IV

## The First Day Motions

38. To minimize any adverse effects on the estates from the commencement of these Chapter 11 Cases, the Debtors have filed customary First Day Motions seeking relief on an immediate basis. The facts set forth in each of the First Day Motions are incorporated herein by reference. As to each of the First Day Motions identified below, I have reviewed each motion or application, including the attachments thereto, and believe the facts set forth therein are true and correct, to the best of my knowledge, information, and belief. I believe that the relief sought in each of the First Day Motions is appropriate under the circumstances presented and necessary to preserve the assets and operations of the Debtors for the benefit of the estates and their creditors

pending completion or confirmation of a plan of reorganization or liquidation in these Chapter 11 Cases.

39. I believe that it is critical that the First Day Motions be heard as soon as practicable. If such motions are not considered on an expedited basis, it could threaten the Debtors' ability to maintain operations and meet their obligations, including payroll obligations—leading to immediate and irreparable harm to the Debtors' business. Accordingly, I believe expedited consideration and approval of the emergency First Day Motions is vital to the continued viability of the Debtors and is in the best interest of all interested parties in these Chapter 11 Cases.

40. The Debtors have filed the following First Day Motions requesting relief on an emergency basis:

a. *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtor to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and other Employee Obligations, (II) Maintain Employee Benefit Programs, and (III) for Related Relief* (the "Wages Motion").

b. *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Financing Motion").

c. *Debtors' Emergency Motion for Interim and Final Orders (A) Authorizing the Debtor to (I) Continue to Use Existing Cash Management System, (II) Maintain Bank Accounts and Continue Use of Existing Business Forms and Checks, (B) Granting a Waiver of Certain Investment and Deposit Guidelines, and (C) Granting Related Relief* (the "Cash Management Motion").

d. *Debtors' Emergency Motion for Authorization to (I) Continue to Administer Insurance Policies and Related Agreements; (II) Honor Certain Obligations in Respect Thereof; and (III) for Related Relief* (the "Insurance Motion").

e. *Debtors' Emergency Motion for Entry of an Order Pursuant to 11 U.S.C. § 366(b) and Local Rule 2081-1(g)(7): (I) Prohibiting Utilities from Altering,*

*Refusing, or Discontinuing Services, (II) Deeming Utilities Adequate Assured of Payment, and (IV) Granting Related Relief* (the "Utilities Motion").

41. The basis for seeking the relief sought in the First Day Motions is described in more detail below.

42. **Wages Motion**: The Debtors filed an emergency motion requesting the authority to pay certain pre-petition obligations due to the Debtors' employees (the "Employees"). The Debtors request authority pay the Employees' prepetition wages and honor certain employee policies (for example, paid time off and health and welfare obligations). The Debtors' next payroll payment is due on November 4, 2026, which includes a pre-petition portion of a pay-period. It is critical to the Debtors' ability to continue operating and preserving estate assets that it timely pays its Employees. If the Debtors are not permitted to fulfill their obligations to Employees, the Employees will not receive full payment for services that have already been performed. I believe such a result would undermine the morale and loyalty of the Debtors' workforce and substantially jeopardize the Debtors' bankruptcy efforts. I believe that the relief requested in this motion is in the best interests of the Debtors, these estates, and all creditors.

43. **DIP Financing Motion**: The Debtors require immediate access to funding to preserve the Debtors' assets and operations for the benefit of creditors. The Debtors will seek the Court's authorization to use cash collateral and enter into a financing agreement with ZOM Holding, LP (the "DIP Lender") that generally provides the Debtors access to a post-petition new money DIP loan facility up to approximately $6.5 million. I believe that the relief requested in this motion is in the best interests of the Debtors, these estates, and all creditors. It will also provide the necessary financing to fund the Chapter 11 Cases and achieve the Debtors' bankruptcy goals.

A separate declaration in support of the DIP Motion will be filed contemporaneously with the DIP Motion.

44. **Cash Management Motion**: The Debtors filed an emergency motion requesting that the Court authorize the Debtors to continue using their prepetition cash management system, including existing bank accounts and business forms. The Debtors maintain a cash management system in the ordinary course of their business. This system allows the Debtors to identify cash requirements, transfer cash as needed, forecast cash needs, maintain accounting records, and pay necessary expenses. I believe that discontinuing the use of the Debtors' existing cash management system would require a significant amount of time and effort and could negatively impact the Debtors' ability to efficiently fund necessary expenses and preserve assets of the estates. These negative results would ultimately adversely affect the Debtors' ability to maximize the value of their estates for the benefit of all interested parties. I believe that the relief requested in this motion is in the best interests of the Debtors, these estates, and all creditors.

45. **Insurance Motion**: The Debtors filed an emergency motion requesting authority but not direction to continue operating its Insurance Program (as defined in the Motion) and pay certain pre-petition Insurance Program expenses to keep the insurance policies in place. The Debtors' Insurance Program is essential to the continued operation of the Debtors' business. This relief is critical to preserve the status quo. I believe that the relief requested in this motion is in the best interests of the Debtors, these estates, and all creditors.

46. **Utilities Motion**: The Debtors filed an emergency motion requesting that the Court determine that the Debtors have provided adequate assurance of payment for certain utility services and preclude these utility providers from altering, refusing, or discontinuing utility services. The utility services are for utilities required to operate the Debtors' office locations. In my opinion, the

continuity of the utility services is essential for the Debtors to preserve and prevent damage to the value of the Debtors' estates. I believe a deposit payable to each utility is adequate assurance of payment for the utility services. I believe that the relief requested in this motion is in the best interests of the Debtors, these estates, and all creditors.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated: October 30, 2026

*/s/ Neil Luria*

Neil Luria

**Exhibit A**


FLOR Holding USA, Inc.
a Florida corporation
ZOM Holding, Inc.
ZF Development, LLC
ZF Development II, LLC
ZMA Development, LLC
ZH Development I, LLC
ZT Development, LLC
ZOM Carolinas, LLC
ZOM Associates, Inc.
ZOM, Inc.
ZOM Texas, Inc.
ZOM Mid-Atlantic, Inc.
ZOM Realty, Inc.
ZOM Properties, Inc.
ZOM Development, Inc.
ZOM Florida, Inc.
Active
Holding Co.
Passive/Legacy

**Exhibit B**

**SO ORDERED.**

**Dated: November 25, 2020**

Madeleine C. Wanslee

**Madeleine C. Wanslee, Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In Re:<br><br>BILTMORE 24 INVESTORS SPE LLC; GRAY BLUE SKY SCOTTSDALE RESIDENTIAL PHASE I LLC; GRAY GUARANTORS I LLC; GRAY GUARANTORS II, LLC; and GRAY GUARANTORS III, LLC,<br><br>Debtors.<br><br>THIS FILING APPLIES TO:<br>■ All Debtors<br>□ Specified Debtor(s). | Case No.: 2:20-bk-04130-MCW<br><br>Jointly Administered with:<br>Case No. 2:20-bk-04131-MCW<br>Case No. 2:20-bk-04133-MCW<br>Case No. 2:20-bk-04134-MCW<br>Case No. 2:20-bk-04136-MCW<br><br>Chapter 7<br><br>**ORDER APPROVING TRUSTEE'S MOTION TO APPROVE SALE OF REAL PROPERTIES FREE AND CLEAR OF LIENS PURSUANT TO 11 U.S.C. §§ 363(b) AND (f)**<br><br>**Hearing Date: November 19, 2020**<br>**Time: 8:30 am** |

This matter came before the Court upon the *Trustee's Motion to Approve Sale of Real Properties Free and Clear of Liens Pursuant to 11 U.S.C. §§ 363(b) and (f)* (the "Sale Motion"), filed by David M. Reaves, as Chapter 7 trustee herein ("Trustee"). Trustee seeks this Court's approval, pursuant to 11 U.S.C. § 363(b), of the sale of certain real estate assets held by these jointly administered estates, free and clear of any and all liens, claims, and

encumbrances on the properties, other than easements and restrictions of record, with all liens, claims, and encumbrances to be paid at closing.

Upon consideration of the Sale Motion, all responses, objections, and argument presented by counsel, the evidence presented at the hearing on the Sale Motion and otherwise in connection with these jointly-administered cases; upon consideration of all bids placed at the time of the hearing; and upon further good cause appearing,

**THE COURT FINDS AND CONCLUDES** as follows:

A. The Sale Motion and the *Notice of Hearing on Trustee's Motion to Approve Sale of Real Properties Free and Clear of Liens Pursuant to 11 U.S.C. §§ 363(b) and (f)* were properly served upon all interested parties and all parties on the master mailing list on file herein.

B. Biltmore 24 Investors SPE, LLC, Gray Guarantors I, LLC, Gray Guarantors II, LLC, Gray Guarantors III, LLC, and Gray Blue Sky Scottsdale Residential Phase I, LLC, (collectively the "Debtors") have filed *Debtors' Limited Objection to Trustee's Motion to Approve Sale of Real Properties Free and Clear of Liens* (the "Limited Objection"), at Dkt. No. 368.

C. On April 21, 2020, the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. On April 24, 2020, this Court ordered that the cases be jointly administered under Case No. 2:20-bk-04130-MCW, *In re Biltmore 24 Investors SPE, LLC*. On August 25, 2020, this Court converted the jointly administered Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code, and David M. Reaves was appointed as Chapter 7 trustee for the jointly administered estates.

D. Gray Guarantors II, LLC ("GG-II") is the lessee under an assigned lease with the Arizona State Land Department ("ASLD") as lessor, relating to approximately 20 acres of vacant land located at 20855 N. 53rd Street, Phoenix, Arizona (the "DR 20"), designated

as Lease No. 03-116780-99 (the "DR 20 Lease"), and legally described in Exhibit "A" attached.

E. Gray Guarantors III, LLC ("GG-III") owns that certain parcel of real estate consisting of approximately 5.92 acres of vacant land near the 20 Acre Parcel in the Desert Ridge Community of North Phoenix, Arizona (the "DR 5.92 Property"), and legally described in Exhibit "B" attached.

F. Gray Guarantors I, LLC ("GG-I ") owns that certain parcel of real estate consisting of approximately 3.74 acres of vacant land near Camelback Road and Scottsdale Road in Scottsdale, Arizona ("Blue Sky Property"), and legally described in Exhibit "C" attached.

G. Biltmore 24 Investors SPE, LLC ("Biltmore 24") owns that certain parcel of real estate consisting of approximately 2.92 acres of vacant land on the southwest corner of 24th Street and Highland Avenue in Phoenix, Arizona ("Biltmore Property"), and legally described in Exhibit "D" attached.

H. TIG Romspen US Master Mortgage, LP ("Romspen") holds liens encumbering the DR 20 Lease, the DR 5.92 Property, the Blue Sky Property, and the Biltmore Property (collectively the "Properties"), currently amounting to approximately $74,318,747.09 as of November 19, 2020, and which accrues interest at the rate of approximately $32,422.31 per day.

I. ZT Development, LP ("ZOM") also holds a blanket lien encumbering all of the Properties, currently amounting to approximately $1,618,000, and which accrues interest at the rate of approximately $617 per day, pursuant to that certain Deed of Trust recorded with the Maricopa County Recorder's Office on April 7, 2020, at Document No. 2020-0298958 (the "ZOM Performance Deed of Trust").

J. The DR 20 Lease is encumbered by the following liens and interests of record:

(i) That certain Deed of Trust held by Romspen dated August 14, 2018, and recorded on November 1, 2018, at Document No. 2018-0817580, Assignment of Rights Under Covenant, Conditions, and Restrictions, Permits and Development Documents recorded at Document No. 2018-0643995, Collateral Assignment of Commercial Lease recorded at Document No. 2018-0644108, and Financing Statement recorded November 1, 2018, at Document No. 2018-0817581 (collectively referred to as the "Romspen DR 20 Liens");

(ii) The ZOM Performance Deed of Trust;

(iii) Outstanding assessments owing to the Desert Ridge Core Association in the approximate amount of $2,609.30; and

(iv) Any liens or encumbrances held or asserted by Pacific Coach, Inc. ("Pacific Coach") or CPF Vaseo Associates, LLC ("CPF Vaseo"), by virtue of that certain Deed of Trust dated and recorded on December 10, 2014, at Document No. 2014-0812396, Absolute Assignment of Leases and Rents recorded on December 10, 2014, at Document No. 2014-0812397, and Assignment of Plans, Specifications and Contracts recorded December 10, 2014, at Document No. 2014-0812398, and Assignment to CPF Vaseo, recorded June 3, 2016, at Document No. 2016-0385919.

K. The DR 5.92 Property is encumbered by the following liens and interests of record:

(i) That certain Deed of Trust held by Romspen dated August 14, 2018, and recorded on August 24, 2018, at Document No. 2018-0643994, Pledge and Collateral Assignment of Economic Incentives recorded August 18, 2018, at Document No. 2018-0643996, and Financing Statement recorded August 24, 2018, at Document No. 2018-0643999 (collectively referred to as the "Romspen DR 5.92 Liens");

(ii) The ZOM Performance Deed of Trust;

(iii) Outstanding and unpaid real property taxes owing to Maricopa County, in the sum of approximately $10,735.08;

(iv) Outstanding assessments owing to the Desert Ridge Community Association in the amount of approximately $10,227.00;

(v) Any liens or encumbrances held or asserted by Pacific Coach or CPF Vaseo by virtue of that certain Deed of Trust dated and recorded on September 17, 2014, at Document No. 2014-0615062, Absolute Assignment of Leases and Rents recorded at Document No. 2014-0615063, and Assignment of Plans, Specifications and Contracts recorded at Document No. 2014-0615064, and Assignment to CPF Vaseo recorded June 3, 2016, at Document No. 2016-0385920; and

(vi) Any liens or encumbrances held or asserted by Pacific Coach or CPF Vaseo by virtue of that certain Deed of Trust dated and recorded on December 10, 2014, at Document No. 2014-0812399, and Assignment to CPF Vaseo, recorded June 3, 2016, at Document No. 2016-0385921.

L. The Blue Sky Property is encumbered by the following liens and interests of record:

(i) That certain Deed of Trust held by Romspen dated August 14, 2018, and recorded on August 24, 2018, at Document No. 2018-0643993, Assignment of Rights Under Covenant, Conditions, and Restrictions, Permits and Development Documents recorded on August 24, 2018, at Document No. 2018-0643995, and Financing Statement recorded August 24, 2018, at Document No. 2018-0643998 (collectively referred to as the "Romspen Blue Sky Liens");

(ii) The ZOM Performance Deed of Trust;

(iii) Outstanding and unpaid real property taxes owing to Maricopa County, in the sum of approximately $133,028.90; and

(iv) Any liens or encumbrances held or asserted by Pacific Coach or CPF Vaseo by virtue of that certain Deed of Trust dated and recorded on December 10, 2014, at Document No. 2014-0812396, Absolute Assignment of Leases and Rents recorded at Document No. 2014-0812397, and Assignment of Plans, Specifications and Contracts recorded at Document No. 2014-0812398, and Assignment to CPF Vaseo recorded June 3, 2016, at Document No. 2016-0385919.

M. The Biltmore Property is encumbered by the following liens and interests of record:

(i) That certain Deed of Trust held by Romspen dated August 14, 2018, and recorded on August 24, 2018, at Document No. 2018-0643988, Assignment of Rights Under Covenant, Conditions, and Restrictions, Permits and Development Documents recorded at Document No. 2018-0643995, Pledge and Collateral Assignment of Economic Incentives recorded August 24, 2018, recorded at Document No.

0643996, and Financing Statement recorded August 24, 2018, recorded at Document No. 2018-0644000 (collectively referred to as the "Romspen Biltmore Liens");

(ii) The ZOM Performance Deed of Trust;

(iii) Outstanding and unpaid real property taxes owing to Maricopa County, in the sum of approximately $93,952.99.

N. All of the above liens and encumbrances of record are to be satisfied in full at closing from the proceeds of sale of the Properties, other than the liens of Pacific Coach and/or CPF Vaseo referenced above. The above liens held by Pacific Coach and CPF Vaseo have been satisfied and are to be released.

O. As set forth in the Sale Motion, ZT Property Acquisition, LLC ("ZT") has presented a "stalking horse" offer of $82,000,000 for the purchase of all of the Properties, in bulk, plus the State Court Litigation described in Paragraph P (collectively, the "Sale Assets").

P. The Debtors have objected to the sale of all right, title and interest held by these jointly administered estates, in that certain state court litigation between the Debtors, on the one hand, and the ASLD and the State of Arizona, on the other hand, filed in Maricopa County Superior Court, Case No. CV2019-000067, *Sonoran Desert Land Investors, LLC, et. al. v. State of Arizona and Arizona State Land Department* (the "State Court Litigation"). ZT has represented to the Court that the acquisition of the State Court Litigation is a necessary and valuable component of ZT's purchase of the DR 20 Lease, without which ZT would not have been willing to go forward with the present sale upon the present terms.

Q. No higher or better offers were presented to the Court at the hearing on this matter.

R. The stalking horse bid of $82 million submitted by ZT is the highest and best offer received.

S. The sale of the Sale Assets to ZT for the sum of $82,000,000, pursuant to the terms of the Sale Motion, the Asset Purchase Agreement, and this Order, is in the best interests of this estate.

T. No allegations of bad faith, fraud, collusion, or unlawful manipulation have been made, and no evidence of bad faith, fraud, collusion, or unlawful manipulation has been presented to this Court.

U. With the lack of any evidence of bad faith, fraud, collusion, or unlawful manipulation, upon consideration of the declarations and live testimony of Trustee and of Greg West, on behalf of ZT, and upon consideration of the entire record herein, the Court finds and concludes that the sale to ZT is and was at arm's length, and that ZT, as the successful bidder for the purchase of the Sale Assets at the auction sale before this Court, is a "good faith purchaser" as defined under 11 U.S.C. § 363(m).

V. The ASLD approved ZT as a successor lessee under the DR 20 Lease, subject to review and approval of the ASLD's normal and customary assignment documentation and payment of ASLD's normal and customary assignment fees.

W. In the event ZT fails to timely close upon the purchase of the Sale Assets and/or otherwise perform in accordance with the terms of this Order, a backup credit bid has been submitted by Romspen, in the sum of $70,000,000.

X. With the lack of any evidence of bad faith, fraud, collusion, or unlawful manipulation, and upon consideration of the declaration and the live testimony of Trustee and the entire record herein, the Court finds and concludes that, to the extent that Romspen is given the opportunity to close upon the purchase of the Sale Assets as the successful

backup bidder for the purchase of the Sale Assets at the auction sale before this Court, Romspen is a "good faith purchaser" as defined under 11 U.S.C. § 363(m).

Y. The Court shall enter a separate order lifting, annulling, modifying, and/or terminating the automatic stay in favor of Romspen to facilitate Romspen's acquisition of the Sale Assets in the event ZT fails to timely close upon the purchase of the Sale Assets and/or otherwise perform in accordance with the terms of this Order and Romspen's backup bid is deemed the highest and best prevailing bid.

Z. All parties affected by Trustee's sale and the sales process have had the opportunity to be heard and/or bid. The Court concludes that the sales and marketing process was at arm's length, sufficient, in good faith, and was otherwise fair and equitable under the circumstances of this case.

AA. The Court finds and concludes that the Trustee has exercised his business judgment in connection with the sale, and based on the evidence and argument presented, the Trustee's exercise of his business judgment shall not be disturbed by this Court.

BB. This Court's rulings as placed upon the record at the hearing on this matter are incorporated herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED** as follows:

1. Overruling all objections to the Sale Motion, including Debtor's Limited Objection, and Granting the Sale Motion.

2. Approving the sale of all right, title, and interest held by these jointly administered estates in each of the Sale Assets to ZT or its nominee ("Buyer"), for the sum of $82,000,000, upon the terms and conditions set forth in this Order and in the *Real Property Purchase Agreement and Joint Escrow Instructions* (the "Purchase Agreement") attached hereto as Exhibit "E." All references herein to "Escrow Agent" shall refer to

Landmark Title Assurance Agency of Arizona, LLC, as the escrow agent under the Purchase Agreement.

3. Pursuant to 11 U.S.C. § 363(f), the sale of the estate's interest in the DR 20 Lease shall be free and clear of the following liens, interests, and encumbrances:

a. The Romspen DR 20 Liens;

b. The ZOM Performance Deed of Trust;

c. Outstanding and unpaid real property taxes owing to Maricopa County;

d. Outstanding assessments owing to the Desert Ridge Core Association;

e. Any liens or encumbrances held or asserted by Pacific Coach or CPF Vaseo by virtue of that certain Deed of Trust dated and recorded on December 10, 2014, at Document No. 2014-0812396, Absolute Assignment of Leases and Rents recorded on December 10, 2014, at Document No. 2014-0812397, and Assignment of Plans, Specifications and Contracts recorded December 10, 2014, at Document No. 2014-0812398, and Assignment to CPF Vaseo recorded June 3, 2016, at Document No. 2016-0385919; and

f. Any unrecorded liens, encumbrances or other interests.

4. The sale of the estate's interest in the DR 20 Lease to Buyer shall include all right, title and interest held by these jointly administered estates in the State Court Litigation.

5. Pursuant to 11 U.S.C. § 363(f), the sale of the DR 5.92 Property shall be free and clear of the following liens, interests, and encumbrances:

a. The Romspen DR 5.92 Liens;

b. The ZOM Performance Deed of Trust;

c. Outstanding and unpaid real property taxes owing to Maricopa County;

d. Outstanding assessments owing to the Desert Ridge Community Association;

e. Any liens or encumbrances held or asserted by Pacific Coach or CPF Vaseo by virtue of that certain Deed of Trust dated and recorded on September 17, 2014, at Document No. 2014-0615062, Absolute Assignment of Leases and Rents recorded at Document No. 2014-0615063, and Assignment of Plans, Specifications and Contracts recorded at Document No. 2014-0615064, and Assignment to CPF Vaseo recorded June 3, 2016, at Document No. 2016-0385920;

f. Any liens or encumbrances held or asserted by Pacific Coach or CPF Vaseo by virtue of that certain Deed of Trust dated and recorded on December 10, 2014, at Document No. 2014-0812399, and Assignment to CPF Vaseo, recorded June 3, 2016, at Document No. 2016-0385921; and

g. Any unrecorded liens, encumbrances or other interests.

6. Pursuant to 11 U.S.C. § 363(f), the sale of the Blue Sky Property shall be free and clear of the following liens, interests, and encumbrances:

a. The Romspen Blue Sky Liens;

b. The ZOM Performance Deed of Trust;

c. Outstanding and unpaid real property taxes owing to Maricopa County;

d. Any liens or encumbrances held or asserted by Pacific Coach or CPF Vaseo by virtue of that certain Deed of Trust dated and recorded on December 10, 2014, at Document No. 2014-0812396, Absolute Assignment of Leases and Rents recorded at Document No. 2014-0812397, and Assignment of Plans, Specifications

and Contracts recorded at Document No. 2014-0812398, and Assignment to CPF Vaseo recorded June 3, 2016, at Document No. 2016-0385919; and

e. Any unrecorded liens, encumbrances or other interests, other than that certain unrecorded License Agreement attached as Exhibit "F."

7. Pursuant to 11 U.S.C. § 363(f), the sale of the Biltmore Property shall be free and clear of the following liens, interests, and encumbrances:

a. The Romspen Biltmore Liens;

b. The ZOM Performance Deed of Trust;

c. Outstanding and unpaid real property taxes owing to Maricopa County; and

d. Any unrecorded liens, encumbrances or other interests.

8. From the collective proceeds of sale of the Sale Assets, the following items shall be paid at closing:

a. Any and all costs of sale to be paid by the estate, as the seller under the Purchase Agreement;

b. All amounts owing to Romspen and secured by the Romspen Deed of Trust;

c. All amounts owing to ZOM and secured by the ZOM Performance Deed of Trust;

d. All real property taxes outstanding and owing, prorated through the date of closing;

e. All association fees outstanding and owing to the Desert Ridge Core Association, prorated through the date of closing [applicable to the DR 20 Lease only];

f. All association fees outstanding and owing to the Desert Ridge Community Association, prorated through the date of closing [applicable to the DR 5.92 only]; and

g. All commissions and costs owing to Cushman & Wakefield, as Trustee's real estate broker, of 1% of the gross combined sales proceeds up to the first $75 million, and 2% on any gross sales proceeds over and above $75 million.

9. After payment of the above items, the balance of the sales proceeds shall be paid to Trustee, on behalf of these jointly administered estates.

10. Based upon the findings and conclusions set forth above, as well as the entire record herein, Buyer's purchase of the Sale Assets as set forth herein is in good faith, and Buyer is thus entitled to the benefits provided by 11 U.S.C. § 363(m).

11. The sale of the Sale Assets shall be "as is, where is," with Trustee making no representations or warranties.

12. Buyer shall take the Blue Sky Property subject to the License Agreement attached as Exhibit "F," as well as the recorded conditions, covenants, restrictions, agreements, and other interests not listed in ¶ 6(a)-(d).

13. Trustee is authorized and directed to execute all documents reasonably contemplated herein and necessary to close the sale and/or required by the title company, including a deed transferring title to each of the Sale Assets to Buyer.

14. Buyer's earnest money deposit shall be nonrefundable to Buyer unless Buyer's failure to close results from any provision of the Purchase Agreement that specifically provides the earnest money is refundable to Buyer. If Buyer's failure to close results from any provision of the Purchase Agreement that specifically provides the earnest money is refundable to Buyer, Buyer's earnest money deposit shall be returned to Buyer.

15. Buyer's earnest money deposit shall be held by Escrow Agent and applied to Buyer's purchase of the Sale Assets, in accordance with the terms of the Purchase Agreement. Buyer shall either (i) pay the balance of the purchase price and close escrow no later than December 23, 2020, or (ii) no later than December 23, 2020, Buyer may elect to extend the closing date, in which event Buyer shall be required to deposit with Escrow Agent the amount of $31,112.32 for each day Buyer elects to extend the closing date, not to exceed thirty days, upon the terms set forth in the Purchase Agreement.

16. In the event that Buyer fails to close on or before December 23, 2020, and fails to make the payment required above to extend closing, Buyer's rights under the Purchase Agreement shall be terminated, the sale to Buyer shall be deemed cancelled, including the cancelation of any and all right, title and interest held or asserted by Buyer to purchase the Properties. If Buyer's failure to close does not result from a provision of the Purchase Agreement that specifically provides the earnest money is refundable to Buyer, Buyer shall forfeit its earnest money deposit. Notwithstanding cancellation of Buyer's purchase rights hereunder for any reason, ZOM shall preserve all of its rights in and to the Properties under the ZOM Performance Deed of Trust.

17. Romspen or its nominee is hereby approved as the backup bidder for the acquisition of the Sale Assets with a credit bid of $70,000,000.

18. If Buyer fails to timely close escrow or otherwise fails to comply with the terms of this Order, all rights of Buyer to acquire the Sale Assets under this Order shall be deemed assigned to Romspen or its nominee. Romspen or its nominee shall thereafter have thirty days from the date of Buyer's cancelation to close the sale. Any such sale to Romspen or its nominee of the Blue Sky Property shall be subject to the License Agreement attached as Exhibit "F," as well as recorded conditions, covenants, restrictions, agreements, and other interests not listed in ¶ 6(a)-(d).

19. In the event that Romspen or its nominee fails to close on or before the deadlines set forth above, the sale to Romspen shall be deemed cancelled. Notwithstanding cancellation of Romspen's purchase rights hereunder: (a) Romspen shall preserve all of its rights in and to the Sale Assets under Romspen's prepetition loan and security documents; and (b) the separate order of this Court lifting, terminating, annulling, and/or terminating all stays and injunctions in favor of Romspen shall remain in full force and effect. All rights and remedies under previous orders of this Court in the above-captioned cases and in *In re Epicenter Partners, L.L.C.*, Case No. 2:16-bk-05493-MCW, Adv. No. 2:20-ap-00119-MCW remain in full force and effect. Emerald Equities L.L.C. and Romspen reserve all of their rights and remedies in the event of a foreclosure of the Blue Sky Property by Romspen pursuant to this section.

20. All forfeited earnest money deposits held by Escrow Agent shall be disbursed from escrow first in accordance with paragraph 8 above, and upon full satisfaction of those items set forth in paragraph 8, the balance shall be distributed in accordance with paragraph 9 above.

21. Based upon the findings and conclusions set forth above, as well as the entire record herein, to the extent that the Sale Assets are sold to Romspen or its nominee pursuant to the terms of this Order, Romspen's (or its nominee's) purchase of the Sale Assets is in good faith, and Romspen or its nominee is thus entitled to the benefits provided by 11 U.S.C. § 363(m).

22. This Order shall be effective and enforceable immediately upon entry; the fourteen (14) day stay set forth in Bankruptcy Rule 6004(h) is hereby waived, and shall not apply to this Order.

23. This Court shall retain jurisdiction to (i) hear and determine all matters arising from or relating to the implementation of this Order, and (ii) resolve any issues and

disputes relating to the rights and obligations of any parties under this Order and the Purchase Agreement.

DATED AND SIGNED ABOVE.

**Exhibit C**

SO ORDERED.

Dated: September 12, 2025

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

Madeleine C. Wanslee, Bankruptcy Judge

**UNDER ADVISEMENT ORDER**

**Bankruptcy Judge**: Madeleine C. Wanslee

**Chapter**: 7

**Case Names and Case Numbers**: Biltmore 24 Investors SPE, LLC, 2:20-bk-04130-MCW (Jointly Administered with Gray Blue Sky Scottsdale Residential Phase I, LLC, 20-bk-04131-MCW; Gray Guarantors I, LLC, 20-bk-4133-MCW; Gray Guarantors II, LLC, 20-bk-04134; and Gray Guarantors III, LLC, 20-bk-04136-MCW)

**Subject of Matter**: (1) Motion for Clarification (Dkt # 527), (2) Motion for Injunctive Relief (Dkt # 581), and (3) Emergency Motion for Determination that Any Executory Contracts Between Gray Entities and Debtors, Not Assumed In Prior Sale, Have Been Deemed Rejected (Dkt # 580)

**Date Matter Ruled Upon**: September 12, 2025

---

This ruling is a combined decision on the pending *Motion for Clarification* (Dkt # 527), *Motion for Injunctive Relief* (Dkt # 581), and *Emergency Motion for Determination that Any Executory Contracts Between Gray Entities and Debtors, Not Assumed In Prior Sale, Have Been Deemed Rejected* (Dkt # 580). The Court grants ZOM entities' Motion for Clarification, declines to enter injunctive relief, and concludes that any agreements or contracts related to the real property administered in this Bankruptcy estate were rejected by operation of Bankruptcy law. Upon the entry of this ruling disposing of the three pending Motions and any responses thereto, the parties shall have thirty (30) days to file a motion requesting that the Court keep the administrative case open, which may be granted only upon a showing of good cause. If such a motion is not filed, or should it be denied, the Clerk of Court shall re-close this Bankruptcy case.

**BACKGROUND:**

This Court granted the *Second Motion to Reopen Bankruptcy Case(s)* based on the assertion by ZT Property Acquisition, LLC ("ZTPA") and ZT Development, LP (collectively with ZOM Holding, Inc., the "ZOM entities") that Mr. Gray and the Gray Plaintiffs (collectively the "Gray parties") in the Arizona State Court litigation pending in Maricopa County Superior Court, No. CV 2022-010650, were using that litigation to challenge the Sale Order entered by the Bankruptcy Court on November 25, 2020 (Dkt # 397), and to circumvent the effect of both the Sale Order and

the Settlement Agreement entered between the Chapter 7 Trustee and ZT Development LP filed on September 16, 2020 (Dkt # 258) and approved on September 23, 2020 (Dkt # 286). The Court's March 26, 2025 *Order Granting the Second Motion to Reopen* (Dkt # 550) states:

> [T]his Court will grant the Motion to Reopen **for the limited purpose of determining what rights the Debtor entities held at the time of the Bankruptcy filing**, which will primarily be determined by the special warranty deeds and lease assignment documents, and what property was transferred out of the Bankruptcy estates pursuant to the final Sale Order. The Court notes that it is not re-opening the actual sale, or the final Sale Order that was entered by this Court, but instead is simply clarifying what was the property of the Bankruptcy estates, as it related to these properties, and what property was transferred out of the Bankruptcy estates as a result of the Sale Order.

**LIMITED JURISDICTION:**

First, this Court makes clear that its jurisdiction is limited to matters that affect the administration of the Bankruptcy estate and to the interpretation of the nature and assets that encompassed the Bankruptcy estate, and to enforce and interpret the orders it entered. In re Ray, 624 F.3d 1124, 1130-31 (9th Cir. 2010) (Bankruptcy Court's jurisdiction is limited to "core" proceedings that arise under the Bankruptcy Code or arise in a case under the Code; bankruptcy courts also have ancillary jurisdiction if reopening the case is necessary to "(1) to permit disposition by a single court of factually interdependent claims, [or] (2) to enable [the bankruptcy] court to vindicate its authority and effectuate its decrees." Citations omitted.). "The bankruptcy court does not have [ancillary] jurisdiction, however, to grant new relief independent of its prior rulings once the underlying action has been dismissed." Id. at 1135 (citing Tsaforoff v. Taylor (In re Taylor), 884 F.2d 478, 481 (9th Cir. 1989). The Ninth Circuit has also rejected ancillary jurisdiction when a party sued on the terms of a settlement agreement after the bankruptcy case had closed and the estate was settled. Ray at 1136 (citing Sea Hawk Seafoods, Inc. v. Alaska (In re Valdez Fisheries Dev. Ass'n, Inc.), 439 F.3d 545, 549-50 (9th Cir. 2006)).

This Court does not stand as an appellate Court to the state court, and does not have the power to review the proceedings in the state court or to determine if the state court's proceedings are proper, except in the case when the outcome of such proceedings might violate the automatic stay or a discharge injunction. Lower federal courts, including the bankruptcy courts, are precluded from exercising appellate jurisdiction over state court judgments and proceedings under the *Rooker-Feldman* doctrine. D.C. Ct. of Appeals v. Feldman, 460 U.S. 462, 482 (1983) and Rooker v. Fid. Tr. Co., 263 U.S. 413, 416 (1923). Review of final state-court judgments issued by the highest court of state is provided by 28 U.S.C. § 1257, and only the United States Supreme Court may exercise that jurisdiction. Lance v. Dennis, 546 U.S. 459, 464 (2006).

Likewise, this Court will not ordinarily enter an injunction that limits a state court from proceeding with litigation pending before that court, or that could be interpreted as an injunction upon the actions of the state court. Injunctive relief is beyond the limited purpose for which this Court granted the Second Motion to Reopen. The ZOM entities asked this Court to 1) enter injunctive relief that would enjoin the Gray Plaintiffs from pursuing causes of action that the ZOM

entities characterize as unwritten and that have been deemed rejected by operation of law that could only be asserted against the Debtors; 2) enter injunctive relief that would enjoin the Gray Plaintiffs from pursuing claims for damages that are dependent upon and arise from the right to use and develop the four parcels of real property that were the subject of this Court's Sale Order (Dkt # 397); 3) enter injunctive relief that would enjoin the Gray Plaintiffs from pursuing causes of action and claims that require relitigating matters that were conclusively resolved by the Settlement Order entered by this Court (Dkt # 286) between the Chapter 7 Trustee and ZT Development, LP; 4) enter injunctive relief that would enjoin the Gray Plaintiffs from pursuing claims for which the basis of liability or damages is dependent upon ZT Property Acquisition's participation in the Section 363 Bankruptcy Sale; and 5) enter injunctive relief that would enjoin the Gray Plaintiffs from pursuing any of the foregoing claims and causes of action until the Bankruptcy Court orders otherwise.

**INJUNCTIVE RELIEF: BEYOND THE LIMITED PURPOSE OF THE CASE REOPENING AND THIS COURT'S JURISDICTION:**

Based on the limited jurisdiction of this Court, and the purpose stated for granting the Second Motion to Reopen, the Court determines that there is no basis for it to grant any form of injunctive relief against parties presently appearing before the Maricopa County Superior Court. The request for injunctive relief against the Gray parties shall therefore be denied.

The proceedings pending in Maricopa County Superior Court generally are beyond the limited jurisdiction of this Court. Those proceedings on their face appear to relate to the Mutual Confidentiality and Non-Circumvention Agreement (the "Non-Circumvention Agreement" copy attached as Exhibit 1 to the State Court Complaint, found at Dkt # 1 in Adv. 22-ap-00220-MCW) entered between non-debtor parties before these Bankruptcy cases were filed, and which may or may not have created obligations that are independent of the administration of these Bankruptcy cases or the interpretation of what was included as property of the estates or what property and interests were transferred pursuant to the sale conducted in the Bankruptcy Court.

There is no doubt that the contract may relate indirectly to the properties of the Bankruptcy estates which were transferred by Mr. Gray and various Gray entities to the Debtor Special Purpose Entities, and which were sold out of the Bankruptcy estates. This Court will only clarify what property interests were part of, and later transferred out of, the Bankruptcy estates. The Maricopa County Superior Court is the proper forum for the determination of whether there is any independent liability under the Non-Circumvention Agreement, or if there was a breach and whether enforcement of the Settlement Agreement (attached to Dkt # 258) approved by this Court is appropriate (Settlement Order at Dkt # 286).

Resolution of the matters currently pending before this Court will have no effect on the administration of the Bankruptcy estates that were originally closed on October 1, 2021 (Dkt # 506). There has been no argument that the resolution of these matters will bring funds into the estates that a Chapter 7 Trustee will be required to administer and distribute to creditors or interested parties.

As indicated, there was a pre-petition Non-Circumvention Agreement entered into between Gray Services, LLC, dba Gray Development Group, LLC, its subsidiaries, affiliates, and successors, and ZOM Living, its subsidiaries, affiliates, successors, partners, and principals. Pursuant to the State Court complaint, ZOM Living was the dba entity of ZOM Holding, Inc. These

named parties are not debtors before this Court – they participated in the case as creditors, parties in interest, or were affiliated with parties appearing in the Bankruptcy proceedings. The Non-Circumvention Agreement was not directly before this Court and does not appear to be property of any of the Bankruptcy estates. The Non-Circumvention Agreement, among other things, concerned the protection of certain confidential and proprietary information and the agreement by both sides of the contract not to:

> interfere with, circumvent or attempt to circumvent, avoid, by-pass or obviate each other's interest, or the interest or relationship between the Parties, by any means. The Parties further agree not to initiate any transactional relationship that bypasses one of the Parties in favor of any other individual or entity, in connection with the subject Transactions or any related future Transactions. The Parties also agree not to circumvent or attempt to circumvent this Agreement, including, but not limited to, contracting, negotiating with, or any creditor or other party in interest, of either of the Parties hereto.

The Agreement was dated May 29, 2019, and signed by a representative for ZOM Living on May 30, 3019.

The enforcement of this agreement between these non-debtor parties is pending in the Maricopa County Superior Court and does not affect the administration of any of these Bankruptcy estates. This Court, therefore, makes no binding determination on the liabilities created by such a contract, or whether that contract may be enforced and damages that may or may not subsequently be awarded. The Court finds and concludes that to the extent that Mr. Gray or the Gray entities may have an independent ability to enforce alleged breach of contract claims against ZOM Holding, or any of the ZOM entities, the resolution of any dispute between these non-debtor parties should be completed in the State Court.

Counsel for Mr. Gray and the Gray entities has previously avowed to this Court that they take the position that ZT Property Acquisition, who was the purchaser of the subject properties out of the Bankruptcy Court Sale, had not been created at the time the Non-Circumvention Agreement was executed, and that ZT Property Acquisition is not a defendant in State Court. Further, Mr. Gray and the Gray entities have confirmed that ZT Property Acquisition acquired the land parcels and appurtenant rights to use, enjoy, and develop those parcels it obtained through the Bankruptcy Court sale. *See* Gray entities *Response to Emergency Motion for Temporary Restraining Order, Preliminary Injunction, and Order to Show Cause* filed August 7, 2025 (Dkt # 590), pg. 12, ll 17-19). The Gray parties have repeatedly said that they do not dispute the validity of the sale or the now-final sale order. The Gray parties state there is a distinction between ZT Property Acquisition's acquiring the subject real estate and having a right to use, enjoy and develop the parcels versus acquisition of the intellectual property rights to the projects that it planned to build on those parcels.

The Court discusses at the end of this ruling whether there remained any right to develop on the real properties that was transferred to the jointly administered Debtor entities or if it was possible, absent a post-sale agreement, for any party other than the purchaser to develop the real properties following the sale of those properties out of the respective Bankruptcy estates free and clear of any liens or interests.

As noted above, this Court's jurisdiction after the Bankruptcy case closed is limited. The injunctive relief the ZOM entities seek in the separate Motion for Temporary Restraining Order, Preliminary Injunction, and Order to Show Cause (Dkt # 581) is to enjoin the Gray parties in bringing or asserting claims or causes of action. The ZOM entities seek to enforce the Sale Order or to assert that the Settlement Agreement approved by this Court should forestall any claims made in the State Court proceedings. While there is no direct request for this Court to enjoin the State Court proceedings, granting the request to enjoin the Gray parties from bringing claims or causes of action would indirectly be an assertion by this Court to control the proceedings before the State Court.

These corporate Debtors did not receive a Chapter 7 Discharge, and there is no Discharge Injunction that this Court might enforce or otherwise find has been violated. This Court will not enter an injunction that limits the Maricopa County Superior Court from proceeding with litigation pending before that court, or that could be interpreted as an injunction upon that Court's actions. The State Court is in the best position, especially after the entry of this Court's findings and clarifications, to determine what claims might still be valid and should proceed in that forum.

However, the findings and conclusions of this Court may indirectly impact the outcome of the State Court proceedings based upon a determination of what property interests were transferred into the jointly administered Debtor SPEs pre-petition by the various Gray entities, and based upon what was transferred out of the Bankruptcy estates as a result of the sale free and clear of liens, claims and interests; or whether Mr. Gray or the Gray entities had any ability to develop the properties once they were sold free and clear of liens and interests pursuant to the United States Bankruptcy Code, 11 U.S.C. § 363.

The injunctive relief requested by the ZOM entities to be entered against the Gray parties is beyond the limited purpose that this Court granted the Second Motion to Reopen the Bankruptcy case(s) and is beyond the limited jurisdiction of this Court. The request for injunctive relief against the Gray parties shall therefore be denied.

**EXECUTORY CONTRACT: ANY EXECUTORY CONTRACT INVOLVING THE DEBTORS WAS DEEMED REJECTED BY OPERATION OF LAW DURING THE BANKRUPTCY CASE**

In a separately filed Motion for Determination That Any Executory Contracts Between [the] Gray Entities and Debtors, Not Assumed In [the] Prior Sale, Have Been Deemed Rejected – Motion filed under seal on July 21, 2025 (Dkt # 580) – the ZOM entities ask for a determination that there was no exclusive agreement by the Debtors to develop the respective real properties, and if there were such an agreement, it would have been an executory contract that would be deemed rejected by operation of law under 11 U.S.C. § 365(d)(1). The Court notes that the Gray parties have repeatedly stated both that the State Court litigation will not affect the administration of these jointly administered Bankruptcy cases, and that there were **no agreements between Mr. Gray or any of the Gray entities and the Debtors concerning the development of the individual parcels of real property**. This includes both disclosed and undisclosed agreements, and the Gray parties argue that the reason there were no executory

contracts listed by the Debtors on the Schedules was that there were no such agreements with the Debtors when the Bankruptcy cases were filed.

The Bankruptcy Schedules and Statements of Financial Affairs were filed in these cases at the direction of Mr. Gray when he was the party responsible for each of the Debtor entities when they were Debtors-in-Possession under Chapter 11 or as the Debtors' representative when the cases were converted to Chapter 7. There were no executory contracts disclosed in Schedule G which was filed on May 15, 2020 (Dkt # 65) when the case was pending as a Chapter 11 case. The Court also notes that there were no disclosed transfers to either creditors or insiders, or any other transfers made within two (2) years preceding the Bankruptcy filing not already listed elsewhere on the Statements (SOFA Questions ## 3, 4, and 13) , or property held by the Debtors that another entity owns (SOFA Question # 21), according to the SOFA filed on May 15, 2020 (Dkt # 65). The Court did not find amended Schedule G or amended SOFA after the case was converted to Chapter 7.

The Court finds and concludes that to the extent that there might have been an executory contract between any party and any of the Debtor entities, that such executory contract by operation of 11 U.S.C. § 365(d)(1) was likewise deemed rejected when it was not assumed by the Chapter 7 Trustee within 60 days after the order for relief, or upon conversion of the case from Chapter 11 to Chapter 7. Carrico v. Thompkins (In re Tompkins), 95 B.R. 722, 723-24 (9th Cir. BAP) (When a Chapter 11 case is converted to Chapter 7, the sixty (60) day period to assume or reject an executory contract runs from the conversion date).

**PROPERTY TRANSFERRED TO DEBTOR ENTITIES: THE SPECIAL PURPOSE ENTITIES HELD ALL RIGHT, TITLE, AND INTEREST IN THE REAL PROPERTIES, WITHOUT RESERVATION, WHEN THE VOLUNTARY BANKRUPTCY PETITIONS WERE FILED**

In this case, the question is what did Mr. Gray and the Gray entities transfer to the Special Purpose Entities that eventually became the jointly administered Debtors when the Bankruptcy petitions were filed: Biltmore 24 Investors SPE LLC, case no. 20-bk-04130-MCW; Gray Blue Sky Scottsdale Residential Phase I LLC, case no. 20-bk-04131-MCW; Gray Guarantors I LLC, case no. 20-bk-04133-MCW; Gray Guarantors II, LLC, case no. 20-bk-04134; and Gray Guarantors III, LLC, case no. 20-bk-04136-MCW.

The Special Warranty Deeds, the Assumption and Assignment of the Leasehold Interest, and the Memorandum of Lease (collectively the "Transfer Documents") are attached to the Motion for Clarification filed by the ZOM entities on November 26, 2024 (Dkt # 527). These documents are attached as Exhibits 4A through 4E to Exhibit 4 of the Declaration of Gerald Shelley, pp. 142-163. The documents, the parties involved and the interests that were transferred by way of these documents are as follows:

- Exhibit 4A: Special Warranty Deed dated April 29, 2013, transferring real property from Biltmore Club Apartments on Highland LLC an Arizona limited liability company ("Grantor") to Biltmore 24 Investors SPE L.L.C. and Arizona limited liability company ("Grantee"). The Special Warranty Deed transferred the subject real property "**together with all appurtenant interests, benefits,**

**rights and privileges and any improvements located thereon** (collectively the 'property')." This Special Warranty Deed was recorded in the Maricopa County Recorder's Office on April 29, 2013.

- Exhibit 4B: Special Warranty Deed dated August 24, 2018, transferring real property from Sonoran Desert Land Investors, LLC, an Arizona limited liability company ("Grantor"), to Gray Guarantors I, LLC, an Arizona limited lability company ("Grantee"). The Special Warranty Deed transferred the subject real property "**together with all of Grantor's right title and interest in and to all tangible and intangible rights, privileges, easements, and appurtenances** thereto (collectively the 'Property')." This Special Warranty Deed was recorded in the Maricopa County Recorder's Office on August 24, 2018.
- Exhibit 4C: Special Warranty Deed dated August 24, 2018, transferring real property from East of Epicenter L.L.C., an Arizona limited liability company ("Grantor"), to Gray Guarantors III, LLC, an Arizona limited lability company ("Grantee"). The Special Warranty Deed transferred the subject real property "**together with all of Grantor's right, title and interest in and to all tangible and intangible rights, privileges, easements, and appurtenances thereto** (collectively the 'Property')." This Special Warranty Deed was recorded in the Maricopa County Recorder's Office on August 24, 2018.
- Exhibit 4D: Lease Assignment and Assumption Agreement executed as of the Agreement Date on August 24, 2018, assigning the Leasehold interest in Arizona State Land Department Commercial Lease No. 03-116780-99 from Gray Phoenix Desert Ridge II, L.L.C., an Arizona limited liability company ("Assignor") to Gray Guarantors II, LLC, and Arizona limited liability company ("Assignee"). "**Assignor has agreed to assign to Assignee and Assignee has agreed to assume from Assignee Assignor's right, title, and interest in and to the Lease** (the 'Premises')." This Lease Assignment and Assumption Agreement was recorded in the Maricopa County Recorder's Office on August 24, 2018.
- Exhibit 4E: Memorandum of Lease (Arizona State Land Department Commercial Lease No. 03-116780-99) executed November 1, 2012 between the State of Arizona as Trustee ("Lessor"), through the State Land Commissioner, and Gray Phoenix Desert Ridge II, L.L.C., an Arizona limited liability company ("Lessee"), with respect to the real property located in Desert Ridge ("Parcel"). The leased term commenced on November 1, 2012 and shall continue until July 6, 2092. "**Lessor has leased the Parcel, together with all easements, rights, improvements, and appurtenances thereto**." This Memorandum of Lease was recorded in the Maricopa County Recorder's Office on November 1, 2012.

As to the transfers by Special Warranty Deed, the Gray entities that transferred the real property into the individual Special Purpose Entities each included all right, title, and interest, with all appurtenant interests, benefits, privileges, and both tangible and intangible rights to the real property parcels. **There is nothing in the Special Warranty Deeds that shows a general scheme, a plan of development, or the existence of a reservation of the right to develop the real properties.** As to the transfer of the Arizona State Land Department Commercial Lease No. 03-116780-99 by way of the Lease Assignment and Assumption, there is likewise nothing to show a general scheme, plan of development, or the existence of a reservation of the right to develop the leased property.

Based on the language in the recorded Special Warranty Deeds and the recorded Assumption and Assignment of Lease, the Court finds and concludes that Mr. Gray and the Gray entities that transferred these real properties to the respective Debtor Special Purpose Entities transferred all rights that the Gray entities held in the real property, including the right to later develop the real property without regard to an undisclosed, unwritten development plan that might have limited who might be able to develop the real property parcels. In any event, while the recordation of the transfer of interests gave notice to all future owners of what interests were transferred or might have been retained, in this case, there was no public indication that any development interest was retained, or could be enforced against a subsequent purchaser of the interests in the real property.

At the time of the Bankruptcy Court sale, it was, and remains, the Court's intention to sell the properties without exception, condition or reservation. The Bankruptcy sales afforded the purchaser clear title, meaning free not only of liens, mortgages, and undisclosed easements, but also free of any other legal claims against the properties.

In short, the Court finds and concludes that the Gray entities transferred all right, title, and interest in the real properties, including the right to later develop the real properties and obtain the benefits from such development efforts. **Because the Special Purpose Entities held all right, title, and interest in the real properties when the voluntary Bankruptcy petitions were filed, the respective Bankruptcy estates obtained all legal and equitable interests of the Debtors in the subject properties pursuant to 11 U.S.C. § 541(a)(1).**

**PROPERTY SOLD OUT OF THE BANKRUPTCY ESTATES WAS NOT THROUGH A TRUSTEE SALE; THE GRAY ENTITIES PLACED ALL OF THE ASSETS OF THE SPEs IN BANKRUPTCY WHERE THEY BECAME PROPERTY OF THE BANKRUPTCY ESTATES**

The Court notes that the Gray parties have made some references about not wishing to overturn the "Trustee Sale Order" or unwind the "Trustee Sale." As discussed with counsel during a hearing in this matter, the Court questions whether these terms are simply shorthand labels, or if the Gray entities are conflating them in an attempt to make a connection in the Non-Circumvention Agreement, or the State Court proceedings, and participation in a trustee sale, which is a non-judicial proceeding allowed under Arizona's deed of trust statutes. The sale that occurred in the Bankruptcy Court ***was not a trustee's sale conducted under the Arizona deed of trust statutes, or a judicial mortgage foreclosure***, which is also allowed under the Arizona

Statutes. Instead, the sale of the subject real properties in Bankruptcy Court ***was conducted as a Sale Free and Clear of Liens and Interests under 11 U.S.C. § 363***. Because the jointly administered Bankruptcy cases had converted to Chapter 7, a Chapter 7 Trustee had been appointed, and the Chapter 7 Trustee filed the Motion to Approve the Sale(s). But this was in no way a trustee sale, as allowed by the Arizona Statutes.

As explained above, Mr. Gray and the Gray entities transferred all right, title, and interest when transferring the subject real properties into the individual Debtor Special Purpose Entities. As to what property was transferred out of the jointly administered Bankruptcy estates, the Court finds and concludes that all interests held by the respective Bankruptcy estates were transferred to the successful purchaser. No evidence has been presented showing that in transferring the subject real properties into the individual Debtor entities that any property right or interest was retained or withheld from that transfer. No evidence has been presented at any time that there was an executory contract that would have granted an exclusive right to any of the Gray parties to develop the subject real properties, and in fact the Gray parties disavow that any executory contract existed. No evidence has been presented at any time that there was an undisclosed agreement in writing made either before or after the Bankruptcy petitions were filed that granted an exclusive interest to any party regarding the future development of the subject properties. To the extent that a right to develop specific projects on a particular piece of real property is an interest in that real property, or an interest that runs with the land, such right must be in writing to be enforceable. Likewise, an agreement which is not to be performed within one year from the making thereof must also be in writing. See Arizona's Statute of Frauds, Arizona Revised Statutes § 44-101 (6) and (5).

The bankruptcy process is initiated by a debtor filing a petition with the bankruptcy court. This action immediately creates the bankruptcy estate. The estate includes all legal and equitable interests in the property that the debtor holds as of the petition date. This is an extremely broad definition and includes both tangible assets (like real estate and vehicles) and intangible assets (like stock options, lawsuits, and intellectual property). The Court finds and concludes that to the extent that there might have been an executory contract between any party and any of the Debtor entities, that such executory contract by operation of 11 U.S.C. § 365(d)(1) was likewise deemed rejected when it was not assumed by the Chapter 7 Trustee within 60 days after the order for relief, or upon conversion of the case from Chapter 11 to Chapter 7.

The Court further finds and concludes that any undisclosed or unperfected right to develop the subject properties, or receive the financial benefits from such development was cut off by operation of 11 U.S.C. § 544, where the trustee (or a debtor asserting the rights of a trustee when acting as a debtor in possession) is deemed to hold the rights of a bona fide purchaser of the property for value that has been perfected as of the commencement of the Bankruptcy case.

Accordingly, the Court finds and concludes that the buyer of the subject properties, in this case ZT Property Acquisition, had the exclusive right to develop the subject properties, and to thereby receive the economic or financial reward from such development, once the sale free and clear of liens and interests was finalized and officially closed on January 15, 2021, as indicated in the Trustee's Report of Sale filed on January 20, 2021 (Dkt # 424).

As to the argument that the Gray entities retained the intellectual property rights to the projects planned in the future development of the specific real estate parcels, this Court notes that the Non-Circumvention Agreement did include obligations and protections for certain confidential and proprietary information, and also defined what information was confidential and proprietary and what was not. Through this ruling, the Court makes no determination on whether the Non-Circumvention Agreement was breached, only that ZT Property Acquisition by successfully purchasing the subject real property out of the Bankruptcy estates received all right, title, interest, and appurtenant interest to the parcels of real property acquired, including the right to develop those parcels of real property. This point is conceded by the Gray entities. There was no *per se* prohibition against ZT Property Acquisition, as the owner of the parcels, using non-confidential or proprietary information or producing its own plans to develop the properties.

The Court comments that the Non-Circumvention Agreement was a pre-petition contract entered into by two non-debtor parties and was therefore never before this Court for consideration. It was Mr. Gray or the Gray entities, at the direction of Mr. Gray, who transferred these properties into the Special Purpose Entities. They then put these Special Purpose Entities into bankruptcy. The Bankruptcy cases were voluntary cases, and Mr. Gray remained as the party responsible for the Debtors, or the representative of the Debtors, after the Bankruptcy filings. By filing the voluntary Bankruptcy petitions, it was Mr. Gray or the Gray entities that initiated the outcome where the Bankruptcy Court sold these properties free and clear of all liens and interests, thereby cutting off any claim they might have had to develop the properties.

The Gary parties have said there were no agreements in place or retained rights (or intellectual property) between the Gray parties and the Debtor Special purpose Entities. The Gray parties have also stated in hearings and documents filed in this Court that the buyer, ZT Property Acquisition, could not have been a party to the Non-Circumvention Agreement because that entity was not in existence when the agreement was executed. Further as the buyer of the real properties from the Bankruptcy estates free and clear of liens and interests, the Gray parties agree that ZT Property Acquisition had the right to develop the properties.

So, it is difficult to see how Mr. Gray or any of the Gray entities could assert a claim for damages based on the value of a development that was impossible to complete by Mr. Gray and any non-debtor Gray entities. At the direction of Mr. Gray, the various Gray entities transferred the individual real property interests into the separate Special Purpose Entities; there was no written or recorded reservation or assignment of the right to develop the individual real properties that occurred at that time. At the direction of Mr. Gray, each of the Special Purpose Entities filed voluntary Chapter 11 Bankruptcy petitions, thereby making the real property interests held by the Debtor Special Purpose Entities into property of the individual Bankruptcy estates. The individual Bankruptcy estates were jointly administered. At no time prior to the eventual sale out of the Bankruptcy estates was there a transfer of the development rights out of the Bankruptcy estates back to Mr. Gray or any other non-debtor Gray entity. Such a post-petition transfer would have had to be approved by the Bankruptcy Court to be effective. After the cases were converted to Chapter 7 and the Gray entities who had filed for Bankruptcy protection were no longer acting as debtors-in-possession; the Chapter 7 Trustee initiated an action to sell the

real properties, and the properties were sold out of the Bankruptcy estates free and clear of any liens or interests. Once the properties were sold free and clear of interests out of the individual Bankruptcy estates, there was no interest in the real properties held by Mr. Gray or any of the Gray entities, either Gray entities that had filed for Bankruptcy protection or those that had not. At that time, it was therefore an impossibility for Mr. Gray or any of the non-debtor Gray entities to assert an absolute right to develop the real properties that they no longer owned or controlled. The only way that Mr. Gray or a Gray entity, or any party other than the purchaser out of the Bankruptcy estate to assert a right to develop the individual real properties would have been if there was an agreement which was made after the sale or became effective after the sale of the properties out of the Bankruptcy estates. The development of the properties based on a purported pre-petition or pre-sale right or undisclosed and unwritten agreement was impossible not only because the sale cut off any such right, but there no longer was any form of ownership or control of the underlying real property upon which a development might occur, other than the ownership and control granted to the buyer out of the Bankruptcy sale. At this time there has been no evidence presented to this Court that an agreement that became effective after the sale granting the right to develop the real properties has ever been made.

**CONCLUSION:**

This ruling disposes of the Motion for Clarification, the Motion for Injunctive Relief, and the Motion for Determination that Any Executory Contracts Not Assumed Prior to Sale Have Been Deemed Rejected, and any responses. After an exhaustive review of the record in this case, and the Motions and Responses filed by the parties, the Court has determined that the Second Motion to Reopen the Case was granted for the limited purpose of this Court determining what rights the Debtor entities held at the time of the Bankruptcy filing, and whether those rights included the unencumbered right to develop the real properties that were the assets in these jointly administered Bankruptcy estates. The Court also has limited jurisdiction when re-opening a case to matters that would affect the administration of the Bankruptcy case, or to extremely limited ancillary jurisdiction.

Based on the limited purpose for re-opening the Bankruptcy case and the limited jurisdiction in a Bankruptcy case that has previously been closed, the Court will not grant any form of injunctive relief to the ZOM parties.

The Court has found that the right to develop the real properties was included with the real property, and there was no written or recorded reservation of a separate right to develop the real properties that would have given a subsequent purchaser notice that such a claim had been reserved.

Further, as the Gray parties acknowledge, there were no executory contracts between any of the Gray entities and the Debtors concerning the right to develop any of the parcels of real property. But even if there were an executory contract, by operation of 11 U.S.C. § 365(d)(1), any such executory contract is deemed rejected if it is not assumed, or extension of time has not timely been granted, upon the sixtieth (60th) day after the entry of the order for relief, or in this case upon conversion from Chapter 11 to Chapter 7. Additionally, a right to develop the real

property based on the Arizona Statute of Frauds must be in writing because it involves an interest in the real property to be developed, and , alternatively, it must be in writing if it is based on an agreement that is not to be performed within one year of making the agreement. Last, even if there were an undisclosed, unwritten, and unperfected interest in the real property based on a reserved right to develop the real properties, upon the filing of the Bankruptcy cases, the Trustee's strong arm powers under 11 U.S.C. § 544, because of the Trustee's status as a hypothetical lien creditor who purchased for value and whose interest was perfected upon the commencement of the Bankruptcy case would eliminate any such unperfected interest.

The Court has determined that there was no written or recorded reservation of right to develop the real properties that any potential executory contract was rejected as a matter of law pursuant to the Bankruptcy Code, and that the buyer of the real properties out of the Bankruptcy estates received the right to develop the real properties. The Court also found that the State Court proceedings based on the Non-Circumvention Agreement would need to be resolved by the State Court and commented that it was difficult to understand how damages might arise under that contract if it was impossible for the Gray entities to develop and build on the subject properties once they were sold out of the Bankruptcy estates free and clear of any liens or interests. Accordingly,

**IT IS ORDERED granting** the ZOM entities' Motion for Clarification, as stated herein;

**IT IS FURTHER ORDERED finding** that any executory contracts related to the subject real property parcels, if any existed, are rejected by operation of the Bankruptcy Code, and there are no existing undisclosed, unwritten, and unperfected interests in the real property that have survived the Trustee's strong-arm powers; and

**IT IS FURTHER ORDERED denying** the ZOM entities' request to impose injunctive relief.

**IT IS FURTHER ORDERED directing** the Clerk of Court to close these Bankruptcy cases thirty (30) days from the date of this Order unless the parties file a motion requesting that the Court keep the administrative case open or, if such a motion is filed, upon further Court order.

**Exhibit D**

Clerk of the Superior Court
*** Filed ***
05/15/2026 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-010650 05/12/2026

HONORABLE ADELE PONCE

CLERK OF THE COURT
L. Gilbert
Deputy

GRAY SERVICES L L C, et al. JAIME R BARRIOS

v.

Z O M HOLDING INC CHRISTOPHER L CALLAHAN

BRETT C GILMORE
DOCKET CV TX
JUDGE PONCE

MINUTE ENTRY

This case proceeded to a jury trial on September 16, 2025. On October 3, 2025, after full presentation of the evidence and jury deliberation, the jury returned its verdict. The jury found Defendant ZOM Holding, Inc. liable for breach of contract and breach of the implied duty of good faith and fair dealing, awarding Gray Services, LLC $148,224,312 and Gray Development LLC $148,224,312.

The Court has also considered Plaintiffs' application for costs and attorneys' fees, and is awarding $12,083,752 in attorneys' fees and $19,955.07 in costs.

Accordingly,

IT IS ORDERED Gray Services, LLC shall recover $148,224, 312 in compensatory damages from ZOM Holding, Inc.

IT IS FURTHER ORDERED Gray Development LLC shall recover $148,224,312 in compensatory damages from ZOM Holding, Inc.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-010650 05/12/2026

IT IS FURTHER ORDERED Gray Services, LLC and Gray Development LLC shall recover 8.25% interest on the above amounts from ZOM Holding, Inc. starting from the date of the jury's verdict October 3, 2025, until the date of the judgment, May 12, 2026.

IT IS FURTHER ORDERED Gray Services, LLC and Gray Development LLC shall recover $12,083,752 in attorneys' fees from ZOM Holding, Inc.

IT IS FURTHER ORDERED Gray Services LLC and Gray Development LLC shall recover $19,955.50 in costs from ZOM Holding, Inc.

IT IS FURTHER ORDERED Gray Services, LLC and Gray Development LLC shall recover 8.25% interest on the above amounts, not including prejudgment interest, from ZOM holding, Inc., starting from the date of the judgment, May 12, 2026, until the judgment is paid.

No further matters remain pending. This is a final judgment as to all claims and parties entered under Arizona Rule of Civil Procedure 54(c).

/ s / ADELE G. PONCE
JUDGE OF THE SUPERIOR COURT

**Exhibit E**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BILTMORE 24 INVESTORS SPE, LLC CH: 7 | ) | 2:20-bk-04130-MCW |
| | ) | |
| ZOM'S SECOND MOTION TO REOPEN BANKRUPTCY CASE | ) | |

U.S. Bankruptcy Court
230 N. First Avenue, Suite 101
Phoenix, AZ 85003-1706

January 7, 2025
11:30 a.m.

BEFORE THE HONORABLE MADELEINE C. WANSLEE, Judge

APPEARANCES:

For ZT Acquisitions: Chris Callahan
Brett Gilmore
Greg West
Jason Haun

For Gray Development Group: David L. Neale
Michael G. D'Alba
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, CA 90034

Also Present: Bruce Gray

Proceedings recorded by electronic sound technician, Michelle Stevenson; transcript produced by eScribers, LLC.

eScribers
www.escribers.net | 800-257-0885

we didn't say X, Y, Z at any of these hearings. Well, if ZT Acquisition thought this was so critical, I mean, this litigation's been going on for years. Why haven't they moved to intervene in all this time to say, hey, judge in the state court, our rights are being affected by this litigation. We're an indispensable party. We need to participate.

THE COURT: But your complaint does cite the noncircumvention agreement, and it identifies the affiliates and subsidiaries of the parties to the contract. By necessity, that includes ZT Acquisition, regardless of whether you have formally named ZT Acquisition as a party. And doesn't it make sense that this Court should use Section 541 to determine what was property of the estate or not?

MR. NEALE: Your Honor, the noncircumvention agreement was created before ZT Acquisition was even in existence. ZT Acquisition was a special purpose entity that was created to go forward with the sale. So I don't know how it could have been party to a contract when it didn't even exist at the time that the contract was entered. So that's number one. Second, the --

THE COURT: But they are in fact an affiliated party --

MR. NEALE: but Your Honor --

THE COURT: -- to the parties to the contract that you sit on.

MR. NEALE: Your Honor, how could they be an affiliated party to a contract when they weren't even in existence at the time the contract was entered?

THE COURT: Well, didn't you list them, not as a party, but as an affiliate?

MR. NEALE: No. And because they couldn't have existed. Its affiliates at the time the -- it can't be that when you say a contract is between party A and its affiliates and party B and its affiliates, that 50 years later, there's a new affiliate that's created and all of a sudden that affiliate is bound -- by that affiliate is bound by the contract that was entered into 50 years ago?

THE COURT: Just your state court complaint states that ZT Development LP was listed as the buyer in the sale agreement, but it also says that the noncircumvention agreement, that that's what it cites to and identifies the affiliates and the subsidiaries of the parties to the contract. That's the language of your complaint.

MR. NEALE: Right. So it's the affiliates to the contract at the time the contract is executed. That couldn't be anything other than that. Your Honor, also, you're referencing Section 541, but that's not the relief that's been thought. So if there was an -- if there was a declaratory relief action being brought under 541 --

THE COURT: I'm just trying to determine whether to

And so with that, the matter, again, is taken under advisement. And we'll adjourn these proceedings until further notice.

(Proceedings Concluded)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated: January 9, 2025

eScribers, LLC
7227 N. 16th Street
Suite #207
Phoenix, AZ 85020