**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **In Re:**<br><br>**ZOM HOLDING, INC.,**<br>**ZOM ASSOCIATES, INC.**<br>**ZH DEVELOPMENT I, LLC,**<br><br>**Debtors.** [1] | **Lead Case No.: 6:26-bk-08509-GER**<br><br>**Chapter 11**<br><br>**(Joint Administration Requested)**<br><br>**Case No. 6:26-bk-08511-GER**<br>**Case No. 6:26-bk-08515-GER** |

# DEBTORS' *EMERGENCY* MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) APPROVING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) MODIFYING AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

**(Emergency Hearing Requested)**

## BASIS FOR EMERGENCY HEARING AND RELIEF

In accordance with Rule 2081-1(g)(1)-(2) of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida, the Debtors respectfully request that the Court conduct an emergency hearing on the Motion as soon as the Court's schedule permits. The Debtors require immediate access to supplementary funding through the DIP Facility to preserve ongoing operations. Without immediate approval of the DIP Facility, which includes authorization to use Cash Collateral, the Debtors will be unable to meet their day-to-day obligations. Cessation of operations would severely prejudice creditors and diminish the value of Estate assets.

ZOM Holding, Inc. ("ZHI") and its affiliated debtors (collectively, the "Debtors"), the debtors and debtors in possession in the above-captioned bankruptcy cases (the "Chapter 11 Cases"), respectfully file this motion (the "Motion") requesting approval of the DIP Facility (defined below) on an interim and final basis and related relief. The Debtors submit the

[1] The Debtors in these Chapter 11 Cases and the last four digits of their EINs are ZOM Holding, Inc. (8703), ZH Development I, LLC (1156), and ZOM Associates, Inc. (0836). The Debtors' address is 1511 East State Road 434, Suite 1005, Winter Springs, FL 32708.

*Declaration of Neil Luria in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration") and the *Declaration of Neil Luria in Support of DIP Motion* (the "DIP Declaration")[2] in support of the Motion. The Debtors further state as follows:

**RELIEF REQUESTED**

1. By this Motion, the Debtors seek entry of interim and final orders (the "Interim Order" and "Final Order,"[3] collectively, the "DIP Orders"), substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**:

a. authorizing Debtor ZOM Holding, Inc. in its capacity as borrower (the "Borrower"), and ZH Development I, LLC and ZOM Associates, Inc., each in its capacity as guarantor (the "Guarantors"), to obtain postpetition financing on a joint and several basis, the Borrower's obligations in connection with a debtor-in-possession financing comprising a non-amortizing, priming, superpriority senior secured term loan facility in an aggregate principal amount not to exceed $10,342,340.00 in term loan commitments (the "DIP Facility"), which consists of (i) an initial commitment in the amount of $5,013,846.00 (the "Initial DIP Commitment"), and (ii) a commitment in the amount of up to $1,500,000.00 in respect of the additional amounts required to pay reasonable fees and expenses of Debtor Professionals, solely to the extent provided for in the DIP Term Sheet (such amount, if any, the "Additional Professional Fee DIP Advance" and the related commitment, if any, the "Incremental DIP Commitment" and, together with the Initial DIP Commitment, the "DIP Commitments"; and the Interim DIP Loans and Final DIP Loans (each as defined below) advanced thereunder, the "New Money DIP Loans"), and (iii) upon entry of the Final Order, a deemed term loan "roll-up" postpetition financing of the outstanding Prepetition Secured Obligations in an amount equal to $3,828,494, of which $3,773,819 is the original principal amount and $54,676 is accrued and capitalized interest (the "Roll-Up Loan" and, together with the New Money DIP Loans, the "DIP Loans");

b. authorizing the Debtors (i) to enter into the *Senior Secured Priming Debtor in Possession Term Loan Facility Summary of Terms and Conditions* among the Borrower, the Guarantors, the lender party thereto (the "DIP Lender") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Term Sheet," together with all agreements, documents, and instruments delivered or executed in connection therewith, the "DIP Documents"), which shall be in substantially the same form attached to the Interim Order as **Exhibit 1**, and (ii) to perform their respective obligations thereunder and all such

[2] The DIP Declaration is attached as **Exhibit C**.

[3] Debtor will file a proposed Final Order prior to the final hearing on the Motion.

other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

c. authorizing the Debtors (x) to use the proceeds of the New Money DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the terms hereof, including pursuant to the DIP Budget (as defined herein) as further described herein, to pay fees and interest under the DIP Facility, to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of any Adequate Protection Obligations (as defined herein), and (y) upon entry of the Final Order, to effectuate the Roll-Up Loan;

d. granting adequate protection to (x) the lender under that certain *Secured Note*, dated as of February 4, 2026 (as amended, supplemented or otherwise modified, the "Prepetition Secured Note" and, together with all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith, each as amended, supplemented or otherwise modified, the "Prepetition Secured Note Documents"), by and among ZOM Holding, Inc. (in such capacity, the "Prepetition Borrower"), ZOM Holding, LP (in such capacity, the "Prepetition Secured Lender");

e. authorizing and directing the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the Upfront Fee (as defined herein), the Exit Fee (as defined herein), and the reasonable fees and disbursements of the DIP Lender's attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

f. granting valid, enforceable, non-avoidable and fully perfected first priority liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Lender, that was not subject to a valid and perfected lien on the Petition Date (such property and assets, the "Unencumbered Assets"), except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, including, Avoidance Actions (as defined herein), subject only to the Carve-Out (as defined herein) and, if any, the Permitted Priority Liens (as defined herein) on the terms and conditions set forth herein and in the DIP Documents;

g. granting valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Lender, except as

otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of Section 541 of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, subject only to the Carve-Out and, if any, the Permitted Priority Liens on the terms and conditions set forth herein and in the DIP Documents;

h. granting valid, enforceable, non-avoidable and fully perfected liens on and junior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Lender, except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, that is subject to valid and perfected security interests in and liens on such property in favor of third parties existing on the Petition Date, excluding the Prepetition Liens (as defined below), subject only to the Carve-Out and, if any, the Permitted Priority Liens on the terms and conditions set forth herein and in the DIP Documents;

i. granting superpriority administrative expense claims against each of the Debtors' estates in favor of the DIP Lender, with respect to the DIP Obligations (as defined herein) with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve-Out on the terms and conditions set forth herein and in the DIP Documents;

j. waiving the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), subject to entry of the Final Order (but retroactive to the Petition Date);

k. authorizing the DIP Lender to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of a DIP Termination Event (as defined herein);

l. modifying the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and DIP Orders;

m. pursuant to Bankruptcy Rule 4001, setting an interim hearing (the "Interim Hearing") on the Motion held before this Court (defined below) to consider entry of the Interim Order, and setting a final hearing (the "Final Hearing") to consider entry of the Final Order authorizing and approving, on a final basis, among other things, the Borrower's borrowing from the DIP Lender under the DIP Documents up to an aggregate principal amount of $10,342,340.00 in DIP Loans, the Roll-Up Loan and the continued use of Cash Collateral and granting adequate protection, in

each case, as described herein and as set forth in the DIP Documents; and

n. granting related relief.

## STATEMENT OF MATERIAL TERMS OF DIP FACILITY

2. The following chart contains a summary of the material terms of the proposed DIP Facility and Interim Order in accordance with Rules 4001(b)(1)(B) and 4001(c)(1)(B) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" and each, a "Bankruptcy Rule"), and Rule 2081-1(g)(1)-(2) of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida (the "Local Rules" and each, a "Local Rule"):

| Bankruptcy Rule | Summary of Material Terms[1] |
|---|---|
| **Parties to the DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B) | **Borrower:** ZOM Holding, Inc. (the "Borrower").<br><br>**Guarantors:** Each direct and indirect affiliate and subsidiary of the Borrower that commences a Chapter 11 Case, including the entities identified on Exhibit 1 to the DIP Term Sheet (each, a "Guarantor" and collectively, the "Guarantors"; together with the Borrower, each a "Loan Party" and collectively, the "Loan Parties").<br><br>**DIP Lender:** ZOM Holding, LP or any other entity it designates. |
| **Term**<br>Bankruptcy Rules 4001(b)(1)(B)(iii), 4001(c)(1)(B) | All DIP Obligations shall be due and payable in full in cash, or in such other form of consideration as the DIP Lender and the Borrower may mutually agree, on the earliest of: (i) March 29, 2027; (ii) the effective date of any chapter 11 plan with respect to a Loan Party; (iii) entry of an order approving a sale of the Debtors' assets to a buyer other than the DIP Lender or its designee; (iv) consummation of a sale or other disposition of all or substantially all assets of the Loan Parties to the DIP Lender or its designee; (v) acceleration of the DIP Loans and termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default; (vi) filing of a cause of action by the Debtors or a third party with the Debtors' support against the Prepetition Secured Parties, the DIP Lender, or their related parties as described in the DIP Term Sheet; (vii) dismissal or conversion of any Chapter 11 Case, or appointment of a trustee or examiner with enlarged powers in any Chapter 11 Case; and (viii) thirty-five (35) days after the Petition Date unless the Final DIP Order has been entered or the DIP Lender extends that date in writing (the earliest such date, the "DIP Termination Date"). The DIP Lender's rights are subject to the Waiting Period. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility is a non-amortizing, priming, superpriority senior secured term loan facility in an aggregate principal amount not to exceed $10,342,340.00, consisting of (i) an initial commitment of $5,013,846.00 and (ii) an incremental commitment of up to $1,500,000.00 for reasonable fees and expenses of Debtor Professionals (the "Additional Professional Fee DIP Advance"). DIP Loans repaid may not be reborrowed. The Additional Professional Fee DIP Advance is subject to the conditions in Section 17 of the DIP Term Sheet, including passage of at least ninety (90) days after the Petition Date, agreement on an updated Budget specific to that advance, and acceptable good-faith fee estimates demonstrating that the initial professional-fee Budget is insufficient. Upon entry of the Final DIP Order, the DIP Facility will include a deemed term-loan roll-up of the outstanding Prepetition Secured Obligations in an amount equal to $3,828,494, of which $3,773,819 is the original principal amount and $54,676 is accrued and capitalized interest, in each case as set forth in the DIP Term Sheet. New-money advances shall be available in accordance with the draw mechanics and conditions set forth in the DIP Term Sheet, including an Initial Draw within three (3) Business Days after entry of the Interim DIP Order and Other Draws upon three (3) Business Days' written notice (or such shorter period as the DIP Lender agrees in its sole discretion), at any time before the date that is three Business Days before the DIP Termination Date, subject to the available undrawn DIP Commitments. |

[1] The following summary of the DIP Facility is qualified in its entirety by reference to the applicable provisions of the relevant DIP Documents or the Interim Order, as applicable. To the extent there are any inconsistencies between this summary and the provisions of the DIP Documents or the Interim Order, the provisions of the Interim Order or the DIP Documents, as applicable, shall control. Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the DIP Documents or the Interim Order, as applicable.

| | |
|---|---|
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Each borrowing under the DIP Facility is subject to satisfaction or written waiver by the DIP Lender of all conditions precedent applicable to the Initial Draw or Other Draws, as applicable, set forth in the DIP Term Sheet, including the applicable order-entry, Budget, lien-perfection, fee-payment, borrowing-notice, representation, covenant, Milestone, and no-default conditions. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Interest Rate**: The DIP Loans bear interest at Term SOFR plus 2.50% per annum, paid in kind quarterly in arrears by adding accrued and unpaid interest to the outstanding principal balance on the last Business Day of each fiscal quarter (the "Non-Default Interest"). Interest is computed on the basis of a 365- or 366-day year, as applicable, and actual days elapsed, subject to the additional terms and definitions set forth in the DIP Term Sheet.<br><br>**Default Interest Rate**: Following the occurrence and during the continuance of an Event of Default, the DIP Loans bear interest at the rate otherwise applicable to the DIP Loans plus 2.00% per annum, payable in cash, together with the Non-Default Interest, on demand. |
| **Use of DIP Facility and Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | Proceeds of the DIP Loans and Cash Collateral shall be used, in each case subject to the Budget (including the Permitted Variance), the DIP Term Sheet, and the DIP Orders, solely to (i) provide working capital and fund other general corporate purposes of the Debtors, (ii) fund the costs of administering the Chapter 11 Cases, including professional fees and expenses, and (iii) fund fees and other payments contemplated in respect of the DIP Facility. |
| **Limitations on Use of DIP Facility and Cash Collateral** | No DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out, or any other cash or funds may be used, directly or indirectly, by any of the Debtors, any official committee appointed in the Chapter 11 Cases (the "Committee"), or any trustee or other estate representative appointed in the Chapter 11 Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to object to, contest, prevent, hinder, delay, or interfere with, in any way, the DIP Lender's or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, Prepetition Collateral, or Cash Collateral, following the occurrence and continuation of a DIP Termination Event; or (b) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, against any of the Prepetition Secured Parties and the DIP Lender, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (in each case, in their respective capacities as such) with respect to any transaction, occurrence, omission, action, or other matter arising under, in connection with, or related to the Interim DIP Order, the DIP Facility, the DIP Documents, the DIP Facility Obligations, the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Documents or the transactions contemplated therein or thereby, or any other matters relating to the Debtors, including, without limitation, (A) any Avoidance Actions (as defined below), (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Claims, the DIP Liens, the DIP Documents, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Secured Obligations, the Prepetition Documents, the Prepetition Liens, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, or |

| | |
|---|---|
| | recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Claims, the DIP Collateral, the Prepetition Secured Obligations, the Prepetition Collateral, the Adequate Protection Liens, and the Adequate Protection Claims, or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to the DIP Lender hereunder or under any of the DIP Documents or the Prepetition Secured Parties hereunder or under any of the Prepetition Documents, as applicable (in each case, including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay any of the DIP Lender's or the Prepetition Secured Parties' assertions, enforcements, realizations, or remedies on or against the DIP Collateral or Prepetition Collateral in accordance with the applicable DIP Documents or Prepetition Documents and the Interim DIP Order and/or the Final DIP Order (as applicable)); *provided*, that no more than $25,000 in the aggregate of the DIP Collateral, the Carve-Out or Cash Collateral, proceeds from the borrowings under the DIP Facility or any other amounts, may be used for allowed fees and expenses incurred solely by any Committee (if appointed) in investigating, but not objecting to, challenging, litigating, opposing, prosecuting, or seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the Prepetition Liens, the Prepetition Documents, the Adequate Protection Liens, or the Adequate Protection Claims prior to the Challenge Deadline. Except to the extent expressly permitted by the terms of the DIP Documents and the Interim DIP Order or any further order of this Court, none of the Debtors, any Committee (if appointed), or any trustee or other estate representative appointed in the Chapter 11 Cases or any other person or entity may use or seek to use Cash Collateral or, to sell, or otherwise dispose of DIP Collateral or Prepetition Collateral, in each case, without the consent of the DIP Lender. |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | ZOM Holding, LP, in its capacity as noteholder under the Prepetition Secured Note (the "Prepetition Lender" and, together with its agent under the Prepetition Secured Note, if applicable, the "Prepetition Secured Parties"), holds the interests in Cash Collateral described in the DIP Documents. |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | No fees, including any exit fee, shall be payable under the DIP Facility, excluding fees and expenses of counsel as provided for in Section 32 of the DIP Term Sheet. The Debtors shall pay all reasonable and documented out-of-pocket legal and other professional fees and expenses related to negotiating, documenting, approving, administering, monitoring, or enforcing the DIP Facility, promptly upon written demand and without further Bankruptcy Court approval. Failure to make such payment that is not provided for in the Approved Budget shall not constitute an Event of Default. |
| **Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The use of Cash Collateral and DIP proceeds is subject to the 13-week cash flow forecast attached as Exhibit 2 to the DIP Term Sheet, as updated only in accordance with the DIP Term Sheet (the "Budget" or "Approved Budget"). |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(1)(B) | By 5:00 p.m. Eastern Time on the fourth Business Day of each week, commencing after the second full week after the Petition Date, the Borrower shall deliver a Variance Report comparing actual results for each Budget line item with the Budget and identifying adverse variances exceeding the Permitted Variance. The Debtors shall also provide financial and operational information and access required by the DIP Term Sheet, including copies of material proposed pleadings and other covered documents as soon as reasonably practicable and no less than two days before filing or distribution. |
| **Budget Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Compliance with the Approved Budget is measured weekly on both a cumulative one-week basis and a cumulative basis from the Petition Date. The permitted adverse variance is (i) up to 10% for total disbursements on a line-item basis, except that the permitted variance for professional fees and expenses is 0% when measured on a cumulative basis, and (ii) up to 10% in the aggregate for Total Receipts (the "Permitted Variance"), in each case as set forth in the DIP Term Sheet. |

| | |
|---|---|
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility is subject to the chapter 11 milestones set forth on Exhibit 3 to the DIP Term Sheet, including: (i) entry of the Interim Order within three (3) Business Days after the Petition Date; (ii) entry of the Final Order within thirty-five (35) days after the Petition Date; (iii) filing of the Bid Procedures Motion within seven (7) calendar days after the Petition Date; (iv) entry of the Bid Procedures Order within thirty-five (35) days after the Petition Date; (v) a hearing to approve the winning bid and entry of the Sale Order within one hundred and twenty (120) days after the Petition Date; (vi) if the Sale Order approves a Sale to an Other Successful Buyer, within three (3) Business Days after entry of the Sale Order, either the DIP Lender's consent to extend the DIP Termination Date or Payment in Full of the then-outstanding DIP Obligations; (vii) consummation of the Sale within one hundred and fifty (150) days after the Petition Date, in each case subject to extension or waiver by the DIP Lender in writing; and (viii) addressing maturities of project-level financings guaranteed by ZOM Holding, Inc. as follows: Ludham Phase I and Phase II land loans by November 17, 2026; Azola Avery Centre by December 9, 2026; Carpenter Fire in Cary land loan by January 17, 2027; and Hazel & Azure National Landing by March 25, 2027. |
| **Guaranties**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Each direct and indirect affiliate and subsidiary of the Borrower that commences a Chapter 11 Case will absolutely and unconditionally guarantee, on a joint-and-several basis, the prompt payment when due and performance of the DIP Obligations as a guaranty of payment and performance and not merely of collection, subject to the DIP Orders. Each guaranty will remain unaffected by the genuineness, validity, regularity, or enforceability of the DIP Obligations or the instruments evidencing them; the existence, validity, enforceability, perfection, nonperfection, or extent of related collateral; or facts or circumstances that might otherwise constitute a defense, other than irrevocable payment in full. Each Guarantor will waive all defenses relating to the foregoing other than the defense of irrevocable payment in full. |
| **Prepetition Roll-Up**<br><br>Bankruptcy Rule 4001(c)(1)(B)(v) | Upon entry of the Final DIP Order, the DIP Facility will include a deemed term-loan roll-up of the outstanding Prepetition Secured Obligations in an amount equal to $3,828,494, of which $3,773,819 is the original principal amount and $54,676 is accrued and capitalized interest. |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i) | **Liens and Priorities.** Subject only to the Carve-Out, the DIP Obligations shall be entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code. Subject to the Carve-Out and Permitted Priority Liens, the DIP Obligations shall be secured by (i) automatically perfected first-priority liens under section 364(c)(2) on unencumbered DIP Collateral, (ii) automatically perfected junior liens under section 364(c)(3) on DIP Collateral subject to Permitted Priority Liens, and (iii) automatically perfected priming first-priority liens under section 364(d)(1) on DIP Senior Collateral subject to valid, perfected, non-avoidable liens, in each case as set forth in the DIP Term Sheet and DIP Orders. |
| **Liens on Avoidance Actions and Proceeds**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The DIP Collateral includes all claims and causes of action, including chapter 5 avoidance actions, and all proceeds thereof, subject to the priorities and limitations set forth in the DIP Term Sheet and DIP Orders. |
| **Debtor Stipulations and Admissions**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors will stipulate to the amount and validity of the Prepetition Secured Obligations; the validity, perfection, enforceability, nonavoidability, and priority of the Prepetition Liens; the value of the Prepetition Collateral; and the absence of defenses, objections, offsets, counterclaims, and avoidance claims, subject to the Investigation Period and Challenge rights set forth in the DIP Orders. |

| | |
|---|---|
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Committee, if appointed, and any other party in interest with proper standing granted by the Court have until the earlier of (i) sixty (60) calendar days after the Petition Date and (ii) the qualified-bid deadline established by the Bid Procedures Order (the "Investigation Period") to investigate and commence an adversary proceeding or contested matter concerning the Challenge Matters described in the DIP Term Sheet. The period may be extended only by the applicable Prepetition Secured Party's prior written consent or Court order. Except to the extent timely asserted, Challenges are forever waived and barred; relevant stipulations become binding; the Prepetition Secured Obligations are finally allowed; the Prepetition Liens are deemed valid, binding, enforceable, and nonavoidable; and the Prepetition Lender receives the release specified in the DIP Term Sheet, solely in its capacity as Prepetition Lender and as to acts or omissions in that capacity. A timely Challenge preserves only matters expressly and successfully challenged; all other parties remain bound. The Prepetition Lender retains its rights to contest any Challenge. Investigation rights do not recognize or consent to Committee standing. The DIP Lender's release, solely in its capacity as DIP Lender and as to acts or omissions in that capacity, is effective upon entry of the Final Order and is not subject to Challenge. |
| **Releases and Waivers of Claims**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Effective upon entry of the Final DIP Order, the Debtors and their estates will release the DIP Lender and the Prepetition Lender from obligations, liabilities, claims, counterclaims, demands, defenses, offsets, and causes of action arising on or before entry of that order, as provided in the DIP Term Sheet. The DIP Lender is released solely in its capacity as DIP Lender and solely as to claims arising from its acts or omissions in that capacity; the Prepetition Lender is released solely in its capacity as Prepetition Lender and solely as to claims arising from its acts or omissions in that capacity. Only the Prepetition Lender's release is subject to the specified Challenge rights concerning Challenge Matters; the DIP Lender's release is not subject to Challenge. No release relieves the Debtors of the Prepetition Secured Obligations or obligations under the DIP Documents. |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B), Guidelines § II(B)(6) | The DIP Liens and DIP Claims are subject and subordinate only to the "Carve-Out," consisting of: (i) all fees payable to the Clerk of the Court and the Office of the United States Trustee under 28 U.S.C. § 1930(a), plus statutory interest; (ii) reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) solely to the extent provided for in the Approved Budget, subject to a 0% Permitted Variance for professional fees and expenses when measured on a cumulative basis, allowed unpaid fees and expenses incurred before or on the first Business Day following delivery of a Carve-Out Trigger Notice by professionals retained by the Debtors under sections 327, 328, or 363 or by any Committee under sections 328 or 1103, together with applicable transaction fees and any other limitations imposed by the DIP Orders; and (iv) allowed fees and expenses of those professionals incurred thereafter up to an aggregate Post-Carve-Out Trigger Notice Cap of $200,000. Clauses (iii) and (iv) constitute the Professional Fee Carve-Out Cap, and no party's right to object to professional compensation or reimbursement is impaired.<br><br>**Carve-Out Account and Trigger Mechanics.** The Debtors will maintain a separate Carve-Out Account outside the DIP Lender's control and may fund it weekly with estimated professional fees for the next unfunded week shown in the Approved Budget. Immediately upon a Carve-Out Trigger Notice and before payment of DIP Obligations, the Debtors may deposit the difference between the Professional Fee Carve-Out Cap and the account balance, plus prior disbursements. The account may be used only for allowed professional fees and expenses, will be reduced dollar-for-dollar as post-trigger amounts are paid, and will not be replenished. Any funding shortfall will not affect the Carve-Out's priority. After all Carve-Out amounts are funded and all allowed budgeted professional fees and expenses are finally paid, remaining funds will be paid first to the DIP Lender until the DIP Obligations are Paid in Full and then to the Prepetition Secured Parties until the Prepetition Secured Obligations are Paid in Full. A Carve-Out Trigger Notice may be delivered by the DIP Lender or its counsel by mail, courier, email, or |

| | |
|---|---|
| | other electronic means to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel for any Committee following a continuing Event of Default and acceleration of the DIP Obligations, and must state that the Post-Carve-Out Trigger Notice Cap has been invoked. The Carve-Out is unavailable for any Restricted Use. |
| **Adequate Protection**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) | As adequate protection for any diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral, the DIP Term Sheet provides for replacement liens on the Prepetition Collateral and superpriority administrative expense claims, in each case junior to the Carve-Out and the DIP Liens or DIP Claims, as applicable, together with reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses, all subject to the DIP Orders. |
| **Adequate-Protection Fees and Expenses**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) | As further adequate protection, the Debtors will reimburse each Prepetition Secured Party for reasonable and documented out-of-pocket fees, costs, disbursements, and expenses, including one local counsel. Such amounts are payable promptly upon written demand without further Court approval; amounts exceeding the applicable Budget allocation will be added to the principal balance of the DIP Loans. |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Term Sheet and DIP Orders contain the Events of Default specified therein, each waivable only in writing by the DIP Lender, including payment defaults; covenant or representation breaches; invalidity of a DIP Document; Budget noncompliance; failure to satisfy a Milestone; unauthorized modification, reversal, vacatur, or stay of a DIP Order, subject to the stated ten (10) Business Day reversal exception; unauthorized additional financing or priming claims, subject to the exception for financing contemplating payment in full; dismissal, conversion, or appointment of a trustee or examiner; termination of Cash Collateral authority; specified Challenges and standing requests; and the other events in the DIP Term Sheet. An order granting stay relief is a default unless consented to by the DIP Lender, except for an order permitting pursuit of ZOM Holding, Inc.'s May 26, 2026 appeal of the May 15, 2026 judgment in the Gray Services/Gray Development litigation. Failure to pay DIP Lender expenses not provided for in the Approved Budget is not an Event of Default. |
| **Automatic-Stay Modification and Remedies**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Following an Event of Default and delivery of a Remedies Notice, the DIP Lender may, subject to the Carve-Out and a five (5) Business Day Waiting Period, terminate, reduce, or restrict the DIP Commitments; accelerate the DIP Obligations; charge default interest; terminate, restrict, or revoke authority to use Cash Collateral; and exercise other remedies under the DIP Documents or applicable law. Upon expiration of the Waiting Period, the automatic stay under section 362 of the Bankruptcy Code will be automatically vacated and modified, without further notice, hearing, application, or order of the Court, to permit the DIP Lender to exercise those rights and remedies. If a hearing cannot be scheduled before expiration of the Waiting Period, the Waiting Period will automatically extend until the Court has heard and ruled on the matter. During the Waiting Period, the Debtors may use DIP Collateral and Cash Collateral solely as permitted by the DIP Term Sheet and Interim Order to preserve going-concern value or contest in good faith the occurrence or continuation of the applicable Event of Default, excluding the occurrence of the stated maturity date. |
| **Credit Bidding**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Lender shall have the unqualified right to credit bid any or all DIP Obligations in connection with any disposition of DIP Collateral in accordance with the DIP Term Sheet and applicable law. |

| | |
|---|---|
| **Waiver/Modification of Nonbankruptcy Law Related to Perfection and Enforcement of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim Order provides for customary waivers of and modifications to non-bankruptcy law pertaining to the perfection or enforcement of liens. |
| **Section 552(b) and Marshaling Waivers**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vi) | Effective upon entry of the Final DIP Order, the DIP Lender and Prepetition Secured Parties will receive the rights and benefits of section 552(b) of the Bankruptcy Code; the equities-of-the-case exception under section 552(b) will not apply; and the DIP Lender and Prepetition Secured Parties will not be subject to the doctrine of marshaling or any similar doctrine with respect to the DIP Collateral or Prepetition Collateral. |
| **Amendments Without Further Court Approval**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Interim Order authorizes amendments, waivers, consents, and other modifications to the DIP Documents without further Court approval if they do not materially and adversely affect the Debtors, shorten the scheduled maturity, increase the principal amount or interest rate, or materially tighten Events of Default or covenants. Any such amendment must be filed and delivered to the U.S. Trustee and counsel to any Committee within three (3) Business Days after effectiveness. |
| **Voluntary and Mandatory Prepayments**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Voluntary prepayments are permitted in minimum principal amounts of $100,000 and must include accrued interest, as provided in Section 12 of the DIP Term Sheet. The Debtors must apply 100% of specified Net Cash Proceeds from dispositions to the DIP Obligations within one Business Day and from nonpermitted indebtedness within three Business Days, together with accrued interest, as provided in Section 12 of the DIP Term Sheet. Reinvestment is prohibited without the DIP Lender's prior written consent. |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors will indemnify, pay, and hold harmless the DIP Lender and its directors, officers, employees, and agents against losses, liabilities, costs, and expenses incurred in respect of the financing or the use or proposed use of proceeds, except to the extent resulting from the indemnified party's gross negligence, bad faith, fraud, or willful misconduct as determined by a final, nonappealable judgment of a court of competent jurisdiction. |
| **Limitations of Section 506(c) of the Bankruptcy Code** | Effective upon entry of the Final Order and subject to the Carve-Out, the Debtors and their Estates will waive and not assert any surcharge claim under sections 105(a) or 506(c) of the Bankruptcy Code or otherwise against DIP Collateral or Prepetition Collateral for the benefit of the DIP Lender and the Prepetition Secured Parties. |
| **Liens on Unencumbered Real Property** | The DIP Collateral includes any unencumbered real property owned by Debtor. |

## JURISDICTION AND VENUE

3. This court (the "Court") has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

4. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5. Debtors consent to the entry of a final order on this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders, judgments, or decrees consistent with Article III of the United States Constitution.

6. This Motion and relief requested herein are predicated upon sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Local Rules 2081-1(g)(1)-(2).

## Background

7. On October 30, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Court, thereby commencing the above-captioned Chapter 11 Cases. The Debtors continue to operate their businesses and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8. The Office of the United States Trustee for the Middle District of Florida (the "U.S. Trustee") has not appointed any creditors' or equity committee, nor has the Court appointed any trustee, examiner, ombudsman, or other fiduciary or limited the rights of the Debtors, as debtors in possession, in the Chapter 11 Cases.

9. A discussion of the Debtors and their business operations, the facts and circumstances supporting this Motion, and events precipitating the Debtors' bankruptcy filings are set forth in the First Day Declaration and the DIP Declaration, as applicable, which are incorporated herein by reference.

**A. Debtors' Prepetition Debt**

**1. Prepetition Secured Loan**

10. On February 4, 2026, ZHI entered into the Prepetition Secured Note with ZOM Holding, LP ("ZHLP") under which ZHLP agreed to provide ZHI advances, in accordance with the terms of the Prepetition Secured Note, to fund operations and costs upon request from ZHI and in ZHLP's discretion. The amounts previously due and owing under the Prepetition Secured Note are secured by a first-priority security interest in all assets of ZHI. As of the Petition Date, the outstanding principal amount and accrued interest under the Prepetition Secured Note are estimated to be approximately $3,828,494.00, plus costs, fees, expenses, and other obligations. Other than the Prepetition Secured Note, the Debtors have no material prepetition secured debt.

**B. Debtor's Cash Collateral**

11. As of the Petition Date, Debtors hold approximately $94,680.91 in cash. Per Local Rule 2081-1(g)(1)(A)(ii), a summary of such accounts, including the amount of Cash Collateral held therein, is set forth below.

| **Bank** | **Account No.** | **Type** | **Account Balance** |
|---|---|---|---|
| PNC Bank | xxxx4227 | Checking Account for ZOM Holding, Inc. | $94,262.95 |
| PNC Bank | Xxxx6425 | Payroll Account for ZOM Associates, Inc. | $417.96 |

**C. Necessity of DIP Financing and Authority to Use Cash Collateral**

12. As demonstrated by the DIP Budget, Debtors require immediate access to the DIP Facility and continued access to and use of the Cash Collateral in order to meet near- and long-term operational and administrative/restructuring expenses.

**D. The DIP Lender and DIP Facility**

13. As described in more detail in the First Day Declaration, ZHI provides certain

services to ZHLP, including providing employees essential to ZHLP's operations.[1] To maintain access to this important services and employees when ZHI experienced liquidity issues earlier this year, ZHI and ZHLP executed the Prepetition Secured Note in February 2026, under which ZHLP agreed to provide certain funding which ZHI used to fund budgetary shortfalls and operational expenses. As explained in the First Day Declaration, Debtors determined that they had no choice but to address certain obligations through bankruptcy. When that decision was made, Debtors launched a process to identify a potential lender. As set forth more fully in the DIP Declaration, the Debtors' professionals identified and solicited proposals from several potential lenders qualified and capable of providing postpetition funding, including the DIP Lender.

14. After considering the proposals and reasonable alternatives to postpetition funding, the Debtors determined (in consultation with their advisors) that the proposal presented by the DIP Lender best served the needs and interests of the Debtors and their creditors. Accordingly, the Debtors and the DIP Lender engaged in arm's-length negotiations through their restructuring professionals to reach mutually acceptable terms for postpetition financing, which ultimately proved successful and culminated in the DIP Term Sheet. The terms upon which the DIP Lender agreed to provide postpetition financing are exceedingly fair—being below market in nearly every way. For instance, the DIP Facility is a non-amortizing term loan bearing interest at Term SOFR plus 2.50% per annum, with interest paid in kind quarterly rather than in cash, and provides for only a 2.00% default-rate spread, no DIP fees other than the specified professional expenses, and a five-Business-Day remedies waiting period. As a result, the DIP Facility is appropriate under the circumstances and should be approved.

[1] For the avoidance of doubt, while ZHI and ZHLP share some, but not all, indirect equityholders, ZHI and ZHLP do not share a common parent entity.

## BASIS FOR RELIEF REQUESTED

### A. Approval of and Authorization to Obtain the DIP Facility are Necessary and Appropriate Under Sections 364(c) and (d) of the Bankruptcy Code

15. Pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code, the Court may approve and authorize a debtor to obtain postpetition financing on a super-priority administrative basis and/or secured by pre- and postpetition assets of the debtor and its estate. 11 U.S.C. §§ 364(c), (d)(1). Section 364(c) of the Bankruptcy Code provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c). Section 364(d)(1) of the Bankruptcy Code, in turn, provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

16. In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis based upon certain considerations, including:

a. whether unencumbered credit or alternative financing without super-priority status is available to the debtor;

b. whether the credit transactions are necessary to preserve assets of the estate;

c. whether the terms of the credit agreement are fair, reasonable, and adequate;

d. whether the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

e. whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003).

17. For the reasons discussed below, Debtors respectfully submit that the requirements for approval of the DIP Facility, including the allowance of super-priority administrative claim status and first priority secured interests in pre- and postpetition assets of the Debtors pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code, are satisfied under the circumstances.

### 1. The Terms of the DIP Facility are the Best Available Under the Circumstances, and DIP Financing on a Junior Secured or Unsecured Basis is Not Available

18. In demonstrating that credit was not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort. *See e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). Moreover, if few (or no) lenders are likely to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search

for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

19. The Debtors engaged in a process, through their advisors, to solicit and evaluate proposals for postpetition financing. The Debtors evaluated several potential lenders, including their available funding, experience in the relevant industries, and prior involvement, if any, in postpetition financing. The Debtors contacted potential lenders and solicited proposals. After evaluating the responses and non-responses, the Debtors determined that the DIP Facility provided the required postpetition financing on the most advantageous terms.

20. Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, when the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to liens priming their interests in collateral obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Lender supports the priming or (b) the Prepetition Lenders interests in collateral are adequately protected. Here, the Prepetition Lender supports priming its own prepetition liens in connection with the DIP Facility. Further, the

Debtors do not believe any alternative financing is available on equal or better terms from the DIP Lender. Therefore, the Debtor submits that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

21. Based on the foregoing, and after evaluating, with the help of their advisors, approved postpetition facilities in similar cases, Debtors have determined in their sound business judgment that the DIP Facility is (i) fair, reasonable, and appropriate, (ii) meets the Debtors' anticipated financing needs for the Chapter 11 Cases, (iii) provides the financing required on the most cost-effective and beneficial terms, and, (iv) is the only actionable and viable proposal for postpetition financing—considering, among other factors, the adequacy of funds available, the applicable interest rates, fees and ancillary charges, conditions of lending, repayment and default terms, and milestones imposed for the administration of the Chapter 11 Cases.

### 2. The DIP Facility is Necessary to Preserve the Value of the Debtors' Estate

22. As debtors in possession, the Debtors have a fiduciary duty to protect and maximize the value of the Estates' assets for the benefit of creditors and other interest holders. *See e.g., In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). Debtors intend to administer the assets of their Estates through the confirmation of a chapter 11 plan. Debtors, however, lack sufficient revenues to preserve its business operations and assets, or fund restructuring costs—which is most readily demonstrated by the DIP Budget. *See* Ex. A. To avoid immediate and irreparable harm, Debtors require a significant infusion of cash to fund operational expenses and preserve assets. Sustaining operations is essential to preserving the value of the Estates' assets for the benefit of all creditors and interest holders. Without additional funding, Debtors will be unable to fund operations, which will negatively affect the value of the Estates' assets.

### 3. The Terms of the DIP Facility are Fair, Reasonable and Adequate Under the Circumstances

23. The DIP Facility terms are fair, reasonable and adequate, given the circumstances of the Debtors and DIP Lender. *See Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003).

24. As discussed above and in the DIP Declaration, the Debtors solicited alternative financing proposals, however those efforts resulted in the Debtors receiving no viable or actionable financing alternative. In short, the DIP Facility is the best and only financing available. Substantially all of the Debtors' assets were encumbered under the Prepetition Secured Note. The Debtors determined it was unlikely the Debtors would be able to obtaining priming debtor in possession financing over the objection of the Prepetition Secured Lender given the absence of a sufficient equity cushion. Further, the Debtors' precarious liquidity position and the timing constraints imposed by the Gray Judgment made the prospect of a priming fight risky at best.

25. While ZHI and ZHLP share certain, but not all, equity owners, ZHI and ZHLP do not share a common parent, nor were any ZHI employees, directors or officers that have a role at ZHLP involved in the negotiation of the DIP Facility. The Debtors Chief Restructuring Officer, with the help of the Debtors other advisors and at the direction of the Debtors' Independent Directors, solicited and negotiated the DIP Facility. The Debtors' Independent Directors approved the Debtors entry into the DIP Facility. The Debtors engaged in an objective process to solicit and evaluate potential postpetition financing options and, in so doing, ensure the reasonableness of the DIP Facility. In consultation with its professionals and advisors, Debtors selected the DIP Facility. The Debtors and the DIP Lender engaged in arm's-length negotiations through independent counsel regarding the particular terms and memorialization of the proposed DIP Facility, which resulted in the DIP Term Sheet and the proposed Interim Order. The objective terms of the DIP Facility further demonstrate that the DIP Facility provides financing on extremely beneficial terms

for the Debtors. Based on the foregoing, Debtors submit that the DIP Facility is procedurally and substantively fair, reasonable, and appropriate under the circumstances presented.

### 4. Entry into the DIP Documents Reflects the Debtors' Reasonable Business Judgment

26. A debtor's decision to obtain postpetition financing under a particular credit facility pursuant to section 364 of the Bankruptcy Code is governed by the business judgment standard. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994); *Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Grp. of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). Unless arbitrary and capricious, bankruptcy courts typically defer to a debtor's business judgment on decisions concerning postpetition financing. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974. Indeed, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

27. The Debtors' decision to obtain funding under the DIP Facility is a sound exercise of business judgment following a marketing process and careful evaluation of the DIP Facility and reasonable alternatives. Specifically, the Debtors and their advisors evaluated the Debtors' financial condition and projected revenues, which demonstrated that the Debtors required

significant financing to support the administration of the Chapter 11 Cases and ongoing operations. The Debtors conducted an unbiased process to solicit proposals for postpetition financing and, after selecting the DIP Facility, negotiated the DIP Documents with the DIP Lender in good faith, at arm's length, and with the assistance of their respective counsel and advisors. The Debtors believe that the DIP Facility represents the best financing option available under the circumstances. Accordingly, the Debtors submit that the decision to incur the DIP Obligations under the DIP Facility is the result of a reasonable exercise of the Debtors' business judgment.[2]

### 5. Preservation of Estate Assets Provides Adequate Protection to Prepetition Secured Creditors

28. Pursuant to section 364(d)(1)(B) of the Bankruptcy Code, the Court may only approve a "priming" or *pari passu* lien under a postpetition credit facility if "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1)(B). Section 361 of the Bankruptcy Code provides a non-exclusive list of possible "adequate protection;" however, bankruptcy courts must evaluate the need and adequacy of proposed "adequate protection" on a case-by-case basis.

---

[2] The mere fact that a negotiating counterparty may constitute an "insider" within the meaning of section 101(31) of the Bankruptcy Code does not automatically alter the standard of review that applies to the Debtors' decision-making process. See, e.g., *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013) (concluding that "the business judgment standard is appropriately applied" to debtor's decision to enter into plan support agreement with insider counterparty where debtor was represented in negotiations by an unconflicted fiduciary); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58 (Bankr. S.D.N.Y. 2005) ("To overcome the business judgment rule, the entity opposing the decision by the directors must establish that they acted in bad faith or with fraudulent intent."); *see also In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 730 (Del. Ch. 1999) (noting that when one director is interested in the transaction, without any allegation that the interested director "controlled of majority of the board, there is no basis to say that the board as a whole lacked independence"). The Debtors and DIP Lender are represented by separate, sophisticated legal and financial advisors, and all negotiations were conducted in good faith and at arm's length. Accordingly, the Debtors' decision to enter into the DIP Documents is governed by the business judgment standard. Even if the business judgment standard did not apply and the Court applied the "entire fairness" standard, the DIP Facility should still be approved. Courts apply the "entire fairness standard to insider DIP transactions, examining both the fairness of the process and the fairness of the terms. *See In re LATAM Airlines Grp.*, 620 B.R. 722, 769-72 (Bankr. S.D.N.Y. 2020). Both elements of the entire fairness standard are satisfied here. The DIP Facility was reviewed by the Debtors' and DIP Lender's advisors. The DIP Facility's terms – Term SOFR plus 2.50% per annum with interest paid in kind quarterly with no fees– are vastly superior to the market alternatives and demonstrates the DIP Facility's fairness.

*See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The purpose and guiding principle of the adequate-protection requirement is the protection of a prepetition secured creditor from the diminution in the value of its interest in the collateral. *See Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

29. As adequate protection for any diminution in value of the Prepetition Secured Lender's interests in the Prepetition Collateral, the Debtors propose to grant replacement liens on the Prepetition Collateral and superpriority administrative expense claims, in each case junior to the Carve-Out and the DIP Liens or DIP Claims, as applicable, together with reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses, all subject to the DIP Orders.

### 6. The Debtors Should be Authorized to Use Cash Collateral per the DIP Documents and Budget

30. Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtors have an urgent need to access and use Cash Collateral in which the Prepetition Secured Lender holds interests to pay expenses essential to maintaining operations and administering the Chapter 11 Cases. Absent such relief, the Debtors lack sufficient cash to fund operations. The Debtors believe that the terms and

conditions governing use of Cash Collateral are appropriate and reasonable and that the adequate protection granted to the Prepetition Secured Lender under the DIP Orders is sufficient to protect their interests, including the restrictions on use of Cash Collateral pursuant to the Approved Budget, subject to the Permitted Variance. Accordingly, the Debtors submit that they should be authorized to use Cash Collateral on the terms set forth in the DIP Documents and DIP Orders.

**7. The Roll-Up Loans Are Appropriate**

31. The refinancing of prepetition debt is a common feature in debtor in possession financing arrangements. Importantly, the proposed roll-up is subject to review by a creditors' committee (if appointed) or another party in interest with requisite standing if a committee is not appointed. Courts have routinely approved similar debtor in possession features. *See, e.g., In re Cenveo*, Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Feb. 6, 2018) (authorizing repayment of $50 million of outstanding revolving obligations and conversion of all remaining outstanding prepetition revolving obligations on an interim basis); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. Apr. 9, 2018) (approving the "roll up" and refinancing of all of the outstanding prepetition ABL/FILO Debt obligations in full on an interim basis); *In re Charlotte Russe Holding, Inc.*, Case No. 19-10210 (LSS) (Bankr. D. Del. Feb. 5, 2019) (approving the "roll up" of all outstanding prepetition ABL obligations in full on an interim basis); *In re Charming Charlie*, Case No. 17 12906 (Bankr. D. Del. Dec. 13, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations); *In re The Gymboree Corp.*, No. 17-32968 (Bankr. E.D. Va. June 12, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $70 million of prepetition term loan obligations); *In re rue21, inc.*, Case No. 17-22045 (GLT) (Bankr. W.D. Pa. May 18, 2017) (approving the "roll up" of all outstanding prepetition ABL obligations in full on an interim basis).

32. Accordingly, the Debtors respectfully submit that the Court should approve the Debtors' request to enter into the DIP Facility and comply with the provisions thereof, including the issuance of the Roll-Up Loans, as a sound exercise of the Debtors' business judgment.

**B. Modification of the Automatic Stay is Necessary and Appropriate**

33. By and through the Motion, Debtors request that the Court modify the automatic stay to permit Debtors and the DIP Lender, as applicable, to, among other things: (a) grant the security interests, liens, and super-priority claims described above in favor of the DIP Lender, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) following the occurrence and during the continuation of an applicable DIP Termination Event, and subject to delivery of a Remedies Notice and expiration or termination of the Waiting Period in accordance with the Waiting Period Procedures, permit the DIP Lender to exercise the remedies available to it pursuant to the DIP Documents and DIP Orders; and (c) implement the terms of the DIP Orders, including payment of all amounts referred to in the DIP Documents.

34. Stay modifications, similar to those requested, are frequently and readily approved as necessary to effectuate the terms and purposes of postpetition financing, and based on the circumstances presented, are appropriate under the circumstances presented. *See e.g., In re Red Lobster Mgmt. LLC, et al.*, Case No. 24-02486-GER (Bankr. M.D. Fla. May 19, 2024); *In re Delphi Behavioral Health Grp., LLC, et al.*, Case No. 23-20945-PDR (Bankr. S.D. Fla. Mar. 7, 2023); *In re Vital Pharmaceuticals, Inc., et al.*, Case No 22-17842 (PDR) (Bankr. S.D. Fla. Jan. 12, 2023); *In re Tamarac 10200, LLC and Unipharma, LLC*, Case No. 20-bk-23346-PDR (Bankr. S.D. Fla. Dec. 30, 2020); *In re Just One More Restaurant Corp., et al.*, Case No. 9:19-bk-1947 (Bankr. M.D. Fla. Feb. 14, 2020); *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015). Accordingly, Debtors respectfully request that the Court modify the

automatic stay as requested herein.

**C. Expedited Relief is Required to Avoid Immediate and Irreparable Harm**

35. Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). Moreover, pursuant to Bankruptcy Rule 6003(b), a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition, if necessary to avoid immediate and irreparable harm.

36. Based on the foregoing, the Court may grant interim relief under sections 363(c) and 364 of the Bankruptcy Code and authorize compliance with prepetition repayment obligations if such relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). As described herein and in the First Day Declaration, Debtors face immediate and irreparable harm absent immediate relief due to the significant disruption to its business operations.

37. Due to the importance of immediate access to funding, courts routinely approve interim relief in similar circumstances. *See, e.g., In re Red Lobster Management LLC, et al.*, Case No. 24-02486-GER (Bankruptcy M.D. Fla. May 19, 2024); *In re Delphi Behavioral Health Group, LLC, et al.*, Case No. 23-20945-PDR (Bankr. S.D. Fla. Mar. 7, 2023); *In re Vital Pharmaceuticals, Inc., et al.*, Case No 22-17842 (PDR) (Bankr. S.D. Fla. Jan. 12, 2023); *In re Tamarac 10200, LLC and Unipharma, LLC*, Case No. 20-bk-23346-PDR (Bankr. S.D. Fla. Dec. 30, 2020); *In re It'Sugar*

*FL U LLC et al.*, Case No. 20-20259-RAM (Bankr. S.D. Fla. Oct. 1, 2020); *In re Midtown Campus Properties, LLC*, Case No. 20-1573-RAM (Bankr. S.D. Fla. May 26, 2020); *In re Cinemex USA Real Estate Holdings, Inc., et al.*, Case No. 20-14695-LMI (Bankr. S.D. Fla. May 18, 2020); *In re ProHCM Holdings, Inc.*, Case No. 18-23156-AJC (Bankr. S.D. Fla. Nov. 1, 2018); *In re Miami Int'l Med. Ctr., LLC*, Case No. 18-12741-LMI (Bankr. S.D. Fla. Mar. 15, 2018); *In re Magnum Construction Mgmt., LLC*, Case No. 19-12821-AJC (Bankr. S.D. Fla. Mar. 8, 2019); *In re Adinath Corp, et al.*, Case No. 15-16885-LMI (Bankr. S.D. Fla. Apr. 17, 2015).

**D. Request For a Final Hearing**

38. Debtors respectfully request that the Court schedule a hearing on final approval of the DIP Facility sufficiently in advance of the date that is thirty-five (35) days after the Petition Date to permit entry of the Final Order by that milestone.

**E. Waiver of Stays pursuant to Bankruptcy Rules 4001(a)(3) and 6004(h)**

39. To implement the foregoing successfully, Debtors request that the Court waive the 14 day stay of an order authorizing the use, sale, or lease of property or modifying the automatic stay under Bankruptcy Rules 4001(a)(3) and 6004(h) and find the Interim Order immediately effective and enforceable upon entry. As discussed herein, Debtors require immediate relief to avoid irreparable harm to its operations. Debtors submit that these risks of immediate and irreparable harm provide ample cause to justify waiver of any stay on the effectiveness of the Interim Order imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), or otherwise, to the extent applicable to the Interim Order and relief requested therein.

## RESERVATION OF RIGHTS

40. Except for the admissions, stipulations, acknowledgments, and agreements expressly set forth in the DIP Orders, nothing contained in this Motion or any order granting the relief requested in this Motion, and no action taken pursuant to such relief requested or granted, is

intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) an impairment or waiver of any right to dispute any claim against, or interest in, Debtors, their property, or their Estates on any grounds; (c) a promise or requirement to pay any claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise entitled to preferential treatment of the sort discussed herein; (f) an implication, admission, or finding as to (i) the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on the property of the Debtors or their Estates or (ii) a waiver or limitation on any party's ability to challenge, recharacterize as equity, void, claw back, or seek other relief with respect to any particular payments authorized hereunder; (g) an impairment or waiver of any claims or causes of action which may exist against any entity; or (h) a waiver of Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

**NOTICE**

41. Notice of this Motion has been provided by email, facsimile or overnight mail to: (a) the Office of the United States Trustee for the Middle District of Florida; (b) the Debtor; (c) all secured creditors; (d) the Office of the Attorney General of the State of Florida; (e) the twenty (20) largest unsecured creditors for the Debtor; (f) the Debtors' identified, interested taxing authorities, including the Internal Revenue Service; (g) the Debtor's identified, interested government and regulating entities; (h) other interested parties as identified by the Debtor; and (i) any known counsel for (a)-(h) (collectively, the "Notice Parties"). The Debtors respectfully submit that, based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested

herein, no further notice is required.

**WHEREFORE**, Debtors respectfully request that the Court enter an order in substantially the form attached hereto as **Exhibit A** (i) granting this Motion and the relief requested herein on an interim basis and, after a final hearing, on a final basis, (ii) authorizing the Debtors to enter into the DIP Documents and take such actions as the Debtors reasonably believe necessary or appropriate to effectuate the DIP Documents and DIP Orders, (iii) authorizing the use of Cash Collateral pursuant to section 363 of the Bankruptcy Code, (iv) approving the DIP Liens and DIP Claims, (v) modifying the automatic stay as necessary to effectuate the DIP Documents and DIP Orders, (vi) scheduling a final hearing on the Motion sufficiently in advance of the thirty-five-day Final DIP Order milestone, and (vii) granting such other and further relief as the Court deems just and proper.

[Signature Page to Follow]

Dated: October 30, 2026

**BAKER & HOSTETLER LLP**

*/s/ Elizabeth A. Green*
Elizabeth A. Green, Esq.
FL Bar No.: 0600547
Email: egreen@bakerlaw.com
Jimmy D. Parrish, Esq.
FL Bar No.: 526401
Email: jparrish@bakerlaw.com
Danielle L. Merola, Esq.
FL Bar No. 120120
Email: dmerola@bakerlaw.com
Benjamin R. Taylor, Esq.
FL Bar No. 1024101
Email: brtaylor@bakerlaw.com
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, Florida 32801-3432
Telephone: (407) 540-7920
Facsimile: (407) 841-0168

*Proposed Counsel for the Debtors and Debtors in Possession*

## CERTIFICATE OF SERVICE

1. **I HEREBY CERTIFY** that on October 30, 2026, a true and correct copy of the foregoing has been served through the CM/ECF system to all registered CM/ECF recipients and whether by facsimile, electronic mail, or overnight courier, to the following parties: (a) the Office of the United States Trustee for the Middle District of Florida; (b) the Debtors; (c) all secured creditors; (d) the twenty (20) largest unsecured creditors for the Debtors; (e) the Debtors' identified, interested taxing authorities, including the Internal Revenue Service; (f) the Debtors' identified, interested government and regulating entities; (g) other interested parties as identified by the Debtors; and (h) any known counsel for (a)-(g). The Debtors respectfully submit that, under the circumstances, such notice is sufficient, and that no other or further notice of this Motion is required.

*/s/ Elizabeth A. Green*
Elizabeth A. Green

# EXHIBIT A

## Proposed Interim Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| **In Re:**<br><br>**ZOM HOLDING, INC.,**<br>**ZOM ASSOCIATES, INC.**<br>**ZH DEVELOPMENT I, LLC,**<br><br>**Debtors.** [1] | **Lead Case No.: 6:26-bk-08509-GER**<br><br>**Chapter 11**<br><br>**(Joint Administration Requested)**<br><br>**Case No. 6:26-bk-08511-GER**<br>**Case No. 6:26-bk-08515-GER** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SENIOR SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Upon the motion, dated October 30, 2026 (the "Motion"),[2] of ZOM Holding, Inc. ("ZHI") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") commenced on October 30, 2026 (the "Petition Date") for interim (this "Interim Order") and final orders under sections 105(a), 361, 362, 363, 364, 503(b), 506(c) and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and the Local Rules (the "Local Rules") of the United States Bankruptcy Court for the Middle District of Florida (this

[1] The Debtors in these Chapter 11 Cases and the last four digits of their EINs are ZOM Holding, Inc. (8703), ZH Development I, LLC (1156), and ZOM Associates, Inc. (0836). The Debtors' address is 1511 East State Road 434, Suite 1005, Winter Springs, FL 32708.

[2] Unless otherwise indicated herein, capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

"Bankruptcy Court") seeking, among other things,

(a) authorization for Debtor ZOM Holding, Inc. in its capacity as borrower (the "Borrower"), and ZH Development I, LLC and ZOM Associates, Inc., each in its capacity as guarantor (the "Guarantors"), to obtain postpetition financing on a joint and several basis, the Borrower's obligations in connection with a debtor-in-possession financing comprising a non-amortizing, priming, superpriority senior secured term loan facility in an aggregate principal amount not to exceed $10,342,340.00 in term loan commitments (the "DIP Facility"), which consists of (i) an initial commitment in the amount of $5,013,846.00 (the "Initial DIP Commitment"), and (ii) a commitment in the amount of up to $1,500,000.00 in respect of the additional amounts required to pay reasonable fees and expenses of Debtor Professionals, solely to the extent provided for in the DIP Term Sheet (such amount, if any, the "Additional Professional Fee DIP Advance" and the related commitment, if any, the "Incremental DIP Commitment" and, together with the Initial DIP Commitment, the "DIP Commitments"; and the Interim DIP Loans and Final DIP Loans (each as defined below) advanced thereunder, the "New Money DIP Loans"), and (iii) upon entry of the Final Order, a deemed term loan "roll-up" postpetition financing of the outstanding Prepetition Secured Obligations in an amount equal to in an amount equal to $3,828,494, of which $3,773,819 is the original principal amount and $54,676 is accrued and capitalized interest (the "Roll-Up Loan" and, together with the New Money DIP Loans, the "DIP Loans");

(b) authorization for the Debtors (i) to enter into the *Senior Secured Priming Debtor in Possession Term Loan Facility Summary of Terms and Conditions* among the Borrower, the Guarantors, the lender party thereto (the "DIP Lender") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Term Sheet," together with all agreements, documents, and instruments delivered or executed in connection therewith, the "DIP Documents"), which shall be in substantially the same form attached hereto as **Exhibit 2**, and (ii) to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

(c) authorization for the Debtors (x) to use the proceeds of the New Money DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the terms hereof, including pursuant to the DIP Budget (as defined herein) as further described herein, to pay fees and interest under the DIP Facility, to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of any Adequate Protection Obligations (as defined herein), and (y) upon entry of the Final Order, to effectuate the Roll-Up Loan;

(d) the granting of adequate protection to (x) the lender under that certain *Secured Note*, dated as of February 4, 2026 (as amended, supplemented or otherwise modified, the "Prepetition Secured Note" and, together with all security

agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith, each as amended, supplemented or otherwise modified, the "Prepetition Secured Note Documents"), by and among ZOM Holding, Inc. (in such capacity, the "Prepetition Borrower"), ZOM Holding, LP (in such capacity, the "Prepetition Secured Lender");

(e) authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including the reasonable fees and disbursements of the DIP Lender's attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(f) the granting of valid, enforceable, non-avoidable and fully perfected first priority liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Lender, that was not subject to a valid and perfected lien on the Petition Date (such property and assets, the "Unencumbered Assets"), except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, including, Avoidance Actions (as defined herein), subject only to the Carve-Out (as defined herein) and, if any, the Permitted Priority Liens (as defined herein) on the terms and conditions set forth herein and in the DIP Documents;

(g) the granting of valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Lender, except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of Section 541 of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, subject only to the Carve-Out and, if any, the Permitted Priority Liens on the terms and conditions set forth herein and in the DIP Documents;

(h) the granting of valid, enforceable, non-avoidable and fully perfected liens on and junior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Lender, except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the

Petition Date, that is subject to valid and perfected security interests in and liens on such property in favor of third parties existing on the Petition Date, excluding the Prepetition Liens (as defined below), subject only to the Carve-Out and, if any, the Permitted Priority Liens on the terms and conditions set forth herein and in the DIP Documents;

(i) the granting of superpriority administrative expense claims against each of the Debtors' estates in favor of the DIP Lender, with respect to the DIP Obligations (as defined herein) with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve-Out on the terms and conditions set forth herein and in the DIP Documents;

(j) the waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), subject to entry of the Final Order (but retroactive to the Petition Date);

(k) authorization for the DIP Lender to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of a DIP Termination Event (as defined herein);

(l) the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order;

(m) pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Bankruptcy Court to consider entry of this Interim Order; and

(n) that this Bankruptcy Court schedule a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing and approving, on a final basis, among other things, the Borrower's borrowing from the DIP Lender under the DIP Documents up to an aggregate principal amount of $10,342,340.00 in DIP Loans, the Roll-Up Loan and the continued use of Cash Collateral and granting adequate protection, in each case, as described in the Motion and set forth in the DIP Documents.

The Bankruptcy Court having considered the Motion, the Declarations, the evidence submitted or proffered and the arguments of counsel made at the Interim Hearing; and proper notice of the Motion and the Interim Hearing having been given and in compliance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 2081-1(g)(1) and (2) of the Local Rules; and the Interim Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion and to the entry of this Interim Order having

been withdrawn, resolved, or overruled by the Bankruptcy Court; and it appearing to the Bankruptcy Court that granting the relief requested is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:[3]

1. *Disposition*. The Motion is GRANTED on an interim basis in accordance with the terms of this Interim Order. Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservation of rights included therein, are hereby denied and overruled.

2. *Jurisdiction*. This Bankruptcy Court has core jurisdiction over the Chapter 11 Cases commenced on the Petition Date, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. *Notice*. Under the circumstances, the notice given by the Debtors of, and as described in, the Motion, the relief requested therein, and the Interim Hearing constitutes proper notice thereof and complies with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4. *Debtors' Stipulations*. Without prejudice to the rights of any other party, but subject to the limitations thereon contained in paragraphs 27 and 28 of this Interim Order, the Debtors represent, admit, stipulate, and agree as follows:

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact.

(a) Prepetition Stipulations.

i. Prepetition Secured Obligations. As of the Petition Date, Debtor ZHI as the Prepetition Borrower, without defense, counterclaim, or offset of any kind, was liable to the Prepetition Secured Lender under the Prepetition Secured Note in an aggregate principal amount of not less than $3,773,819 (the "Prepetition Secured Obligations"). The Prepetition Secured Obligations constitute legal, valid, binding and non-avoidable obligations against the Prepetition Borrower and is not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Secured Lender by or on behalf of the Prepetition Borrower prior to the Petition Date or in connection with the Prepetition Secured Note is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(i) Prepetition Liens. Pursuant to the Prepetition Secured Note Documents, the Prepetition Secured Obligations are secured by valid, binding, perfected and enforceable first priority liens on and security interests in (the "Prepetition Liens") the "Collateral" (as defined in the Prepetition Secured Note Documents) (the "Prepetition Collateral"). The Prepetition Liens (i) are valid, binding, perfected, and enforceable first priority liens and security interests in the Prepetition Collateral and (ii) are not subject, pursuant to the Bankruptcy Code or other applicable non-bankruptcy law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind.

(b) Cash Collateral. Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date or from time to time, and the proceeds of any of the foregoing, is the Prepetition Secured Lender's cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

5. *Findings Regarding the DIP Facility and Use of Cash Collateral.*

(a) Good cause has been shown for the entry of this Interim Order.

(b) As set forth in the Declarations, the Debtors have an immediate need to obtain the DIP Facility and to use the Cash Collateral in each case on an interim basis, in order to, among other things: (i) permit the orderly continuation of their business operations; (ii) maintain business relationships with their vendors and other parties; (iii) make payroll and honor other obligations to employees; (iv) make adequate protection payments; and (v) pay the costs of the administration of the Chapter 11 Cases and satisfy other working capital and general corporate purposes of the Debtors. The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, preserving and maintaining the going concern value of the Debtors' business. The Debtors will not have sufficient sources of working capital and financing to operate their businesses in the ordinary course of business throughout the Chapter 11 Cases without the DIP Facility and authorized use of Cash Collateral.

(c) As set forth in the Declarations, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Documents and are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as

an administrative expense. Notwithstanding the existence of Unencumbered Assets, the Debtors are unable to secure adequate funding, the Debtors are also unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Lender, subject to the Carve-Out as provided for herein and the Permitted Priority Liens (if any), the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein) and, subject to the Carve-Out, incurring the Adequate Protection Obligations, in each case, under the terms and conditions set forth in this Interim Order and the DIP Documents. For the avoidance of doubt, the DIP Liens include liens on and security interests in the Unencumbered Assets pursuant to Bankruptcy Code section 364(c)(2).

(d) The extensions of credit under the DIP Facility, the DIP Documents, and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e) The DIP Facility has been negotiated in good faith and at arm's length among the Debtors, the DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents including, without limitation, all loans (including, the Roll-Up Loan) made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other DIP Obligations (as defined in the DIP Term Sheet) (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Lender in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e) and the terms of this Interim Order. The DIP Obligations, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e).

(f) The Roll-Up Loan as provided for under the DIP Facility is appropriate and the DIP Lender would not be willing to provide the DIP Loans or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loan within the DIP Facility.

(g) The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules. For the reasons set forth in the Motion, the declarations filed in support of the Motion, and the record presented to the Bankruptcy Court at the Interim Hearing, absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and authorization of the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Interim Order and the DIP Documents are, therefore, in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

6. *Authorization of the DIP Facility and the DIP Documents.*

(a) The Debtors are hereby expressly authorized and empowered to execute and deliver and, on such execution and delivery, directed to perform under the DIP Documents, including the DIP Term Sheet.

(b) Upon entry of this Interim Order, the Borrower is hereby authorized, but not directed, to borrow borrowings up to an aggregate principal amount of $1,528,545 in New Money DIP Loans (the "Interim DIP Loans"), subject to and in accordance with this Interim Order and the DIP Documents.

(c) Upon the entry of the Final Order, the Borrower will be authorized, but not directed, to borrow borrowings up to an aggregate principal amount of $6,513,846.00 in New Money DIP Loans subject to and in accordance with this Final Order and the DIP Documents comprising (i) the Interim DIP Loans, and (ii) $4,985,301 in additional New Money DIP Loans approved pursuant

to the Final Order (the "Final DIP Loans"), and, subject to the rights and limitations set forth in paragraph 27 and 28 of this Interim Order, Debtors will be authorized to roll up and convert into DIP Obligations (plus interest, fees, indemnities and other expenses and other amounts provided for in the DIP Documents) the full amount of the Prepetition Secured Obligations.

(d) Proceeds of the DIP Loans and Cash Collateral shall be used solely for the purposes permitted under the DIP Term Sheet, this Interim Order and in accordance with the DIP Budget, the DIP Documents, and this Interim Order.

(e) In furtherance of the foregoing and without further approval of this Bankruptcy Court, each Debtor is authorized, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary and applicable, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Term Sheet and any collateral documents contemplated thereby), and to pay all fees, expenses, indemnities, and other amounts contemplated thereby or that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility including, without limitation:

i. the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Term Sheet and any collateral documents contemplated thereby;

ii. the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents (in each case, in accordance with the terms of the DIP Documents and in such form as the Debtors and DIP Lender may agree), it being understood that no further approval of the Bankruptcy Court shall be required for any amendments, waivers, consents or other modifications to and under the DIP Documents or the DIP Budget, except that any modifications or amendments to the DIP Documents that shorten the maturity thereof

or increase the aggregate commitments thereunder, the rate of interest payable with respect thereto, or effect any other material amendments shall be on notice and subject to a hearing and Bankruptcy Court approval, as necessary;

iii. make the payments on account of the Adequate Protection Obligations provided for in this Interim Order; and

iv. the performance of all other acts required under or in connection with the DIP Documents.

(f) Upon execution and delivery of the DIP Term Sheet and the other DIP Documents, such DIP Documents shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Chapter 11 Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code, or after the dismissal of any Case. No obligation, payment, transfer, or grant of security under the DIP Term Sheet, the other DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy Code sections 502(d), 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transaction Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

7. *DIP Budget.*

(a) Except as otherwise provided herein or in the DIP Documents, the Debtors may only use Cash Collateral and the proceeds of the DIP Facility in accordance with a projected statement of sources and uses of cash for the Debtors for the 13 calendar weeks (but not any

preceding weeks) attached hereto as **Exhibit 1** (as may be amended, replaced, supplemented or otherwise modified in accordance with the terms of this Interim Order and the DIP Documents, the "DIP Budget"), subject to permitted variances as set forth in the DIP Documents, including without limitation for: (A) working capital requirements; (B) general corporate purposes; and (C) the costs and expenses (including making payments on account of the Adequate Protection Obligations hereunder and payment of the allowed fees and expenses of professionals retained by the Debtors' estates) of administering the Chapter 11 Cases (including payments under the Carve-Out as provided herein). If necessary, the Debtors may provide to the DIP Lender (with a copy to the DIP Lender's advisors) an updated 13-week cash flow forecast, containing line items of sufficient detail to reflect the Debtors' projected cash receipts and disbursements for such 13-week period on a weekly basis (the "Updated 13-Week Forecast"). Such Updated 13-Week Forecast shall be acceptable to the DIP Lender in its sole discretion, and upon acceptance by the DIP Lender, such Updated 13-Week Forecast shall become the new DIP Budget commencing on such week, and promptly after the DIP Lender approves the new DIP Budget, the Debtors shall deliver the new DIP Budget, together with any amendments or modifications thereto approved by the DIP Lender. In the event that the DIP Lender and the Debtors do not agree to an updated DIP Budget, the DIP Budget shall be the then-existing DIP Budget or such Budget as may be approved by the Bankruptcy Court after a hearing.

(b) By no later than 5:00 pm ET on the fourth Business Day of each week, commencing after the second full week after the Petition Date, the Borrower shall deliver to the DIP Lender (with a copy to the DIP Lender' advisors), a detailed report setting forth the actual cash receipts and disbursements for the preceding week and on a rolling cumulative basis against the projections from the last DIP Budget (which report shall certify whether or not the Borrower was in

compliance with the Permitted Variance (as defined below)), together with a detailed narrative explanation of any variances, in each case, in form and substance satisfactory to the DIP Lender (such comparison, the "Variance"). Without giving effect to the making of DIP Loans or the repayments or prepayments of DIP Loans, it shall be an Event of Default under the DIP Documents if there are any adverse variances that exceed the allowed variances, which means, in each case measured on a cumulative basis for the period from the Petition Date: (i) the actual aggregate disbursements (on a line item by line item basis) exceed 110% of the anticipated disbursements as set forth in the DIP Budget delivered immediately prior to such period (the "Applicable DIP Budget"), excluding disbursements for fees and expenses of Professional Persons, which shall be subject to a 0% variance on a cumulative basis since the Petition Date, or (ii) the aggregate actual cash receipts (the "Total Receipts") is less than 90% of the anticipated cash receipts for such period. Any Variance that does not exceed the Variance permitted pursuant to the foregoing clauses (i) and (ii) shall be referred to herein as a "Permitted Variance" Notwithstanding anything to the contrary herein or in the DIP Documents, the Permitted Variance shall not modify the amount of the DIP Commitments or the New Money DIP Loans authorized pursuant to this Interim Order.

(c) The consent of the DIP Lender to any Applicable DIP Budget shall not be construed as consent to the use of any Cash Collateral or DIP Loans after the occurrence of an Event of Default (as defined in the DIP Term Sheet), regardless of whether the aggregate funds shown on any Applicable DIP Budget have been expended.

8. *Reporting Requirements/Access to Records*. The Debtors shall provide the DIP Lender with all reporting and other information required to be provided to the DIP Lender under the DIP Documents. In addition to, and without limiting, whatever rights to access the DIP Lender

has under the DIP Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Lender to: (i) have access to and inspect the Debtors' assets; (ii) examine the Debtors' books and records; and (iii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers and relevant financial advisors; *provided that* nothing in this paragraph 8 or otherwise (x) shall require the Debtors or their advisors to furnish to, or discuss with, the DIP Lender any materials (whether prepared by the Debtors' financial advisors or legal advisors or otherwise) or other information subject to any attorney-client or other privilege or confidentiality obligations or (y) shall be construed to obligate any of the aforementioned advisors to disclose any information or to otherwise take or refrain from taking any action, absent an express contractual requirement to do so.

9. *DIP Superpriority Claims*. Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims of the DIP Lender, against each of the Debtors' estates (the "DIP Superpriority Claims"), without the need to file any proof of claim or request for payment of administrative expenses, with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under

Bankruptcy Code section 503(b) and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, any claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions" and any proceeds thereof, the "Avoidance Proceeds"), subject only to the payment of the Carve-Out to the extent specifically provided for herein. Except as set forth in, or permitted by, this Interim Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

10. *DIP Liens*. As security for the DIP Obligations, the following security interests and liens are hereby granted by the Debtors to the DIP Lender, for the benefit of the DIP Lender (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), subject only to the payment of the Carve-Out to the extent specifically provided for herein and the Permitted Priority Liens (if any) (all such liens and security interests granted to the DIP Lender, for the benefit of the DIP Lender, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"). Except as set forth in, or permitted by, this Interim Order, no other liens shall be granted or allowed in these Chapter 11 Cases. The DIP Liens shall be effective and automatically perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of, or over, any DIP Collateral (as defined herein):

(a) First Lien on Unencumbered Property. Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by

Bankruptcy Code section 546(b)), including, without limitation, any unencumbered cash of the Debtors (whether maintained with the DIP Lender or otherwise) and any investment of such cash, all contracts, contract rights, licenses, general intangibles (including, without limitation, all payment intangibles), instruments (including, without limitation, promissory notes), equipment (including, without limitation, documents of title), accounts, documents, goods, vehicles, inventory, furniture, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each Loan Party's current and future subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), guarantees, arbitration awards, money, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), insurance, receivables, receivables records, securities accounts, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, service marks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by a Loan Party, claims (including commercial tort claims) or other causes of action (including Avoidance Actions), books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, including insurance proceeds or other proceeds (as such terms are defined in

the Uniform Commercial Code as in effect from time to time in the State of New York), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located.

(b) Liens Priming the Prepetition Liens and Subordinate Liens. Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtors including, without limitation, the Prepetition Collateral, Cash Collateral, and any investment of such cash, all contracts, contract rights, licenses, general intangibles (including, without limitation, all payment intangibles), instruments (including, without limitation, promissory notes), equipment (including, without limitation, documents of title), accounts, documents, goods, vehicles, inventory, furniture, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each Loan Party's current and future subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), guarantees, arbitration awards, money, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), insurance, receivables, receivables records, securities accounts, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, service marks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), and all substitutions, indemnification rights, all present and future intercompany debt,

fee interests in real property owned by a Loan Party, claims (including commercial tort claims) or other causes of action (including Avoidance Actions), books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, including insurance proceeds or other proceeds (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located., that is subject to the Prepetition Liens.

(c) Liens Junior to Certain Other Liens. Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all prepetition and postpetition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 10, as to which the liens and security interests in favor of the DIP Lender will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, if any, that are senior to the liens securing the Prepetition Secured Obligations or to valid and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition Secured Obligations, which security interests and liens in favor of the DIP Lender are junior only to such valid, perfected and unavoidable liens (collectively, the "Permitted Priority Liens").

11. *Carve-Out*.

(a) Carve-Out. As used in this Interim Order, the "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000.00 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, and with respect to (x), solely to the extent provided for in the Budget (for the avoidance of doubt, the Permitted Variance with respect to professional fees and expenses shall be 0%), all unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and an official committee of unsecured creditors (the "Creditors' Committee"), if any, pursuant to Bankruptcy Code section 328 or 1103 (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") (x) at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined herein), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (but not to exceed the amount of Allowed Professional Fees specified in the Applicable DIP Budget for the period from the Petition Date to the date of the Carve-Out Trigger Notice, without giving effect to the Permitted Variance, if any, the "Pre-Carve-Out Trigger Amount"), plus (y) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000.00 incurred after the first business day following delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (y) the "Post-Carve-Out Trigger Notice Cap" and the amounts

set forth in clauses (x) and (y), net of any unused retainers, collectively, the "Professional Fee Carve-Out Cap"). For the avoidance of doubt, the maximum aggregate Pre-Carve-Out Trigger Amount shall not exceed the cumulative amount set forth in the Applicable DIP Budget for the Professional Persons incurred from the Petition Date to the date of the Carve-Out Trigger Notice. Within three (3) business days of the receipt of a Carve-Out Trigger Notice, each Professional Person shall provide its reasonable, good-faith estimate of the amount of its fees and expenses to be included in the Pre-Carve-Out Trigger Amount. For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice by mail, courier, or email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee (if appointed) providing that a DIP Termination Event and acceleration of the DIP Obligations have occurred and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b) The Debtors shall be authorized and permitted to establish and maintain an escrow, to be held solely for the benefit of the Professional Persons and fund such escrow on a weekly basis the amount of the professional fees for the next unfunded week as set forth in the DIP Budget (solely to the extent of Carve-Out amounts deposited, the "Carve-Out Account"), to satisfy the Carve- Out. The Carve-Out Account shall be funded on a weekly basis (starting on the Closing Date and then on the first business day of each week, and ending on the date upon which a Carve-Out Trigger Notice is delivered) with the amount for Professional Persons set forth in the DIP Budget for that week. After the delivery of a Carve-Out Trigger Notice, notwithstanding anything herein to the contrary, the Debtors shall be authorized to deposit cash on hand into the Carve-Out Account up to the amount of the Professional Fee Carve-Out Cap, less any amounts previously paid on account of Allowed Professional Fees. The funds on deposit in the Carve-Out Account shall be the

sole source available to satisfy the obligations benefiting from the Carve-Out. The Debtors shall disburse funds on deposit in the Carve-Out Account to satisfy the obligations benefiting from the Carve-Out, and shall be permitted to make such disbursement at any time, including following delivery of a Carve-Out Trigger Notice.

(c) Application of Carve-Out Account. All funds in the Carve-Out Account shall be used to pay the obligations set forth in Carve-Out, until paid in full, and then, to the extent the Carve-Out Account has not been reduced to zero, as follows: (1) first, to the DIP Lender, in accordance with the DIP Term Sheet, until the DIP Obligations are paid in full; (2) second, to the Prepetition Secured Lender until the Prepetition Secured Obligations are paid in full. Notwithstanding anything to the contrary in the DIP Documents, this Interim Order, or the Final Order, following delivery of a Carve-Out Trigger Notice, the DIP Lender shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Account has been fully funded, but shall have DIP Liens and DIP Superpriority Claims in any residual interest in the funds constituting the Carve-Out Account, with any excess paid to the DIP Lender for application. Further, notwithstanding anything to the contrary in this Interim Order or the Final Order, (i) the failure of the Carve-Out Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, and (ii) in no way shall the DIP Budget, Carve-Out, Post-Carve-Out Trigger Notice Cap, Carve-Out Account or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or the Prepetition Secured Note Documents, the Carve-Out shall be senior to the DIP Superpriority Claims, the DIP Liens, the Adequate Protection Liens (as defined herein), the Prepetition Liens, Prepetition Secured Obligations, and

any and all other forms of adequate protection, liens, or claims securing the DIP Obligations, or the Prepetition Secured Obligations.

(d) Reduction for Unused Retainers. During the time when a Carve-Out Trigger Notice is outstanding or following approval by this Bankruptcy Court of such Professional Person's final fee application, prior to any payment from the Carve-Out Account, each Professional Person must apply any unused retainers held by or on behalf of such Professional Person as of the Petition Date to satisfy its Allowed Professional Fees prior to receiving payment from the funds in the Carve-Out Account for its Allowed Professional Fees.

(e) Carve-Out Procedure. The Debtors must, upon reasonable request of DIP Lender, provide to DIP Lender a written report (each, a "Carve-Out Report"), in which Debtors disclose their then current estimate of: (1) the aggregate amount of unpaid professional fees, costs, and expenses accrued or incurred by the Professional Persons through the date of the Carve-Out Report; and (2) the projected fees, costs, and expenses of the Professional Persons for the thirty (30) day period following the date of such Carve-Out Report.

(f) Reservation of Rights. Nothing herein may be construed as consent by the DIP Lender, or the Prepetition Secured Lender to the allowance of any fees, costs, or expenses of the Professionals Persons or will affect the right of the DIP Lender, the Prepetition Secured Lender to object to the allowance and payment of any such fees, costs, or expenses, or the right of the DIP Lender, the Prepetition Secured Lender to the return of any portion of the Carve-Out that is funded with respect to fees, costs, and expenses for a Professional Person that are approved on an interim basis, but that are later denied on a final basis.

(g) No Direct Obligation to Pay Allowed Professional Fees. Subject to the Carve-Out, neither the DIP Lender, nor the Prepetition Secured Lender shall be responsible for the payment

or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender, nor the Prepetition Secured Lender, nor the Debtors, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

12. *Limitation on Charging Expenses Against Collateral.* Subject to entry of the Final Order (but retroactive to the Petition Date), no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve-Out), the DIP Lender, or the Prepetition Secured Lender pursuant to Bankruptcy Code sections 105(a) or 506(c) or any similar principle of law or equity, without the prior written consent of the DIP Lender or the Prepetition Secured Lender, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Prepetition Secured Lender.

13. *No Marshaling/Application of Proceeds*. Subject to entry of the Final Order (but retroactive to the Petition Date), the DIP Lender and the Prepetition Secured Lender shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral in accordance with the provisions of this Interim Order or the Final Order, as applicable, the DIP Documents, or Prepetition Secured Note Documents, each as applicable, and in no event shall the DIP Lender, or the Prepetition Secured Lender, be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

14. *Equities of the Case*. Subject to entry of the Final Order (but retroactive to the

Petition Date), (i) the DIP Lender, and the Prepetition Secured Lender shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable.

15. *Use of Cash Collateral*. The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Interim Order, the DIP Documents and the Applicable DIP Budget, including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of the Final Hearing. Except on the terms and conditions of this Interim Order, the Debtors shall be prohibited from at any time using the Cash Collateral.

16. *Adequate Protection for the Prepetition Secured Lender*. Subject only to the Carve-Out and the terms of this Interim Order, including, without limitation, the rights and limitations set forth in paragraphs 27 and 28 of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e), and 364 and applicable case law interpreting the same, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests (each such diminution, a "Diminution in Value"), resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve-Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay, and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Secured Lender is hereby granted the following (collectively, the "Adequate Protection Obligations"):

(a) Adequate Protection Liens. As security for and solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of the Prepetition Secured Lender's interests in the Prepetition Collateral, from and after the Petition Date, the Prepetition Secured Lender is hereby granted additional and replacement valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens on, as of the date of this Interim Order (the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or similar documents, all DIP Collateral (including Avoidance Actions). Subject to the terms of this Interim Order, the Adequate Protection Liens shall be subordinate only to (A) the Carve-Out, (B) the DIP Liens, and (C) the Permitted Priority Liens (if any).

(b) Adequate Protection Superpriority Claim. As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), the Prepetition Secured Lender is hereby granted an allowed administrative expense claim in the Chapter 11 Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases, except the Carve-Out and the DIP Superpriority Claims (the "Adequate Protection Superpriority Claims"). The Adequate Protection Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof. Subject to the Carve-Out and the DIP Superpriority Claims in all respects, the Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105,

326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114. The Prepetition Secured Lender shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the DIP Lender, in each case as provided in the DIP Documents.

(c) Fees and Expenses. As further adequate protection, the Debtors are authorized and directed to pay, without further Bankruptcy Court order, reasonable and documented fees and expenses (the "Adequate Protection Fees"), whether incurred before or after the Petition Date, of the Prepetition Secured Lender, including, without limitation, the reasonable and documented fees and expenses of McDermott Will & Schulte LLP. The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only, and may include redactions. The applicable professional shall serve copies of the invoices supporting the Adequate Protection Fees on counsel to the Debtors, the U.S. Trustee and counsel to the Creditors' Committee (if any), and any Adequate Protection Fees shall be subject to prior ten (10) day review by the Debtors, the U.S. Trustee and the Creditors' Committee (if any), and in the event the Debtors, the U.S. Trustee or the Creditors' Committee (if any) shall file with this Bankruptcy Court an objection to any such legal invoice, the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Bankruptcy Court. If no objection is filed within such ten (10) day review period, such invoice shall be paid without further order of the Bankruptcy Court within five (5) days following the expiration of the foregoing review period and shall not be subject to any further review, challenge, or disgorgement. For the avoidance of doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.

17. *Section 507(b) Reservation*. Nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Secured Lender is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases. Nothing contained herein shall be deemed a finding by the Bankruptcy Court, or an acknowledgment by the Prepetition Secured Lender that the adequate protection granted herein does in fact adequately protect the Prepetition Secured Lender against any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

18. *Restrictions on Disposition of Material Assets Outside the Ordinary Course of Business*. Except as expressly permitted under the "first day" pleadings or the DIP Documents, the Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of this Bankruptcy Court to the extent required by Bankruptcy Code section 363, without obtaining the prior written consent of the DIP Lender at least five (5) days (or such shorter period as the DIP Lender, in its sole discretion) prior to the date on which the Debtors seek the Bankruptcy Court's authority for such use, sale, or lease. Except as otherwise provided under the DIP Documents, subject to the Carve-Out and Permitted Priority Liens, in the event of any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Interim Order), the Debtors are authorized and shall promptly pay, without further notice or order of this Bankruptcy Court, the DIP Lender, 100% of the net cash proceeds resulting therefrom no later than the second business day following receipt of such proceeds. Upon indefeasible and irrevocable payment in full of the DIP Obligations, subject to the Carve-Out and Permitted Priority Liens, and subject to the rights and limitations set forth in paragraph 27 and 28

of this Interim Order, the Debtors are authorized and shall promptly pay, without further notice or order of this Bankruptcy Court, the Prepetition Secured Lender, 100% of the net cash proceeds, up to the full amount of the Prepetition Secured Obligations, resulting from any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Interim Order) no later than the second business day following receipt of such proceeds. Except as otherwise provided under the DIP Documents, subject to the Carve-Out and Permitted Priority Liens, in the event of any casualty, condemnation, or similar event with respect to property that constitutes DIP Collateral, the Debtors are authorized and shall promptly pay to the DIP Lender any insurance proceeds, condemnation award, or similar payment (excluding any amounts on account of any D&O policies) no later than the second business day following receipt of payment by the Debtors, unless the DIP Lender consents, in its sole discretion, in writing, to the funds being reinvested by the Debtors.

19. *Insurance*. At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date. Upon entry of this Interim Order, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insured and lender's loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

20. *Reservation of Rights of the DIP Lender, and Prepetition Secured Lender*. Notwithstanding any other provision in this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition Secured Lender to seek any other

or supplemental relief in respect of the Debtors, including the right to seek additional adequate protection; provided that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Lender granted under this Interim Order and the DIP Documents; (b) any of the rights of the DIP Lender or the Prepetition Secured Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the DIP Lender or the Prepetition Secured Lender to (i) request modification of the automatic stay of Bankruptcy Code section 362, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases, (iii) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lender, or the Prepetition Secured Lender. The delay in or failure of the DIP Lender and/or the Prepetition Secured Lender to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Lender or the Prepetition Secured Lender's rights and remedies.

21. *DIP Termination Event*. Subject to paragraph 22, the Debtors' authorization to use Cash Collateral and the proceeds of the DIP Facility pursuant to this Interim Order shall automatically terminate, and the DIP Obligations shall become due and payable, without further notice or action by the Bankruptcy Court following the earliest to occur of any of the following (each a "DIP Termination Event"): (a) the occurrence of an Event of Default (as defined in the DIP Term Sheet); (b) the Debtors' failure to (i) comply with any provision of this Interim Order, or (ii) comply with any other covenant or agreement specified in this Interim Order or the DIP Term Sheet (which covenants and agreements, together with any applicable grace periods, are explicitly incorporated by reference into this Interim Order); or (c) the occurrence of the DIP

Termination Date (as defined in the DIP Term Sheet). For the avoidance of doubt, the DIP Lender's rights under the Maturity and Termination provisions of the DIP Term Sheet are subject to the Notice Period.

22. *Remedies Upon a DIP Termination Event*. The Debtors shall immediately provide notice to counsel to the DIP Lender and the Prepetition Secured Lender (with a copy to counsel to the Creditors' Committee (if any) and the U.S. Trustee), of the occurrence of any DIP Termination Event, at which time the Debtors' ability to use Cash Collateral hereunder shall terminate (subject to the proviso at the end of this paragraph 22) and the DIP Obligations shall become due and payable. Upon the occurrence of a DIP Termination Event and following the giving of not less than five business days' advance written notice, which may be by email (the "Enforcement Notice"), to counsel to the Debtors, the U.S. Trustee, and counsel to the Creditors' Committee (if any) (the "Notice Period"), but subject to and in accordance with the terms of the DIP Documents and any order of the Court, (a) the DIP Lender may exercise any rights and remedies against the DIP Collateral available to them under this Interim Order, the DIP Documents, and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facility, and (b) the Prepetition Secured Lender may exercise any rights and remedies to satisfy the Prepetition Secured Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, Permitted Priority Liens and, in each case, the Carve-Out. The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated with respect to the DIP Lender and the Prepetition Secured Lender at the end of the Notice Period, without further notice or order of the Bankruptcy Court, unless the DIP Lender, and the Prepetition Secured Lender elect otherwise in a written notice to the Debtors, which may be by email. Upon termination of the automatic stay, the DIP Lender, and the Prepetition Secured Lender shall be permitted to

exercise all rights and remedies set forth herein, in the DIP Documents, and in the Prepetition Secured Note Documents, as applicable, and as otherwise available at law against the DIP Collateral or Prepetition Collateral, without any further order of or application or motion to the Bankruptcy Court, and without restriction or restraint imposed by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against (x) the enforcement of the liens and security interests in the DIP Collateral or the Prepetition Collateral, or (y) the pursuit of any other rights and remedies granted to the DIP Lender or the Prepetition Secured Lender pursuant to the DIP Documents or the Prepetition Secured Note Documents; provided that during the Notice Period, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of a DIP Termination Event) or Cash Collateral, in accordance with the Approved Budget and the Permitted Variance, which immediately upon the occurrence of a DIP Termination Event, shall be reduced to 0.00% of the disbursements as set forth in the Applicable DIP Budget, solely to (i) preserve the Debtors' going-concern value, and (ii) to fund the Carve-Out Account, provided, however, for the avoidance of doubt, that the amount funded to the Carve-Out Account following the occurrence of a DIP Termination Event shall be limited to the difference between the balance of the Carve-Out Account immediately prior to the occurrence of the DIP Termination Event and the Professional Fee Carve-Out Cap, less any amounts previously paid on account of Allowed Professional Fees, without giving effect to any Permitted Variance; provided further that any fees and expenses incurred by the Debtors or the Creditors Committee (if any) during the Notice Period shall permanently reduce the Post-Carve-Out Trigger Notice Cap. During the Notice Period, the Debtors and the DIP Lender consent to a hearing on an expedited basis; provided that at any hearing regarding a Enforcement Notice, the Court may only consider whether an Event of Default has occurred or is continuing (other than, for the avoidance of doubt, the occurrence of the Maturity Date

under the DIP Term Sheet); provided further, that if a hearing to consider the foregoing is requested to be heard before the end of the Notice Period but is scheduled for a later date by the Bankruptcy Court, the Notice Period shall be automatically extended to the date of such hearing.

23. *No Waiver for Failure to Seek Relief.* The failure or delay of the DIP Lender or any of the Prepetition Secured Lender to exercise rights and remedies under this Interim Order, the DIP Documents, the Prepetition Secured Note Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.

24. *Perfection of the DIP Liens and Adequate Protection Liens.*

(a) The DIP Lender and the Prepetition Secured Lender are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether or not the DIP Lender or the Prepetition Secured Lender shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order, and subject to the rights and limitations set forth in paragraphs 27 and 28 of this Interim Order), at the time and on the date of entry of this Interim Order. Upon the request of the DIP Lender or Prepetition Secured Lender, as applicable, the Prepetition Secured Lender and the Debtors, without any further consent of any party, is authorized to take, execute, deliver, and file such instruments (in the case of the Prepetition Secured Lender, without representation or warranty of any kind) to

enable the DIP Lender and the Prepetition Secured Lender, in each case, to further validate, perfect, preserve, and enforce the DIP Liens and the Adequate Protection Liens, respectively. All such documents will be deemed to have been recorded and filed as of the Petition Date. Notwithstanding anything to the contrary herein, but subject to the rights and limitations set forth in paragraphs 27 and 28 of this Interim Order, any financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction previously filed by the Prepetition Secured Lender in order to validate and perfect the liens securing the Prepetition Secured Obligations shall remain in existence and shall be deemed postpetition filings to validate and perfect the liens securing the DIP Loans, including, without limitations, the Roll-Up Loan.

(b) A certified copy of this Interim Order, in the discretion of the DIP Lender or the Prepetition Secured Lender, may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c) Effective upon entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Thereupon, any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such

leasehold interest or the proceeds of any assignment, and/or the sale thereof by any Debtor in accordance with the terms of the DIP Term Sheet or this Interim Order.

25. *Preservation of Rights Granted Under this Interim Order.*

(a) Subject to the Carve-Out, other than as set forth in this Interim Order, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(b) In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the Prepetition Secured Lender hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Lender shall be entitled to the protections afforded in Bankruptcy Code section 363(m) with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all Adequate Protection Obligations.

(c) Subject to the Carve-Out, unless and until all DIP Obligations, Prepetition Secured Obligations, and Adequate Protection Obligations are indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents and with the prior written consent of the DIP Lender (x) any modification, stay, vacatur, or amendment of this Interim Order, (y) a priority claim for any administrative expense,

secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition Secured Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any property of the Debtors, including without limitation, the DIP Collateral or the Prepetition Collateral; (iii) except as permitted in the DIP Documents, the sale or transfer of any property of the Debtor, including without limitation, the DIP Collateral or the Prepetition Collateral; (iv) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (v) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (vi) an order converting or dismissing any of the Chapter 11 Cases; (vii) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (viii) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(d) Notwithstanding any order dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order,

shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(e) Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens (subject to the rights and limitations in paragraphs 27 and 28 of this Interim Order), the Adequate Protection Superpriority Claims (subject to the rights and limitations in paragraphs 27 and 28 of this Interim Order), and all other rights and remedies of the DIP Lender, and the Prepetition Secured Lender granted by the provisions of this Interim Order and the DIP Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to Bankruptcy Code section 363(b) or (iii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code. The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Obligations (subject to the rights and limitations in paragraphs 27 and 28 of this Interim Order) and all other rights and remedies of the DIP Lender and the Prepetition Secured Lender granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate

Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the DIP Lender).

26. *Expenses and Indemnification*.

(a) The Debtors are authorized and directed to pay all (i) reasonable and documented out-of-pocket fees and expenses incurred by professionals or consultants retained by the DIP Lender (the "DIP Professionals"), incurred in connection with the Chapter 11 Cases (in any capacity) and the DIP Facility, whether or not the DIP Facility is successfully consummated, and (ii) reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of the DIP Lender, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby. All fees and expenses described above shall be payable by the Debtors (whether accrued or incurred prior to, on, or after the Petition Date) within ten (10) calendar days after the delivery of invoices (which invoices shall not be required to comply with any particular format and may be in summary form only and may be in redacted form to protect privileged and confidential information) to the Debtors, the U.S. Trustee, and the Creditors' Committee (if any), without the necessity of filing motions or fee applications and such fees and expenses shall not be subject to any further review, challenge, or disgorgement following the expiration of such period. For the avoidance of doubt, the failure to pay an amount for DIP Professionals' fees and expenses not provided for in the Approved Budget does not constitute an Event of Default.

(b) As set forth in the DIP Facility, the Debtors will, jointly and severally, defend and indemnify the DIP Lender, and its respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses,

claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the execution or delivery of the DIP Term Sheet and other DIP Documents, transactions contemplated hereby and thereby, and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Term Sheet; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual fraud, gross negligence, or willful misconduct of such person (or their related persons). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in an final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's actual fraud, bad faith, gross negligence or willful misconduct, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

27. *Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral*

(a) Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve-Out may be used, directly or indirectly: (a) to object to, contest, prevent, hinder, delay, or interfere with, in any way, the DIP Lender's or the Prepetition Secured Lender's enforcement or realization upon any of the DIP Collateral, Prepetition Collateral, or Cash Collateral, following the occurrence and continuation of a DIP Termination Event; or (b) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support, or prosecute any action for any claim, counter-

claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, against the Prepetition Secured Lender and the DIP Lender, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (in each case, in their respective capacities as such) with respect to any transaction, occurrence, omission, action, or other matter arising under, in connection with, or related to the Interim DIP Order, the DIP Facility, the DIP Documents, the DIP Facility Obligations, the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Secured Note Documents or the transactions contemplated therein or thereby, or any other matters relating to the Debtors, including, without limitation, (A) any Avoidance Actions (as defined below), (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the DIP Documents, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Secured Obligations, the Prepetition Secured Note Documents , the Prepetition Liens, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the Prepetition Secured Obligations, the Prepetition Collateral, the Adequate Protection Liens, and the Adequate Protection Claims, or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to the DIP Lender hereunder or under any of the DIP Documents or the Prepetition Secured

Lender hereunder or under any of the Prepetition Secured Note Documents , as applicable (in each case, including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay any of the DIP Lender's or the Prepetition Secured Lender's assertions, enforcements, realizations, or remedies on or against the DIP Collateral or Prepetition Collateral in accordance with the applicable DIP Documents or Prepetition Secured Note Documents and the Interim DIP Order and/or the Final DIP Order (as applicable)); *provided*, that no more than $25,000 (the "Challenge Budget") in the aggregate of the DIP Collateral, the Carve-Out or Cash Collateral, proceeds from the borrowings under the DIP Facility or any other amounts, may be used for allowed fees and expenses incurred solely by any Committee (if appointed) in investigating, but not objecting to, challenging, litigating, opposing, prosecuting, or seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the Prepetition Liens, the Prepetition Secured Note Documents , the Adequate Protection Liens, or the Adequate Protection Claims prior to the Challenge Deadline (as defined below). Except to the extent expressly permitted by the terms of the DIP Documents and the Interim DIP Order or any further order of this Court, none of the Debtors, any Committee (if appointed), or any trustee or other estate representative appointed in the Chapter 11 Cases or any other person or entity may use or seek to use Cash Collateral or, to sell, or otherwise dispose of DIP Collateral or Prepetition Collateral, in each case, without the consent of the DIP Lender.

(b) Subject to entry of the Final Order, all fees and expenses of the Committee Professionals incurred in connection with the investigation of the matters described in paragraph 27(a) in excess of the Challenge Budget shall not be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code or otherwise.

28. *Effect of Stipulations on Third Parties*.

(a) The Debtors' acknowledgments, stipulations, admissions, waivers, and releases set forth in this Interim Order shall be binding on the Debtors, their respective representatives, successors and assigns upon entry of this Interim Order. The acknowledgments, stipulations, admissions, waivers, and releases contained in this Interim Order shall also be binding upon the Debtors' estates and all other parties in interest, including the Creditors' Committee (if any), or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (i) such party with requisite standing, has duly filed an adversary proceeding challenging the validity, perfection, priority, extent, or enforceability of the Roll-Up Loan, the Prepetition Liens, the Prepetition Secured Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests, or defenses (each a "Challenge" and collectively, the "Challenges") against the Prepetition Secured Lender in connection with any matter related to the Roll-Up Loan, the Prepetition Collateral, the Prepetition Liens, or the Prepetition Secured Obligations, by no later than the earlier of (x) sixty (60) calendar days after the Petition Date and (y) the date established by the Court in the Bid Procedures Order for the submission of qualified bids in connection with the Sale (such time period, the "Challenge Period"); provided that in the event that, prior to the expiration of the Challenge Period, (x) these Chapter 11 Cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these Chapter 11 Cases, then, in each such case, the Challenge Period shall be extended, solely with respect to such Trustee, until the later of (1) the Challenge Period and (2) the date that is ten (10) calendar days from the date such Trustee is appointed; and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding. If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period, without further order of this

Bankruptcy Court: (x) the Roll-Up Loan and the Prepetition Secured Obligations shall constitute allowed claims, not subject to any Challenges (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in paragraphs 4(a)(ii) and 4(b)(ii), not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (z) the Prepetition Liens, the Prepetition Secured Obligations, and the Prepetition Secured Lender shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period). If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, (A) the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and any other party in these cases, including any Trustee, except as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding and (B) any Challenges not brought in such adversary proceeding shall be forever barred; provided that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all

parties in interest.

(b) Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Secured Note Documents or the Prepetition Secured Obligations.

29. *Release*. Subject to the rights and limitations set forth in paragraphs 27 and 28 of this Interim Order, effective upon entry of the Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lender and the Prepetition Secured Lender (in their capacity as the DIP Lender and Prepetition Secured Lender only), from any and all from any and all (a) obligations and liabilities to the Debtors (and their successors and assigns), and (b) claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the date of the Final Order of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against the DIP Lender or the Prepetition Secured Lender for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Final DIP Order including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the

Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Lender, or the Prepetition Secured Lender.

30. *Credit Bidding*. (a) the DIP Lender shall have, pursuant and subject to Bankruptcy Code section 363(k), the right to credit bid up to the full amount of any DIP Obligations (with respect to the Roll-Up Loan, subject to the rights and limitations in paragraphs 27 and 28 of this Interim Order) in the sale of any of the DIP Collateral, including pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725, and (b) subject to the rights and limitations in paragraphs 27 and 28 of this Interim Order and subject to the satisfaction of the DIP Obligations, or as otherwise consented to by the DIP Lender, the Prepetition Secured Lender shall have the right to credit bid up to the full amount of the Prepetition Secured Obligations in the sale of any of the Prepetition Collateral, including, but not limited to, pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725. The DIP Lender shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Lender to any acquisition entity or joint venture formed in connection with such bid.

31. *Interim Order Governs*. In the event of any inconsistency between the provisions of this Interim Order or the DIP Documents, the provisions of this Interim Order shall govern.

32. *Binding Effect; Successors and Assigns*. The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in

these Chapter 11 Cases, including without limitation, the DIP Lender, the Prepetition Secured Lender, any Creditors' Committee appointed in these Chapter 11 Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender, and the Prepetition Secured Lender, provided that, except to the extent expressly set forth in this Interim Order, the Prepetition Secured Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any Trustee or similar responsible person appointed for the estates of the Debtors.

33. *Limitation of Liability*. In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents, or the Prepetition Secured Note Documents, the DIP Lender, and the Prepetition Secured Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors. Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Secured Note Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender, or the Prepetition Secured Lender of any liability for any claims arising from the

prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

34. *Effectiveness*. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

35. *Final Hearing*. The Final Hearing is scheduled for [], 2026 at [___]:[___] [a.m. / p.m.] (prevailing Eastern Time), before the Honorable United States Bankruptcy Judge [__], at the United States Bankruptcy Court for the Middle District of Florida. The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Bankruptcy Court and to any Creditors' Committee after the same has been appointed, or Creditors' Committee counsel, if the same shall have been appointed. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file a written objection thereto, which shall be served upon the Notice Parties, and shall also be filed with the Clerk of the Court, in each case to allow actual receipt by the foregoing no later than [_] at [4:00 p.m.] (prevailing Eastern Time).

36. No later than two (2) business days after the date of this Interim Order, the Debtors shall serve on the Notice Parties (a) a copy of this Interim Order and shall file a certificate of service no later than 24 hours after service.

# EXHIBIT 1

Budget

**ZOM Holding, Inc. ("ZHI")**
*DIP Budget*
Date of Filing: October 30, 2026

| | ZHI DIP Budget | | | | | | | | | | | | | | | | | TOTALS | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Payroll** | *Payroll* | | *Payroll* | | *Payroll* | | *Payroll* | | *Payroll* | | *Payroll* | | *Payroll* | | *Payroll* | | *Payroll* | Post-BK | Post-BK |
| **Actual (A) / Forecast (F)** | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F |
| **Month** | Nov | Nov | Nov | Nov | Dec | Dec | Dec | Dec | Dec | Jan | Jan | Jan | Jan | Feb | Feb | Feb | Feb | Total | Total |
| **Week #** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 13-Wk (3 Mo.) | 17-Wk (4 Mo.) |
| **Week Beginning** | 11/2/26 | 11/9/26 | 11/16/26 | 11/23/26 | 11/30/26 | 12/7/26 | 12/14/26 | 12/21/26 | 12/28/26 | 1/4/27 | 1/11/27 | 1/18/27 | 1/25/27 | 2/1/27 | 2/8/27 | 2/15/27 | 2/22/27 | 11/2/26 | 11/2/26 |
| **Week Ending** | 11/6/26 | 11/13/26 | 11/20/26 | 11/27/26 | 12/4/26 | 12/11/26 | 12/18/26 | 12/25/26 | 1/1/27 | 1/8/27 | 1/15/27 | 1/22/27 | 1/29/27 | 2/5/27 | 2/12/27 | 2/19/27 | 2/26/27 | 1/29/27 | 2/26/27 |
| **RECEIPTS** | | | | | | | | | | | | | | | | | | | |
| Development Fees | $0 | $0 | $0 | $0 | $0 | $0 | $366,660 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$366,660** | **$366,660** |
| Stonebridge Payroll & Accounting Reimb. | $30,181 | $33,000 | $63,181 | $0 | $33,000 | $0 | $0 | $33,000 | $30,181 | $33,000 | $0 | $0 | $33,000 | $63,181 | $0 | $0 | $33,000 | **$288,543** | **$384,724** |
| ZRS Rent Reimbursement | $0 | $0 | $22,730 | $0 | $0 | $0 | $0 | $22,730 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$45,460** | **$45,460** |
| **Total Receipts** | **$30,181** | **$33,000** | **$85,911** | **$0** | **$33,000** | **$0** | **$366,660** | **$55,730** | **$30,181** | **$33,000** | **$0** | **$0** | **$33,000** | **$63,181** | **$0** | **$0** | **$33,000** | **$700,663** | **$796,844** |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | |
| Payroll Wages, Taxes, & Fees | ($242,000) | $0 | ($244,500) | $0 | ($458,175) | $0 | ($249,500) | $0 | ($284,175) | $0 | ($239,500) | ($2,500) | ($239,675) | $0 | ($239,500) | ($2,500) | ($239,675) | **($1,960,025)** | **($2,441,700)** |
| Benefits | ($95,500) | ($1,000) | ($34,500) | ($1,000) | ($95,500) | ($1,000) | ($34,500) | ($1,000) | ($34,500) | ($66,000) | ($47,000) | ($1,000) | ($47,000) | ($66,000) | ($47,000) | ($1,000) | ($47,000) | **($459,500)** | **($620,500)** |
| Rent | ($81,000) | $0 | $0 | $0 | ($78,509) | $0 | $0 | $0 | $0 | ($78,509) | $0 | $0 | $0 | ($78,509) | $0 | $0 | $0 | **($238,018)** | **($316,527)** |
| Utilities / Adequate Assurance | ($1,915) | $0 | $0 | $0 | ($6,300) | ($4,792) | $0 | $0 | $0 | ($6,300) | ($4,792) | $0 | $0 | ($6,300) | ($4,792) | $0 | $0 | **($24,099)** | **($35,191)** |
| Insurance | $0 | ($1,500) | ($227) | $0 | $0 | ($1,500) | ($227) | $0 | $0 | $0 | ($115,000) | ($1,727) | $0 | $0 | ($1,500) | ($227) | $0 | **($120,180)** | **($121,907)** |
| All Other Disbursements | ($15,000) | ($51,461) | ($15,000) | ($15,000) | ($15,000) | ($15,000) | ($26,461) | ($22,500) | ($7,500) | ($15,000) | ($40,000) | ($26,461) | ($15,000) | ($15,000) | ($15,000) | ($26,461) | ($15,000) | **($279,383)** | **($350,844)** |
| **Total Operating Disbursements** | **($435,415)** | **($53,961)** | **($294,227)** | **($16,000)** | **($653,484)** | **($22,292)** | **($310,688)** | **($23,500)** | **($326,175)** | **($165,809)** | **($446,292)** | **($31,688)** | **($301,675)** | **($165,809)** | **($307,792)** | **($30,188)** | **($301,675)** | **($3,081,205)** | **($3,886,669)** |
| **Cash Flow before Non-Op. Disbursements** | **($405,234)** | **($20,961)** | **($208,316)** | **($16,000)** | **($620,484)** | **($22,292)** | **$55,972** | **$32,230** | **($295,994)** | **($132,809)** | **($446,292)** | **($31,688)** | **($268,675)** | **($102,628)** | **($307,792)** | **($30,188)** | **($268,675)** | **($2,380,542)** | **($3,089,825)** |
| **NON-OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | |
| **Bankruptcy Fees** | | | | | | | | | | | | | | | | | | | |
| Independent Directors Fees | ($60,000) | $0 | $0 | $0 | ($60,000) | $0 | $0 | $0 | $0 | ($60,000) | $0 | $0 | $0 | ($60,000) | $0 | $0 | $0 | **($180,000)** | **($240,000)** |
| D&O Insurance (CRO & Independent Directors) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($125,000) | $0 | $0 | $0 | $0 | $0 | $0 | **($125,000)** | **($125,000)** |
| Baker & Hostetler (Counsel for Debtor) **[A]** | $0 | $0 | $0 | ($666,667) | $0 | $0 | $0 | ($666,667) | $0 | $0 | $0 | ($666,667) | $0 | $0 | $0 | $0 | ($1,000,000) | **($2,000,000)** | **($3,000,000)** |
| SOLIC Capital Advisors (CRO for Debtor) **[A]** | $0 | $0 | $0 | ($416,667) | $0 | $0 | $0 | ($416,667) | $0 | $0 | $0 | ($416,667) | $0 | $0 | $0 | $0 | ($500,000) | **($1,250,000)** | **($1,750,000)** |
| Osborn Maledon (Appellate Counsel) | $0 | $0 | $0 | ($50,000) | $0 | $0 | $0 | ($95,000) | $0 | $0 | $0 | ($65,000) | $0 | $0 | $0 | $0 | ($65,000) | **($210,000)** | **($275,000)** |
| Counsel for DIP Lender | ($100,000) | $0 | $0 | ($200,000) | $0 | $0 | $0 | ($150,000) | $0 | $0 | $0 | ($200,000) | $0 | $0 | $0 | $0 | ($150,000) | **($650,000)** | **($800,000)** |
| Unsecured Creditors' Committee | $0 | $0 | $0 | ($6,250) | $0 | $0 | $0 | ($6,250) | $0 | $0 | $0 | ($6,250) | $0 | $0 | $0 | $0 | ($6,250) | **($18,750)** | **($25,000)** |
| Angeion (Noticing Agent) | $0 | $0 | $0 | ($25,000) | $0 | $0 | $0 | ($25,000) | $0 | $0 | $0 | ($25,000) | $0 | $0 | $0 | $0 | ($25,000) | **($75,000)** | **($100,000)** |
| U.S. Trustee Quarterly Fee | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($45,930) | $0 | $0 | $0 | $0 | ($46,096) | **($45,930)** | **($92,026)** |
| **Total Bankruptcy Fees** | **($160,000)** | **$0** | **$0** | **($1,364,583)** | **($60,000)** | **$0** | **$0** | **($1,359,583)** | **$0** | **($60,000)** | **($125,000)** | **($1,425,513)** | **$0** | **($60,000)** | **$0** | **$0** | **($1,792,346)** | **($4,554,680)** | **($6,407,026)** |
| DIP Interest Expense | $0 | $0 | $0 | ($3,961) | $0 | $0 | $0 | $0 | ($22,919) | $0 | $0 | ($23,603) | $0 | $0 | $0 | $0 | ($56,337) | **($50,483)** | **($106,820)** |
| **Total Non-Operating Disbursements** | **($160,000)** | **$0** | **$0** | **($1,368,545)** | **($60,000)** | **$0** | **$0** | **($1,359,583)** | **($22,919)** | **($60,000)** | **($125,000)** | **($1,449,116)** | **$0** | **($60,000)** | **$0** | **$0** | **($1,848,683)** | **($4,605,162)** | **($6,513,846)** |
| **Net Cash Flow** | **($565,234)** | **($20,961)** | **($208,316)** | **($1,384,545)** | **($680,484)** | **($22,292)** | **$55,972** | **($1,327,353)** | **($318,913)** | **($192,809)** | **($571,292)** | **($1,480,803)** | **($268,675)** | **($162,628)** | **($307,792)** | **($30,188)** | **($2,117,358)** | **($6,985,704)** | **($9,603,670)** |
| **CASH BALANCE** | | | | | | | | | | | | | | | | | | | |
| Beginning Book Balance | $94,681 | $94,681 | $94,681 | $94,681 | $94,681 | $94,681 | $94,681 | $150,653 | $182,883 | $182,883 | $182,883 | $182,883 | $182,883 | $182,883 | $182,883 | $182,883 | $182,883 | | |
| Operating Disbursements | ($405,234) | ($20,961) | ($208,316) | ($16,000) | ($620,484) | ($22,292) | $55,972 | $32,230 | ($295,994) | ($132,809) | ($446,292) | ($31,688) | ($268,675) | ($102,628) | ($307,792) | ($30,188) | ($268,675) | **($2,380,542)** | **($3,089,825)** |
| Non-Operating Disb. (BK Fees) | ($160,000) | $0 | $0 | ($1,368,545) | ($60,000) | $0 | $0 | ($1,359,583) | ($22,919) | ($60,000) | ($125,000) | ($1,449,116) | $0 | ($60,000) | $0 | $0 | ($1,848,683) | **($4,605,162)** | **($6,513,846)** |
| **Ending Bal. before Mgmt Fees / DIP Borrowings** | **($470,553)** | **$73,720** | **($113,635)** | **($1,289,864)** | **($585,803)** | **$72,389** | **$150,653** | **($1,176,700)** | **($136,030)** | **($9,926)** | **($388,409)** | **($1,297,920)** | **($85,792)** | **$20,255** | **($124,909)** | **$152,696** | **($1,934,475)** | | |
| **MANAGEMENT FEES / DIP BORROWINGS** | | | | | | | | | | | | | | | | | | | |
| Management Fees | $405,234 | $20,961 | $208,316 | $16,000 | $620,484 | $22,292 | $0 | $0 | $295,994 | $132,809 | $446,292 | $31,688 | $268,675 | $102,628 | $307,792 | $30,188 | $268,675 | **$2,468,744** | **$3,178,027** |
| **Total Management Fees** | **$405,234** | **$20,961** | **$208,316** | **$16,000** | **$620,484** | **$22,292** | **$0** | **$0** | **$295,994** | **$132,809** | **$446,292** | **$31,688** | **$268,675** | **$102,628** | **$307,792** | **$30,188** | **$268,675** | **$2,468,744** | **$3,178,027** |
| DIP Borrowings | $160,000 | $0 | $0 | $1,368,545 | $60,000 | $0 | $0 | $1,359,583 | $22,919 | $60,000 | $125,000 | $1,449,116 | $0 | $60,000 | $0 | $0 | $1,848,683 | **$4,605,162** | **$6,513,846** |
| **Total DIP Borrowings** | **$160,000** | **$0** | **$0** | **$1,368,545** | **$60,000** | **$0** | **$0** | **$1,359,583** | **$22,919** | **$60,000** | **$125,000** | **$1,449,116** | **$0** | **$60,000** | **$0** | **$0** | **$1,848,683** | **$4,605,162** | **$6,513,846** |
| **Total Management Fees / DIP Borrowings** | **$565,234** | **$20,961** | **$208,316** | **$1,384,545** | **$680,484** | **$22,292** | **$0** | **$1,359,583** | **$318,913** | **$192,809** | **$571,292** | **$1,480,803** | **$268,675** | **$162,628** | **$307,792** | **$30,188** | **$2,117,358** | **$7,073,907** | **$9,691,873** |
| **Ending Balance** | **$94,681** | **$94,681** | **$94,681** | **$94,681** | **$94,681** | **$94,681** | **$150,653** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | | |

**Note:**
[A] Baker Hostetler's and SOLIC's fees from Week 14 to Week 17 are subject to budget approval

| | Mgmt Fees | DIP | Total |
|---|---|---|---|
| **13-wks / 3 months** | $2,468,744 | $4,605,162 | **$7,073,907** |
| **17-wks / 4 months** | $3,178,027 | $6,513,846 | **$9,691,873** |

# EXHIBIT 2

## DIP Term Sheet

**October 30, 2026**

**ZOM Holding, Inc.,** ***et al.***
**Senior Secured Priming Debtor in Possession Term Loan Facility**
**Summary of Terms and Conditions**

This binding term sheet (including all schedules, annexes and exhibits hereto, this "**DIP Term Sheet**" and together with the Interim DIP Order, the Final DIP Order, the Budget (each as defined below), collectively, the "**DIP Documents**") sets forth a summary of the terms and conditions with respect to the DIP Facility (as defined below) to be provided by the DIP Lender (as defined below) to the Borrower (as defined below) in connection with cases (the "**Chapter 11 Cases**") to be filed by the Debtors (as defined below) in the United States Bankruptcy Court for the Middle District of Florida (the "**Bankruptcy Court**") under chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**").

This DIP Term Sheet is a binding and enforceable agreement to the extent provided under the Bankruptcy Code, subject to entry of the Interim DIP Order with respect to the Debtors, with respect to the subject matter contained herein, it being acknowledged and agreed that the obligation of the DIP Lender to provide financing pursuant to this DIP Term Sheet shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this DIP Term Sheet and the terms of the DIP Orders, the terms of the DIP Orders shall govern.

This DIP Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this DIP Term Sheet is protected by Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential settlement discussions. Nothing contained in this DIP Term Sheet shall be an admission of fact or liability.

| | | |
|---|---|---|
| 1. | ***Borrower*** | ZOM Holding, Inc. in its capacity as a debtor and debtor in possession (the "**Borrower**") in the Chapter 11 Cases to be filed (such date, the "**Petition Date**") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.<br><br>This DIP Term Sheet assumes that the Borrower and the Guarantors (as defined below) will file voluntary petitions simultaneously under the Bankruptcy Code in the Bankruptcy Court and will request joint administration of the Chapter 11 Cases; provided that all of Borrower's and Guarantors' existing and future, direct or indirect domestic or foreign affiliates and subsidiaries that become debtors and debtors in possession in the Chapter 11 Cases at any time and from time to time, shall be Guarantors, as described below under "Guarantors". |
| 2. | ***Guarantors*** | Each of the Borrower's direct and indirect affiliates and subsidiaries that commence Chapter 11 Cases on or after the Petition Date, including without limitation such affiliates and subsidiaries as set forth on **<u>Exhibit 1</u>** hereto, in their capacities as debtors and debtors in possession, on a joint and several basis (each, a "**Guarantor**" and collectively, the "**Guarantors**", together with the Borrower, each individually a "**Loan Party**" and a "**Debtor**", and collectively, the "**Loan Parties**" and the "**Debtors**") absolutely and unconditionally guarantees, as a guaranty of performance and payment and not as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, the payment and performance of any and all obligations of Borrower under and with respect to the DIP Facility (as defined below), including, without limitation any and all DIP Loans and DIP |

| | | |
|---|---|---|
| | | Claims (each as defined below) (collectively, the "**Guaranteed Obligations**"), subject to, and in accordance with, the terms of the DIP Orders. This guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Guaranteed Obligations or any instrument or agreement evidencing any Guaranteed Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the Guaranteed Obligations which might otherwise constitute a defense to the obligations of any Guarantor under this Guaranty other than the irrevocable payment in full in cash and performance of all obligations hereunder, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing (other than the defense of payment in full). |
| 3. | ***Prepetition Secured Obligations; Prepetition Collateral:*** | As of the Petition Date, the Debtor has outstanding term loans in an aggregate estimated principal amount outstanding and accrued interest thereon of approximately $3,828,494 ("**Prepetition Secured Obligations**") under the Secured Note dated as of February 4, 2026 (as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition Secured Note**") by and among ZOM Holding, Inc. as Issuer and ZOM Holding, LP as Noteholder (the "**Prepetition Lender**" and, together with its agent pursuant to the Prepetition Secured Note, if applicable, the "**Prepetition Secured Parties**"). The Prepetition Claims are secured by a first priority lien on the Collateral (as defined in the Prepetition Secured Note, the "**Prepetition Collateral**"). |
| 4. | ***DIP Lender*** | ZOM Holding, LP. or any other entities it designates |
| 5. | ***Type and Amount of the DIP Facility*** | • A non-amortizing, priming, super-priority senior secured term loan facility in an aggregate principal amount not to exceed $10,342,340.00 in term loan commitments (the "**DIP Facility**") comprising (i) an initial commitment in the amount of $5,013,846.00 (the "**Initial DIP Commitment**" and (ii) a commitment in the amount of up to $1,500,000.00 in respect of the additional amounts required to pay reasonable fees and expenses of Debtor Professionals, solely to the extent provided for herein (such amount, if any, the "**Additional Professional Fee DIP Advance**" and the related commitment, if any, the "**Incremental DIP Commitment**" and, together with the Initial DIP Commitment, the "**DIP Commitments**"; and the loans under the DIP Facility, the "**DIP Loans**").<br>• Subject to satisfaction of all conditions to the Additional Professional Fee DIP Advance set forth in Section 17 and satisfaction of all conditions to the Other Draws set forth in Section 17 below, the DIP Lender shall make the Additional Professional DIP Advance in the amount of $1,500,000.00.<br>• The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and DIP Loans repaid may not be reborrowed. |

| | | |
|---|---|---|
| | | • The Initial Draw (as defined below) shall be funded to the Borrower, to be used solely in accordance with the DIP Orders and the Budget, subject to the Permitted Variance (in each case, as defined below and in the DIP Orders).<br>• Upon entry of the Final DIP Order (as defined below), a deemed term loan "roll-up" postpetition financing of the outstanding Prepetition Secured Obligations in an amount equal to $3,828,494, of which $3,773,819 is the original principal amount and $54,676 is accrued and capitalized interest. |
| 6. | ***Approval and Availability*** | • Upon the Bankruptcy Court's entry of an interim order of the Bankruptcy Court in form and substance satisfactory to the DIP Lender, in its sole discretion, authorizing and approving the DIP Facility and the use of Cash Collateral (within the meaning of section 363(a) of the Bankruptcy Code) (the "**Interim DIP Order**"), and satisfaction of all applicable conditions precedent described in Section 16 herein, the DIP Lender shall make available DIP Loans in an aggregate amount of up to $1,528,545.00 (or such lesser amount as the parties hereto may agree) and the Borrower shall be entitled to make a draw of the DIP Loans as described in Section 7 below immediately upon entry of the Interim DIP Order (the first draw under the DIP Facility, the "**Initial Draw**" and each draw after the Initial Draw, if any, an "**Other Draw**" and collectively, the "**Other Draws**," and together with the Initial Draw, the "**Draws**" and each a "**Draw**"). The funding of the Initial Draw in accordance with this DIP Term Sheet (such date shall be referred to herein as the "**Closing Date**") shall occur as soon as reasonably possible after the entry of the Interim DIP Order, but in any event no later than three Business Days thereafter unless the DIP Lender agrees otherwise. |
| 7. | ***Draws*** | • Subject to satisfaction of all conditions to the Initial Draw or Other Draws set forth in Sections 16 and 17 below, as applicable, the Borrower shall be entitled to make Draws of the DIP Loans solely in accordance with the Budget, up to the amount of the undrawn DIP Commitments.<br>• The Initial Draw shall be made within three Business Days after entry of the Initial DIP Order. Each Other Draw shall be made (in an aggregate minimum amount of $100,000 and, thereafter, in multiples thereof) upon three Business Days' written notice (or such shorter period as agreed to by the DIP Lender in its sole discretion), up to the aggregate amount of the available undrawn DIP Commitments at any time prior to the date that is three Business Days before the DIP Termination Date (as defined below). |
| 8. | ***Maturity and Termination*** | • All DIP Obligations (as defined below) shall be due and payable in full in cash ("**Payment in Full**"[1] or such other form of consideration as the DIP |

[1] For purposes hereof, the term "**Payment in Full**" or, as applicable, "**Paid in Full**," means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been

| | | |
|---|---|---|
| | | Lender and the Borrower may mutually agree) on the earliest of the following (such earliest date, the "**DIP Termination Date**"):<br><br>i. March 29, 2027;<br><br>ii. the effective date of any chapter 11 plan with respect to a Loan Party (a "**Plan**");<br><br>iii. the entry of an order approving a sale of the Debtors assets to a buyer other than the DIP Lender or its designee;<br><br>iv. the consummation of the sale or other disposition of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code to the DIP Lender or its designee;<br><br>v. the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default (as defined below and, as applicable, in the DIP Documents) in accordance with the DIP Documents;<br><br>vi. the date any cause of action is filed by the Debtors or any third party (with the support of the Debtors) against any of the Prepetition Secured Parties or the DIP Lender, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (in each case, in their respective capacities as such) with respect to any transaction, occurrence, omission, action, or other matter relating to the Debtors;<br><br>vii. dismissal of any Chapter 11 Case, conversion of any Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner (with enlarged powers) in any Chapter 11 Case; and<br><br>viii. 35 days after the Petition Date (or such later date as agreed to by the DIP Lender), unless a final order of the Bankruptcy Court in form and substance satisfactory to the DIP Lender, in its sole discretion, inter alia, authorizing and approving the DIP Facility (including the DIP Loans and the DIP Loan Documents and all lender fees related thereto) (the "**Final DIP Order**," and, together with the Interim DIP Order, the "**DIP Orders**") has been entered by the Bankruptcy Court on or prior to such date, unless otherwise extended in writing by the DIP Lender in its sole discretion. |

asserted, and all commitments thereunder shall have irrevocably, permanently, and finally expired or shall have been terminated, cancelled, and discharged.

| | | |
|---|---|---|
| | | • The occurrence of the DIP Termination Date shall terminate the ability of the Borrower to borrow under the DIP Facility and use any proceeds thereof (other than the Carve-Out), including Cash Collateral (as defined in the DIP Orders) and shall terminate the DIP Commitments and any further obligation the DIP Lender have to make any DIP Loans under the DIP Documents.<br>• For the avoidance of doubt, any of the above conditions from (i) through (vii) automatically triggers the DIP Termination Date under the DIP Order and the other DIP Documents.<br>• For the avoidance of doubt, the DIP Lender's rights under this Section 8 are subject to the Waiting Period. |
| 9. | ***Interest Rate*** | • The DIP Loans shall bear interest at a per annum rate equal to Term SOFR plus 2.50% per annum, which shall be paid in kind quarterly in arrears by adding such accrued, unpaid interest to the principal amount of the DIP Loans then outstanding on the last Business Day of each fiscal quarter (the "**Non-Default Interest**").<br>• Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of 2.00%, in each case payable in cash, together with the Non-Default Interest, on demand.<br>• All computations of interest under this DIP Term Sheet shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. Interest shall accrue on each DIP Loan for the day on which the DIP Loan is made, and shall not accrue on a DIP Loan, or any portion thereof, for the day on which the DIP Loan or such portion is paid; provided that any DIP Loan that is repaid on the same day on which it is made shall bear interests for one day.<br>• For purposes hereof, certain terms used herein are defined as follows:<br>  ◦ "**Business Day**" means (1) any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of the State of New York, or are in fact closed in, New York City; and (2) if such day relates to any calculation or determination involving Term SOFR, means any such day described in clause (1) above that is also a U.S. Government Securities Business Day.<br>  ◦ "**Floor**" means 0.00% per annum.<br>  ◦ "**Interest Period**" means the period commencing (x) initially, on the date each DIP Loan is made and (y) thereafter, at the end of the prior Interest Period, and ending on the date that is (A) in the case of the initial Interest Period for such DIP Loan, the last Business Day of the fiscal quarter in which such DIP Loan is made and (B) thereafter, one quarter thereafter; provided that:<br>    (a) any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar |

| | | |
|---|---|---|
| | | month, in which case such Interest Period shall end on the immediately preceding Business Day;<br><br>(b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and<br><br>(c) no Interest Period shall extend beyond the Maturity Date.<br><br>• "**Term SOFR**" means, the Term SOFR Reference Rate for a three-month tenor comparable to the applicable Interest Period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, provided that if Term SOFR determined as provided above (including pursuant to the proviso above) shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.<br><br>• "**Term SOFR Administrator**" means CME Group Benchmark Administration Limited as administrator of the Term SOFR Reference Rate (or a successor administrator of the Term SOFR Reference Rate selected by the Noteholder with the consent of the Issuer).<br><br>• "**Term SOFR Reference Rate**" means the forward-looking term rate based on SOFR.<br><br>• "**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government Securities. |
| 10. | ***DIP Fees*** | • No fees (excluding fees and expenses of counsel, as provided for in Section 32 hereof). |
| 11. | ***Use of Proceeds*** | Proceeds of the DIP Loans and Cash Collateral shall be used, in each case subject to the Budget (including Permitted Variances (as defined below) and subject to Section 15 of this Term Sheet) and the terms and conditions of the |



136578.000001\4907-0212-5533.1

| | | |
|---|---|---|
| | | DIP Term Sheet, the Interim DIP Order, the Final DIP Order, and the DIP Documents, to (i) provide working capital and for other general corporate purposes of the Debtors, (ii) fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses), and (iii) fund fees and other payments contemplated in respect of the DIP Facility.<br><br>Without in any way limiting the foregoing, no DIP Collateral (as defined below), Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out, or any other cash or funds may be used, directly or indirectly, by any of the Debtors, any official committee appointed in the Chapter 11 Cases (the "Committee"), or any trustee or other estate representative appointed in the Chapter 11 Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to object to, contest, prevent, hinder, delay, or interfere with, in any way, the DIP Lender's or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, Prepetition Collateral, or Cash Collateral, following the occurrence and continuation of a DIP Termination Event; or (b) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, against any of the Prepetition Secured Parties and the DIP Lender, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (in each case, in their respective capacities as such) with respect to any transaction, occurrence, omission, action, or other matter arising under, in connection with, or related to the Interim DIP Order, the DIP Facility, the DIP Documents, the DIP Facility Obligations, the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Documents or the transactions contemplated therein or thereby, or any other matters relating to the Debtors, including, without limitation, (A) any Avoidance Actions (as defined below), (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Claims, the DIP Liens, the DIP Documents, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Secured Obligations, the Prepetition Documents, the Prepetition Liens, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Claims, the DIP Collateral, the Prepetition Secured Obligations, the Prepetition Collateral, the Adequate Protection Liens, and the Adequate Protection Claims, or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to the DIP Lender hereunder or under any of the DIP Documents or the Prepetition Secured Parties hereunder or under any of the Prepetition Documents, as |

| | | |
|---|---|---|
| | | applicable (in each case, including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay any of the DIP Lender's or the Prepetition Secured Parties' assertions, enforcements, realizations, or remedies on or against the DIP Collateral or Prepetition Collateral in accordance with the applicable DIP Documents or Prepetition Documents and the Interim DIP Order and/or the Final DIP Order (as applicable)); *provided*, that no more than $25,000 in the aggregate of the DIP Collateral, the Carve Out or Cash Collateral, proceeds from the borrowings under the DIP Facility or any other amounts, may be used for allowed fees and expenses incurred solely by any Committee (if appointed) in investigating, but not objecting to, challenging, litigating, opposing, prosecuting, or seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the Prepetition Liens, the Prepetition Documents, the Adequate Protection Liens, or the Adequate Protection Claims prior to the Challenge Deadline (as defined below). Except to the extent expressly permitted by the terms of the DIP Documents and the Interim DIP Order or any further order of this Court, none of the Debtors, any Committee (if appointed), or any trustee or other estate representative appointed in the Chapter 11 Cases or any other person or entity may use or seek to use Cash Collateral or, to sell, or otherwise dispose of DIP Collateral or Prepetition Collateral, in each case, without the consent of the DIP Lender. |
| 12. | ***Voluntary and Mandatory Prepayments*** | • **Voluntary Prepayments**. Optional prepayments of the DIP Loans shall be permitted at any time, subject to (i) allocation of such payment to the ratable portion of the Exit Fee due thereon (which, for the avoidance of doubt, shall be deemed to be due and payable on the date of such voluntary prepayment), (ii) accrued interest on the amount prepaid, and (iii) in minimum amounts of at least $100,000 of principal.<br>• **Mandatory Prepayments**.<br>i. **Dispositions**. Within one Business Day of the date of receipt by any Loan Party of the Net Cash Proceeds[2] of any disposition (whether through a voluntary or involuntary sale, the loss, destruction, or damage thereof or any actual condemnation, confiscation, requisition, seizure, or taking thereof or otherwise) of |

[2] For purposes hereof, the term "**Net Cash Proceeds**" means, with respect to any sale or disposition of the DIP Collateral, in whole or in part, by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (a) estimated fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition, (b) estimated taxes paid or payable to any taxing authorities in connection with such sale or disposition, in each case, only to the extent, that the amounts so deducted are properly attributable to such transaction and (c) any escrow or reserve for any adjustment in respect of the sale price of such asset or assets and indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of the applicable sale or disposition or other liabilities in connection with such sale or disposition (provided that upon release of any such escrow or reserve, the amount released shall be considered Net Cash Proceeds). Moreover, for the purposes hereof, the term "**Person**" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business or statutory trust, or other organization, irrespective of whether constituting a separate legal entity, and governments and agencies and political subdivisions thereof.

| | | |
|---|---|---|
| | | DIP Collateral, such Loan Party shall prepay such portion of the outstanding amount of the DIP Obligations in accordance with the applicable DIP Documents in an amount equal to 100% of the Net Cash Proceeds (including applicable insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions. Such Net Cash Proceeds shall be applied to the repayment of principal, accrued interest, and the allocable portion of the Exit Fee.<br><br>ii. **Indebtedness**. Within three Business Day of the date on which a Loan Party receives proceeds of any indebtedness (other than permitted indebtedness set forth in the applicable DIP Documents), such Loan Party shall prepay the outstanding principal amount of the DIP Obligations in accordance with the applicable DIP Documents in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such indebtedness, <u>plus</u> the accrued interest and Exit Fee as applied to the principal amount of such prepayment.<br><br>• No reinvestment of the proceeds of any extraordinary receipts, asset sales, or other proceeds described above shall be permitted without the prior written consent of the DIP Lender in its sole discretion. |
| 13. | ***Security*** | • As security for the DIP Obligations, and effective upon entry of the DIP Order, each Loan Party and its estate shall grant to the DIP Lender, subject to the priorities set forth in Section 14 below and the DIP Orders (as applicable), liens on all of such Loan Party's and its estate's right, title, and interest in, to and under such Loan Party's and its estates assets and property, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located, including, but not limited to, the following (all such assets and property collectively referred to as the "**DIP Collateral**"): all Cash Collateral, all contracts, contract rights, licenses, general intangibles (including, without limitation, all payment intangibles), instruments (including, without limitation, promissory notes), equipment (including, without limitation, documents of title), accounts, documents, goods, vehicles, inventory, furniture, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each Loan Party's current and future subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), guarantees, arbitration awards, money, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), insurance, receivables, receivables records, securities accounts, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, service marks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by a Loan Party, |

| | | |
|---|---|---|
| | | claims (including commercial tort claims) or other causes of action (including chapter 5 causes of action or the proceeds thereof (“**Avoidance Actions**”)), books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, including insurance proceeds or other proceeds (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York).<br>• Negative pledge on all assets of the Loan Parties subject to the Carve-Out, under the DIP Documents.<br>• In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, the Loan Parties shall take all other commercially reasonable steps regarding the execution and filing of UCC financing statements, requested by DIP Lender. |
| 14. | ***Priority and Security*** | • Subject to only the Carve-Out and Permitted Priority Liens (as defined in the Interim DIP Order), all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein, and all obligations of the Loan Parties under the DIP Facility (the “**DIP Obligations**”) shall be entitled to, as applicable, (i) a priming first-priority lien, (ii) a senior first-priority lien on unencumbered assets and property, (iii) junior liens, and (iv) superpriority claim status pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, with senior (or junior, as applicable) priority over any and all liens and secured claims, administrative-expense claims, other priority claims, and other unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (such superpriority claims, the “**DIP Claims**”).<br>• Subject to the Carve-Out and Permitted Priority Liens (if any), at a minimum, all DIP Obligations in respect of the DIP Facility shall be:<br>i. pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral);<br>ii. secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on all DIP Collateral that is not subject to a valid, perfected, non-avoidable lien or security interest (including any such lien or security interest that is perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code);<br>iii. secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior lien on all DIP Collateral that is subject to a Permitted Priority Lien (all such DIP Collateral, the “**DIP Junior** |

| | | |
|---|---|---|
| | | **Collateral**," all DIP Collateral that is not DIP Junior Collateral, collectively, the "**DIP Senior Collateral**"); and<br>iv. secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by an automatically perfected priming first-priority lien on all DIP Senior Collateral that is subject to a valid, perfected, non-avoidable lien or security interest (including any such liens or security interests that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code).<br>• The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above and with the priority set forth in the DIP Order. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be automatically effected and perfected upon entry of the DIP Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements, or other agreements. |
| 15. | ***Remedies and Waiting Period Procedures*** | • Upon the occurrence and during the continuation of an Event of Default under this DIP Term Sheet or any other DIP Document, the DIP Lender shall be entitled to exercise any and all remedies customarily available in the Chapter 11 Cases, including, without limitation, those remedies set forth in the Final DIP Order approving the DIP Facility or customarily available to a senior secured, administrative expense claim of a debtor in possession lender, which shall include, without limitation, the right to (subject to the Carve-Out):<br>i. declare that the DIP Commitments are terminated, reduced or restricted, whereupon the DIP Commitments shall be terminated, reduced, or restricted on account of any further Draws;<br>ii. declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;<br>iii. charge interest at the default rate under the DIP Documents;<br>iv. subject to the Carve-Out, declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral; or<br>v. take any other action or exercise any other right or remedy (including, without limitation, with respect to the DIP Liens) permitted under the DIP Documents or applicable law.<br>Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Order, including the following procedures (the "**Waiting Period Procedures**"):<br>i. Upon the occurrence of a DIP Termination Event (as defined in the DIP Order), of which written notice (including via email) of the occurrence of such DIP Termination Event is |

| | | |
|---|---|---|
| | | delivered by the DIP Lender to counsel for the Debtors, the U.S. Trustee, and counsel for the Committee (the "**Remedies Notice**" and such date, the "**DIP Termination Declaration Date**"), without further notice to, hearing of, application to, or order from the Bankruptcy Court, subject to the expiration of the Waiting Period (as defined below), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to, among other things, (a) deliver a Carve-Out Trigger Notice; (b) declare the termination of the DIP Commitments; (c) declare all DIP Obligations to be immediately due and payable; and (d) charge default interest at the default rate set forth in the DIP Term Sheet or the other DIP Documents, as applicable.<br><br>ii. The Debtors may seek an emergency hearing solely during the period beginning on the DIP Termination Declaration Date and through the date that is five (5) Business Days after the DIP Termination Declaration Date (such period, the "**Waiting Period**"). If, notwithstanding the foregoing, a hearing cannot be scheduled prior to the expiration of the Waiting Period, the Waiting Period shall be deemed automatically extended until such time as the matter can be heard and adjudicated by the Bankruptcy Court. At any hearing regarding a Remedies Notice, the Court may only consider whether an Event of Default has occurred or is continuing (other than, for the avoidance of doubt, the occurrence of the Maturity Date under the DIP Term Sheet). During the Waiting Period, the Debtors shall continue to have the right to use DIP Collateral (including, without limitation, Cash Collateral) in accordance with the terms of the DIP Order and the Approved Budget (subject to the Permitted Variance), solely to pay any expenses necessary to (i) preserve the Debtors' going-concern value or (ii) contest, in good faith, the occurrence of the Event of Default (other than, for the avoidance of doubt, the occurrence of the Maturity Date under the DIP Term Sheet). |
| 16. | ***Conditions Precedent to Initial Draw*** | The DIP Lender's obligations to fund the Initial Draw will be subject to each of the following conditions precedent satisfied to the DIP Lender's sole discretion:<br><br>i. All "first day" motions, including those related to the DIP Facility, filed by the Debtors and related interim and final orders, as applicable, entered within 3 Business Days of the Petition Date by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to each of the DIP Lender.<br><br>ii. The DIP Lender shall have received a Budget in form and substance satisfactory to the DIP Lender. Entry by the Bankruptcy Court of the Interim DIP Order authorizing the secured financing under the DIP Facility on the terms and conditions contemplated by this DIP |

| | | |
|---|---|---|
| | | Term Sheet, authorizing the Debtors' use of DIP Collateral subject to the terms provided herein, and otherwise on terms reasonably acceptable to the DIP Lender no later than 3 Business Days after the Petition Date, and such Interim DIP Order shall be in full force and effect and not have been vacated, reversed, stayed, modified or amended (except in the case of a modification or amendment as consented to by each of the DIP Lender, in its sole discretion) and shall not be subject to a stay pending appeal or motion for leave to appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it, except as consented to by each of the DIP Lender.<br><br>iii. Entry by the Bankruptcy Court of an order authorizing, on an interim basis, the use of Cash Collateral and providing for adequate protection in favor of the Prepetition Secured Parties on terms satisfactory to the Prepetition Secured Parties.<br><br>iv. The DIP Lender shall have a valid and perfected lien on and security interest in the DIP Collateral of the Debtors on the basis and with the priority set forth herein.<br><br>v. All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender under this DIP Term Sheet, the DIP Documents or the Interim DIP Order shall have been paid.<br><br>vi. No default or Event of Default shall have occurred, and shall be continuing, under the DIP Term Sheet immediately prior to the funding of the DIP Loans or would result from such borrowing of the DIP Loans.<br><br>vii. The Borrower shall have delivered to the DIP Lender a customary borrowing notice.<br><br>viii. Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases, or as disclosed in writing to the DIP Lender prior to the Petition Date, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental authority that (a) would reasonably be expected to result in a material adverse effect, or (b) restrains, prevents or purports to affect materially adversely the legality, validity or enforceability of the DIP Facility or the consummation of the transactions contemplated thereby (each, a "**Material Adverse Effect**").<br><br>ix. The making of the Initial Draw shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently. |
| 17. | ***Conditions Precedent to Other Draws*** | The DIP Lender's obligation to fund Other Draws will be subject to each of the following conditions precedent: |

| | | |
|---|---|---|
| | | i. The Interim DIP Order, as entered by the Bankruptcy Court, shall not have been reversed, modified, amended, stayed or vacated, without the consent of the DIP Lender, and the Borrower shall be in compliance in all respects with the Interim DIP Order.<br><br>ii. The Bankruptcy Court shall have entered the Final DIP Order within thirty-five (35) calendar days following the Petition Date, in form and substance consistent with the terms and conditions set forth herein, authorizing the Debtors' use of DIP Collateral subject to the terms provided herein, and otherwise satisfactory to the DIP Lender, which Final DIP Order shall include, an updated Budget (as necessary) as an exhibit thereto, entered on notice to such parties as may be satisfactory to the DIP Lender and otherwise as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of the Bankruptcy Court, authorizing and approving, on a final basis, (a) the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the superpriority status, security interests and priming liens, and the payment of all fees, referred to herein; (b) the use of cash collateral and providing for adequate protection in favor of the Prepetition Secured Parties as and to the extent provided herein; and (c) reflecting such other terms and conditions that are mutually satisfactory to the DIP Lender and the Debtors, in their respective discretion, in each case, on the terms and conditions set forth herein; which Final DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender.<br><br>iii. The DIP Lender shall have received a borrowing notice from the Borrower at least two (2) Business Days prior to the anticipated date of the Final Draw.<br><br>iv. The representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects).<br><br>v. No default or "Event of Default" shall have occurred, and shall be continuing, under the DIP Documents immediately prior to the funding of the DIP Loans or would result from such borrowing of the DIP Loans.<br><br>vi. The Debtors have delivered to the DIP Lender the most recent Budget and such other information as requested by the DIP Lender, in form and substance satisfactory to the DIP Lender.<br><br>vii. The Debtors are in compliance with the Milestones as of that date.<br><br>viii. Since the Petition Date, other than the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, |

circumstance or contingency that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole; (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender; or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document.

ix. All reasonable and documented costs, fees, expenses (including, without limitation, legal fees and expenses) incurred in connection negotiating, documenting, approving, administering, monitoring or enforcing any rights under the DIP Facility set forth in the DIP Documents or otherwise to be paid to the DIP Lender shall have been paid when due.

x. The amounts requested by the Borrower shall be used for an authorized purpose as defined under "Use of Proceeds" above and in accordance with the Budget, subject to a Permitted Variance (as defined below).

xi. The Loan Parties are in compliance with (a) the Interim DIP Order; (b) the Final DIP Order; and (c) the Budget (subject to Permitted Variances).

xii. The Debtors shall have filed a motion, in form and substance acceptable to the DIP Lender, seeking approval of (a) bid procedures for a sale of substantially all of the Debtors' assets (the "**Sale**"), (b) entry into asset purchase agreement with a stalking horse purchaser, and (c) the sale of substantially all of the Debtors' assets in accordance with the bid procedures (such motion, the "**Bid Procedures Motion**") within seven (7) days of the Petition Date.

In addition to the conditions precedent set forth above, the DIP Lender's obligation to fund the Additional Professional Fee DIP Advance will be subject to each of the following conditions precedent:

i. No less than ninety (90) days shall have passed form the Petition Date.

ii. The Debtors and the DIP Lender shall have agreed on an updated Budget specific to the Additional Professional Fee DIP Advance.

iii. The Debtor Professionals shall have delivered to the DIP Lender good faith estimates, in form and substance acceptable to the DIP Lender, in its discretion, of the reasonable fees and expenses (a) incurred in the first ninety (90) days of the Chapter 11 Cases, and (b) estimated to be incurred through the reminder of the Chapter 11 Cases (the "Fee Estimates"), and the Fee Estimates demonstrate that

| | | |
|---|---|---|
| | | the amounts provided for in the initial Budget for the Debtor Professionals fees and expenses are insufficient. |
| 18. | ***Representations and Warranties*** | As a condition to each Draw under the DIP Facility, each Debtor shall make the following representations and warranties as of the date of such draw:<br><br>(i) *Collateral Title*. Each Debtor has the corporate power to transfer each item of the Collateral upon which it has granted a DIP Lien pursuant to the DIP Documents, free of all liens whatsoever, except for Permitted Priority Liens, if any, and DIP Liens.<br><br>(ii) *Due Organization*. Each Debtor is a limited partnership, corporation or limited liability company, as applicable, duly organized, legally existing and in good standing under the laws of its jurisdiction of incorporation or organization and is duly qualified as a foreign limited partnership, corporation or limited liability company, as applicable, in all jurisdictions in which the conduct of its business or its ownership of property requires such qualification and where the failure to do so could reasonably be expected have a Material Adverse Effect on the Debtors' businesses.<br><br>(iii) *Enforceability of DIP Documents*. Each DIP Document is the valid, binding obligation of each Debtor party (or in the case of the DIP Order, subject) thereto, enforceability against such Debtor in accordance with its terms.<br><br>(iv) *Compliance with Applicable Laws*. By entering into the DIP Documents, no Debtor is in violation of any law, rule or regulation or in default with respect to any judgment, writ, injunction or decree of any governmental authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect.<br><br>(v) *Conflict*. Subject to the approval of the Court, the DIP Documents do not (a) violate any provisions of the Debtors' organizational documents, bylaws, or operating agreements, as applicable, or any material law, regulation, order, injunction, judgment, decree or writ to which the Debtors are subject or (b) other than the commencement of the Chapter 11 Cases and as a reasonable consequence of the commencement of the Chapter 11 Cases, conflict with or result in the material breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any material lease, agreement or other contract to which any Debtor is a party or by which any Debtor or any of its property is bound which is not subject to the automatic stay.<br><br>(vi) *Material Adverse Effect*. Other than the commencement of the Chapter 11 Cases and as a reasonable consequence of the commencement of the Chapter 11 Cases, no event that has had |

| | | |
|---|---|---|
| | | or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing since the Petition Date.<br><br>(vii) *Information Correct*. No information, report, financial statement, exhibit or schedule furnished by or on behalf of the Debtors to the DIP Lender in connection with the negotiation of any DIP Documents contains, when furnished, any material misstatement of fact or omitted or omits, when furnished, to state any material fact necessary to make the statements, in the light of circumstances under which they were, are or will be made, not misleading (it being recognized by DIP Lender that (i) projections and pro forma financial information, including the Approved Budget, are based upon good faith estimates and assumptions believed by the Debtors to be reasonable at the time made, and (ii) projections and estimates as to future events are not to be viewed as facts and that the actual results during the period or periods covered by any such projections and estimates may differ materially from projected or estimated results). |
| 19. | ***Affirmative Covenants*** | The Debtors shall:<br><br>(i) satisfy, or cause to be satisfied, each Milestone on or before the applicable deadline set forth in Exhibit 3 hereto.<br><br>(ii) timely deliver, or cause to be timely delivered, to the DIP Lender the Budget, Variance Reports, Updated 13-Week Forecasts, as applicable, all in accordance with the provisions set forth in Section 21 below;<br><br>(iii) deliver to DIP Lender any and all financial and other data, documents, and information reasonably requested by DIP Lender and provide reasonable access to any and all such other data, documents, and information (including, without limitation, historical data, documents, and information) and to personnel (including, without limitation, through in-person, telephonic, or videoconference meetings), all as may be requested by the DIP Lender;<br><br>(iv) deliver to the DIP Lender as soon as reasonably practicable, but in no event less than two days prior to any filing, copies of all material proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Cases or any other party in interest, including, without limitation, the DIP Orders, the Bid Procedures Motion, and the Bid Procedures Order in the Cases (each of which must (i) in the case of any of the foregoing relating to the DIP facility, the DIP Liens, the Collateral or the sale process, be in form and substance reasonably acceptable to DIP Lender in its sole |

| | | |
|---|---|---|
| | | discretion, or (ii) otherwise be in form and substance reasonably acceptable to DIP Lender).<br><br>(v) (A) Upon the reasonable request of DIP Lender, during normal business hours, and on reasonable prior notice (*provided* no prior notice is required if an Event of Default has occurred and is continuing), make the Debtors' inventory, equipment, other DIP Collateral, and books and records concerning the DIP Collateral (including software used in Debtors' business) available to DIP Lender for inspection at the place where it is located and shall make Debtors' log and maintenance records pertaining to the inventory and equipment available to DIP Lender for inspection and (B) take all reasonable action necessary to correctly and completely maintain such books, records, logs, and maintenance records;<br><br>(vi) upon request of the DIP Lender, obtain additional insured and loss payee endorsements, as applicable, to the Loan Parties' insurance policies with respect to the DIP Collateral that name the DIP Lender as an additional insured and loss payee, as applicable, in form and substance reasonably acceptable to the DIP Lender;<br><br>(vii) comply with the provisions of the DIP Documents;<br><br>(viii) at the request of the DIP Lender, take whatever actions are necessary to address maturities of project level financings for which Zom Holding, Inc. is a guarantor; and<br><br>(ix) take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Lender to carry out the provisions of the DIP Documents. |
| 20. | ***Negative Covenants*** | The Debtors shall not, without the prior written consent of the DIP Lender, do, cause to be done, or agree to do or cause to be done, any of the following:<br><br>(i) create, incur, assume or suffer to exist any indebtedness, except the DIP Obligations, indebtedness arising prior to the Petition Date and disclosed in writing to the DIP Lender prior to the Petition Date, and other indebtedness expressly contemplated by this DIP Term Sheet, or cause, permit to be caused, or agree to cause or permit to be caused, any direct or indirect subsidiary that is not a Debtor to, create, incur, assume or suffer to exist any such indebtedness other than trade payables created or incurred in the ordinary course of the Debtors' business;<br><br>(ii) create, incur, assume or suffer to exist any lien upon any of their property, assets, income or profits, whether now owned or hereafter acquired, except the DIP Liens the Permitted Priority |

| | | |
|---|---|---|
| | | Liens, if any, and, to the extent such Liens are junior to the DIP Liens, any Liens arising prior to the Petition Date and disclosed in writing to the DIP Lender Prior to the Petition Date, and shall not cause, or permit to be caused, any direct or indirect subsidiary that is not a Debtor to, create, incur, assume or suffer to exist any such liens other than liens arising in connection with trade payables created or incurred in the ordinary course of the Debtors' business;<br><br>(iii) convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) or cause, permit to be caused, or agree to cause or permit to be caused, any direct or indirect subsidiary that is not a Debtor to convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or hereafter acquired, out of the ordinary course of business; or<br><br>(iv) incur or make any expenditure (including, without limitation, any capital expenditure), investment or other payment, other than in accordance with the Budget, subject to the Permitted Variances. |
| 21. | ***DIP Budget / Variance Reporting*** | • Subject to the satisfaction of the conditions precedent set forth above, use of cash shall be subject to a 13-week cash flow forecast commencing on the Petition Date, which forecast shall include an itemized list of expenses to be incurred during each week along with information sufficient to denote the purpose of such expenses and shall be in form and substance acceptable to each of the DIP Lender in its sole discretion (the "**Budget**," a copy of the initial Budget is attached as Exhibit 2 to this DIP Term Sheet) and shall, at a minimum, contain the categories set forth in the Budget attached as Exhibit 2 (each, a "**Reporting Category**").<br><br>• By no later than 5:00 pm ET on the fourth Business Day of each week, commencing after the second full week after the Petition Date (each, a "**Reporting Date**"), Borrower shall deliver to the DIP Lender a variance report (each, a "**Variance Report**") showing comparisons of actual results for each line item against such line item in the Budget. Each Variance Report shall indicate whether there are any adverse variances that exceed the allowed variances, which means, in each case measured on a cumulative basis for the period from the Petition Date, (x) up to 10% of the total disbursements (on a line item by line item basis) as set forth in the Budget, excluding disbursements for fees and expenses of Professional Persons, which shall be subject to a 0% variance on a cumulative basis since the Petition Date, and (y) up to 10% in the aggregate for all "Total Receipts" (all as defined in the Budget) (each, a "**Permitted Variance**"). In no event shall the Permitted Variances increase or be deemed to increase the amount of the DIP Commitments. |

| | | |
|---|---|---|
| | | • If necessary, the Debtors may provide to the DIP Lender an updated 13-week cash flow forecast, containing line items of sufficient detail to reflect the Debtors' projected cash receipts and disbursements for such 13-week period on a weekly basis (the "**Updated 13-Week Forecast**"). Such Updated 13-Week Forecast shall be acceptable to the DIP Lender in its sole discretion, and upon acceptance by the DIP Lender, such Updated 13-Week Forecast shall become the new Budget commencing on such week, and promptly after the DIP Lender approves the new Budget, the Debtors shall deliver the new Budget, together with any amendments or modifications thereto approved by the DIP Lender. In the event that the DIP Lender and the Debtors do not agree to an updated Budget, the Budget shall be the then-existing Budget or such Budget as may be approved by the Bankruptcy Court after a hearing. |
| 22. | ***Chapter 11 Milestones*** | The obligations of the DIP Lender to advance the DIP Loans shall be subject to the Debtors satisfying, or causing the satisfaction of, the milestones listed on Exhibit 3 attached hereto (collectively, the "Milestones") by the date specified therein or by such later date as the DIP Lender may agree in writing (email being sufficient) in its sole discretion. |
| 23. | ***Carve-Out*** | • The DIP Liens and the DIP Claims shall be subject and subordinated only to the Carve-Out.<br>• As used herein, the "**Carve-Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) solely to the extent provided for in the Budget (for the avoidance of doubt, the Permitted Variance with respect to professional fees and expenses shall be 0% when measured on a cumulative basis), the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by Persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") or the Committee, pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first Business Day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, applicable transaction fees, and any other limits imposed by the amount set forth in the DIP Order; and (iv) allowed fees and expenses of Professional Persons in an aggregate amount not to exceed $200,000 incurred after the first Business Day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**" and, together with the amounts set forth in clause (iii) above, the "**Professional Fee Carve-Out Cap**"); provided that nothing herein shall be construed to impair the ability of any party to the DIP Documents |

| | | |
|---|---|---|
| | | to object to the fees, expenses, reimbursement or compensation described above on any grounds.<br><br>The Debtors shall maintain a separate account not subject to control of the DIP Lender (the "**Carve-Out Account**") and may deposit cash weekly into the Carve-Out Account in an amount equal the estimated fees of Professional Persons for the next unfunded week as set forth in the Budget. Immediately upon the delivery of a Carve-Out Trigger Notice (as defined below), and prior to the payment of any DIP Obligations, the Loan Parties shall be authorized to deposit into the Carve-Out Account cash (which disbursement shall be deemed approved under the DIP Documents) in an amount up to the difference between the Professional Fee Carve-Out Cap and the balance held in the Carve-Out Account as of the date on which a Carve-Out Trigger Notice is received by the Debtors (plus any amounts previously disbursed from the Carve-Out Account). The amounts in the Carve-Out Account shall be available only to satisfy allowed fees and expenses of the Professional Persons until such amounts are paid in full. The amount in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for allowed fees and expenses of the Professional Person that are accrued and paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for such amounts so paid. The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out. To the extent the funds held in the Carve-Out Account are not reduced to zero after all amounts included in the Carve-Out have been funded into the applicable Carve-Out Account and all allowed fees and expenses of Professional Persons incurred in accordance with the Budget have been paid in full pursuant to a final order of the Bankruptcy Court, the remaining funds in the Carve-Out Account shall be paid as follows: (1) first to the DIP Lender until the DIP Obligations are Paid in Full, and (2) second to the Prepetition Secured Parties until the Prepetition Secured Obligations are Paid in Full.<br><br>• For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by mail, courier, or email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.<br><br>• The Carve-Out shall not include, apply to, or be available for any Person or party in connection with any Restricted Use. |
| 24. | ***Events of Default*** | "**Events of Default**" shall include the following and any other defaults specified as such in the DIP Orders, each of which may only be waived in writing by the DIP Lender:<br><br>i. failure to make payments including adequate protection payments when due; |



136578.000001\4907-0212-5533.1

| | | |
|---|---|---|
| | | ii. noncompliance with covenants (subject to customary cure periods as may be agreed with respect to certain covenants); |
| | | iii. breaches of representations and warranties in any material respect, in either case, under the DIP Documents; |
| | | iv. invalidity of any material provision of the DIP Documents; |
| | | v. change in ownership or control; |
| | | vi. filing of a Plan by the Debtors that does not propose to indefeasibly repay the DIP Obligations, to the extent outstanding, in full in cash on the Plan effective date, unless otherwise consented to in writing by the DIP Lender prior to its filing; |
| | | vii. any of the Debtors shall file a pleading seeking to vacate or modify the Interim DIP Order or the Final DIP Order over the objection of the DIP Lender; |
| | | viii. entry of an order without the prior written consent of each of the DIP Lender amending, supplementing or otherwise modifying the Interim DIP Order or the Final DIP Order; |
| | | ix. entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364(d) of the Bankruptcy Code except if such financing contemplates payment in full of the DIP Obligations; |
| | | x. reversal, vacatur or stay of the effectiveness of the Interim DIP Order or the Final DIP Order except to the extent reversed within ten (10) Business Days; |
| | | xi. any violation of any material term of the Interim DIP Order or the Final DIP Order by the Debtors; |
| | | xii. termination of the Debtors' right to use Cash Collateral as permitted hereunder by the Bankruptcy Court; |
| | | xiii. failure to comply with the Budget, including Permitted Variances; |
| | | xiv. the commencement of a timely-filed Challenge Proceeding, the filing of a motion to authorize the commencement of a late-filed Challenge Proceeding, or the filing of a motion for derivative standing to assert a Challenge Proceeding; |
| | | xv. entry of an order in favor of the objector, movant or plaintiff any timely filed Challenge Proceeding; |
| | | xvi. dismissal of the Chapter 11 Case of a Debtor with material assets or conversion of the Chapter 11 Case of a Debtor with material assets to a case under chapter 7 of the Bankruptcy Code, or any Debtor |

| | | |
|---|---|---|
| | | shall file a motion or other pleading seeking such dismissal or conversion of any Bankruptcy Case;<br><br>xvii. appointment of a chapter 11 trustee or examiner with enlarged powers, or any Debtor shall file a motion or other pleading seeking such appointment;<br><br>xviii. failure to meet a Milestone, unless extended or waived by the prior written consent (email being sufficient) of the DIP Lender;<br><br>xix. the Bankruptcy Court shall enter any order to materially limit, restrict, curtail, reduce, suspend, stay or enjoin the right of the DIP Lender, or its designee to credit bid the Obligations or Prepetition Secured Obligations;<br><br>xx. the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Claims;<br><br>xxi. the Debtors seeking, or supporting any other person's motion seeking (in any such case, verbally in any court of competent jurisdiction or by way of any motion or pleading filed with the Bankruptcy Court, or any other writing to another party in interest by the Debtors), to challenge the validity or enforceability of any of the obligations of the parties under the Prepetition Secured Documents;<br><br>xxii. the Debtors filing a motion for the Bankruptcy Court to approve a sale of the DIP Collateral under section 363 of the Bankruptcy Code, unless such proposed sale is approved by the DIP Lender, in its sole discretion;<br><br>xxiii. any Debtor shall fail to execute and deliver to the DIP Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the DIP Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Lender;<br><br>xxiv. the Debtors shall assert in any pleading filed in any court that the guarantee contained in the DIP Loan Documents is not valid and binding, for any reason, to be in full force and effect, other than under the terms hereof or thereof;<br><br>xxv. payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or as otherwise consented to by the DIP Lender; |

| | | |
|---|---|---|
| | | xxvi. expiration or termination of the period provided by section 1121 of the Bankruptcy Code for the exclusive right to file a plan with respect to a Debtor with material assets unless such expiration or termination was sought by any of the Prepetition Secured Parties or the DIP Lender;<br><br>xxvii. cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable in all respects;<br><br>xxviii. any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility are paid in full and the commitments are terminated;<br><br>xxix. subject to entry of the Final DIP Order, the allowance of any claim or claims under section 506(c) of the Bankruptcy Code;<br><br>xxx. the entry of an order in any of the Chapter 11 Cases granting relief from any stay (including, without limitation, the automatic stay) unless otherwise consented to in writing by the DIP Lender prior to its entry, other than entry of an order granting relief from the automatic stay to permit the Debtors to pursue the appeal filed by Zom Holding, Inc. on May 26, 2026 of the Judgement filed by the Superior Court of Arizona, County of Maricopa on May 15, 2026 in the case captioned *Gray Services, LLC, d/b/a Gray Development Group, and Gray Development LLC, d/b/a Gray Development Group, v. Zom Holding, Inc., d/b/a Zom Living*;<br><br>xxxi. the entry of an order in any Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations owing under the DIP Loan Documents; and<br><br>xxxii. the entry of an order by the Bankruptcy Court providing relief adverse to the interests of any DIP Lender or any Prepetition Secured Party with respect to any motion, objection, application or adversary proceeding challenging the validity, enforceability, perfection or priority of, or seeking avoidance, subordination or characterization of, any portion of the Prepetition Secured Obligations and/or the liens and security interests securing the Prepetition Secured Obligations or asserting any other claim or cause of action against and/or with respect to the Prepetition Secured Obligations or the liens and security interests securing the Prepetition Secured Obligations, including, without limitation, preliminary or final relief granting standing to any other party to prosecute such claims, causes of action or proceeding. |
| 25. | ***Credit Bidding*** | The DIP Lender shall have the unqualified right to credit bid any or all of the obligations under the DIP Facility in connection with any disposition of DIP Collateral. |
| 26. | ***Admissions and Stipulations*** | The Borrower and Guarantors shall make customary admissions and stipulations with respect to the amount of the Prepetition Secured |

| | | |
|---|---|---|
| | | Obligations, the validity, perfection, enforceability, non-avoidability, and priority of the Prepetition Liens, and the value of the Prepetition Collateral. |
| 27. | ***Adequate Protection*** | As adequate protection for the interests of the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral), under sections 361, 362 and 363(e) of the Bankruptcy Code, and as a condition for the use of the Prepetition Collateral, including any Cash Collateral, the Prepetition Secured Parties will be granted the following (collectively, the "Prepetition Adequate Protection"):<br><br>xxiii. Prepetition Adequate Protection Liens. Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of any Prepetition Secured Party's interests in such Prepetition Secured Party's Prepetition Collateral, from and after the Petition Date, the Prepetition Lenders are granted the following security interests and liens (collectively, the "Prepetition Adequate Protection Liens" and the collateral subject thereto, the "Prepetition Adequate Protection Collateral") under sections 361, 362, and 363 of the Bankruptcy Code: valid, binding, enforceable, and perfected replacement liens on and security interests in the Prepetition Collateral, including now-owned and hereafter-acquired real and personal property, assets, and rights of any kind or nature, wherever located, which liens and security interests shall be junior to the Carve Out and the DIP Liens.<br><br>xxiv. Prepetition Adequate Protection Superpriority Claims. Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of its respective Prepetition Collateral, and in each case, subject and subordinate to the Carve Out, each Prepetition Secured Party is hereby granted an allowed superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code against the applicable Debtors (collectively, the "Prepetition Adequate Protection Superpriority Claims"). All Prepetition Adequate Protection Superpriority Claims shall be junior to (a) the Carve Out and (b) the DIP Claims, and otherwise have priority over any and all other administrative expenses and other claims against the applicable Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under the Bankruptcy Code.<br><br>xxv. Prepetition Term Loan Adequate Protection Payments: As further adequate protection, the Debtors will reimburse each Prepetition Secured Party for all reasonable and documented out-of-pocket fees, costs and expenses of (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses, including one (1) local counsel). All such fees, including reasonable and documented out-of-pocket legal and other professional fees shall be paid by the Debtors promptly upon written demand and without the requirement of Bankruptcy Court approval; provided, however, that in the event such fees and expenses exceed |

| | | |
|---|---|---|
| | | the amounts set forth in the DIP Budget, any excess amounts shall be added to the principal balance of the DIP Loans.] |
| 28. | ***Release*** | Effective as of the date of entry of the Final DIP Order, subject solely to the Challenge rights and limitations set forth in herein with respect to the Challenge Matters,[3] each of the Debtors and the Debtors' estates, on its and their own behalf, on behalf of its and their respective past, present and future predecessors, heirs, successors, subsidiaries, and assigns, shall absolutely, unconditionally and irrevocably release and forever discharge and acquit the DIP Lender and the Prepetition Lender from any and all (a) obligations and liabilities to the Debtors (and their successors and assigns), and (b) claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the date of the Final DIP Order of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against the DIP Lender or the Prepetition Lender for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Final DIP Order (the "Release"). For the avoidance of doubt, nothing in the release shall relieve the Debtors of the Prepetition Secured Obligations or their obligations under the DIP Documents.<br><br>Notwithstanding anything to the contrary in this DIP Term Sheet, (i) the DIP Lender shall obtain the Release solely in its capacity as DIP Lender and solely as to claims arising from the acts or omissions of the DIP Lender in its capacity as DIP Lender, and (ii) the Prepetition Lender shall obtain the Release solely in its capacity as Prepetition Lender and solely as to claims arising from the acts or omissions of the Prepetition Lender in its capacity as Prepetition Lender. |
| 29. | ***Waivers*** | Effective upon entry of the Final DIP Order, the DIP Lender and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied under the Final DIP Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary.<br><br>Effective upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, (i) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or |

[3] For the avoidance of doubt, the Release of the DIP Lender is not subject to Challenge. The release of the DIP Lender shall be effective as of the date of the Final DIP Order.

| | | |
|---|---|---|
| | | enhancement of, or realization by the DIP Lender and the Prepetition Secured Parties, upon the DIP Collateral or the Prepetition Collateral, and (ii) the DIP Lender and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender and the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral. |
| 30. | ***Investigation Rights*** | The Committee (to the extent appointed) and any other party in interest with proper standing granted by the Bankruptcy Court, shall have until the earlier of (x) sixty (60) calendar days after the Petition Date and (y) the date established by the Court in the Bid Procedures Order for the submission of qualified bids in connection with the Sale (the "<u>Investigation Period</u>") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, and challenge (each, a "<u>Challenge</u>") the findings, the Debtors' stipulations, or any other stipulations contained in the Interim DIP Order and the Final DIP Order relating to the Prepetition Documents, including, without limitation, any challenge to the validity, priority or enforceability of the liens securing the Prepetition Secured Obligations, or to assert any claim or cause of action against the Prepetition Secured Parties or their affiliates solely to the extent arising under or in connection with their respective Prepetition Documents, or their respective Prepetition Secured Obligations, as the case may be, whether in the nature of a setoff, counterclaim or defense of Prepetition Secured Obligations, or otherwise (the "<u>Challenge Matters</u>"). The Investigation Period may only be extended with the prior written consent of the applicable Prepetition Secured Party or under an order of the Bankruptcy Court.<br><br>Except to the extent asserted in an adversary proceeding or contested matter filed during the Investigation Period, upon the expiration of such applicable Investigation Period (to the extent not otherwise waived or barred), (i) any and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in the Interim DIP Order and Final DIP Order shall be irrevocably and forever binding on the Debtors, the Committee and all parties-in-interest and any and all successors-in- interest as to any of the foregoing, including any chapter 7 trustee, without further action by any party or the Bankruptcy Court; (iii) the Prepetition Secured Obligations shall be deemed to be finally allowed and the Prepetition Liens securing such claims shall be deemed to constitute valid, binding and enforceable encumbrances, and not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtors shall be deemed to have released, waived, and discharged the Prepetition Lender from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Secured Obligations. Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced with the Bankruptcy Court (such commencement, a "<u>Challenge Proceeding</u>"), the stipulations contained in the Interim DIP Order and the Final DIP Order shall nonetheless remain binding on all other parties- |

| | | |
|---|---|---|
| | | in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (y) the Prepetition Lender reserves all of its rights to contest on any grounds any Challenge. For the avoidance of doubt, the Interim DIP Order and the Final DIP Order shall include language that the investigation rights afforded to the Committee will not constitute the Debtors', the DIP Lender's or the Prepetition Lender's recognition, consent, or agreement not to object to, the Committee's standing to assert any claim or cause of action. |
| 31. | ***Indemnification*** | The Debtors shall indemnify, pay and hold harmless the DIP Lender (and its directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith, fraud, or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). |
| 32. | ***Expenses*** | All fees, including reasonable and documented out-of-pocket legal and other professional fees (limited to the reasonable and documented fees of the advisors) related to negotiating, documenting, approving, administering, monitoring or enforcing any rights under the DIP Facility of the DIP Lender shall be paid by the Debtors promptly upon written demand and without the requirement of Bankruptcy Court approval, but, any failure to make such payment that is not provided for in the Approved Budget, shall not constitute an Event of Default. |
| 33. | ***Counterparts and Electronic Transmission*** | • This DIP Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this DIP Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this DIP Term Sheet. |
| 34. | ***Governing Law*** | • The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this DIP Term Sheet.<br>• The Debtors and the DIP Lender shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |

[*Signatures on following pages.*]

**IN WITNESS WHEREOF,** the parties hereto have caused this DIP Term Sheet to be executed as of the date first set forth above.

**ZOM HOLDING, INC.,**
as the Borrower

By: ______________________
Name: Neil Lum
Title: Chief Restructuring Officer

**ZOM ASSOCIATES, INC.**
as a Guarantor

By: ______________________
Name: Neil Lum
Title: Chief Restructuring Officer

**ZH DEVELOPMENT I, LLC,**
as a Guarantor

By: ______________________
Name: Neil Lum
Title: Chief Restructuring Officer

**ZOM Holding, LP,**
as the DIP Lender

By: ______________________
Name: Jonathan Young
Title: CFO

**Exhibit 1**

**(Loan Parties)**

**Borrower:** ZOM Holding, Inc.

**Guarantors:**

1. ZH Development I, LLC
2. ZOM Associates, Inc.

# <u>Exhibit 2</u>

**(Initial Budget)**

**ZOM Holding, Inc. ("ZHI")**
*DIP Budget*
Date of Filing: October 30, 2026

| | ZHI DIP Budget | | | | | | | | | | | | | | | | | TOTALS | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Payroll** | *Payroll* | | *Payroll* | | *Payroll* | | *Payroll* | | *Payroll* | | *Payroll* | | *Payroll* | | *Payroll* | | *Payroll* | Post-BK | Post-BK |
| **Actual (A) / Forecast (F)** | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F | F |
| **Month** | Nov | Nov | Nov | Nov | Dec | Dec | Dec | Dec | Dec | Jan | Jan | Jan | Jan | Feb | Feb | Feb | Feb | Total | Total |
| **Week #** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 13-Wk (3 Mo.) | 17-Wk (4 Mo.) |
| **Week Beginning** | 11/2/26 | 11/9/26 | 11/16/26 | 11/23/26 | 11/30/26 | 12/7/26 | 12/14/26 | 12/21/26 | 12/28/26 | 1/4/27 | 1/11/27 | 1/18/27 | 1/25/27 | 2/1/27 | 2/8/27 | 2/15/27 | 2/22/27 | 11/2/26 | 11/2/26 |
| **Week Ending** | 11/6/26 | 11/13/26 | 11/20/26 | 11/27/26 | 12/4/26 | 12/11/26 | 12/18/26 | 12/25/26 | 1/1/27 | 1/8/27 | 1/15/27 | 1/22/27 | 1/29/27 | 2/5/27 | 2/12/27 | 2/19/27 | 2/26/27 | 1/29/27 | 2/26/27 |
| **RECEIPTS** | | | | | | | | | | | | | | | | | | | |
| Development Fees | $0 | $0 | $0 | $0 | $0 | $0 | $366,660 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$366,660** | **$366,660** |
| Stonebridge Payroll & Accounting Reimb. | $30,181 | $33,000 | $63,181 | $0 | $33,000 | $0 | $0 | $33,000 | $30,181 | $33,000 | $0 | $0 | $33,000 | $63,181 | $0 | $0 | $33,000 | **$288,543** | **$384,724** |
| ZRS Rent Reimbursement | $0 | $0 | $22,730 | $0 | $0 | $0 | $0 | $22,730 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | **$45,460** | **$45,460** |
| **Total Receipts** | **$30,181** | **$33,000** | **$85,911** | **$0** | **$33,000** | **$0** | **$366,660** | **$55,730** | **$30,181** | **$33,000** | **$0** | **$0** | **$33,000** | **$63,181** | **$0** | **$0** | **$33,000** | **$700,663** | **$796,844** |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | |
| Payroll Wages, Taxes, & Fees | ($242,000) | $0 | ($244,500) | $0 | ($458,175) | $0 | ($249,500) | $0 | ($284,175) | $0 | ($239,500) | ($2,500) | ($239,675) | $0 | ($239,500) | ($2,500) | ($239,675) | **($1,960,025)** | **($2,441,700)** |
| Benefits | ($95,500) | ($1,000) | ($34,500) | ($1,000) | ($95,500) | ($1,000) | ($34,500) | ($1,000) | ($34,500) | ($66,000) | ($47,000) | ($1,000) | ($47,000) | ($66,000) | ($47,000) | ($1,000) | ($47,000) | **($459,500)** | **($620,500)** |
| Rent | ($81,000) | $0 | $0 | $0 | ($78,509) | $0 | $0 | $0 | $0 | ($78,509) | $0 | $0 | $0 | ($78,509) | $0 | $0 | $0 | **($238,018)** | **($316,527)** |
| Utilities / Adequate Assurance | ($1,915) | $0 | $0 | $0 | ($6,300) | ($4,792) | $0 | $0 | $0 | ($6,300) | ($4,792) | $0 | $0 | ($6,300) | ($4,792) | $0 | $0 | **($24,099)** | **($35,191)** |
| Insurance | $0 | ($1,500) | ($227) | $0 | $0 | ($1,500) | ($227) | $0 | $0 | $0 | ($115,000) | ($1,727) | $0 | $0 | ($1,500) | ($227) | $0 | **($120,180)** | **($121,907)** |
| All Other Disbursements | ($15,000) | ($51,461) | ($15,000) | ($15,000) | ($15,000) | ($15,000) | ($26,461) | ($22,500) | ($7,500) | ($15,000) | ($40,000) | ($26,461) | ($15,000) | ($15,000) | ($15,000) | ($26,461) | ($15,000) | **($279,383)** | **($350,844)** |
| **Total Operating Disbursements** | **($435,415)** | **($53,961)** | **($294,227)** | **($16,000)** | **($653,484)** | **($22,292)** | **($310,688)** | **($23,500)** | **($326,175)** | **($165,809)** | **($446,292)** | **($31,688)** | **($301,675)** | **($165,809)** | **($307,792)** | **($30,188)** | **($301,675)** | **($3,081,205)** | **($3,886,669)** |
| **Cash Flow before Non-Op. Disbursements** | **($405,234)** | **($20,961)** | **($208,316)** | **($16,000)** | **($620,484)** | **($22,292)** | **$55,972** | **$32,230** | **($295,994)** | **($132,809)** | **($446,292)** | **($31,688)** | **($268,675)** | **($102,628)** | **($307,792)** | **($30,188)** | **($268,675)** | **($2,380,542)** | **($3,089,825)** |
| **NON-OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | |
| **Bankruptcy Fees** | | | | | | | | | | | | | | | | | | | |
| Independent Directors Fees | ($60,000) | $0 | $0 | $0 | ($60,000) | $0 | $0 | $0 | $0 | ($60,000) | $0 | $0 | $0 | ($60,000) | $0 | $0 | $0 | **($180,000)** | **($240,000)** |
| D&O Insurance (CRO & Independent Directors) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($125,000) | $0 | $0 | $0 | $0 | $0 | $0 | **($125,000)** | **($125,000)** |
| Baker & Hostetler (Counsel for Debtor) **[A]** | $0 | $0 | $0 | ($666,667) | $0 | $0 | $0 | ($666,667) | $0 | $0 | $0 | ($666,667) | $0 | $0 | $0 | $0 | ($1,000,000) | **($2,000,000)** | **($3,000,000)** |
| SOLIC Capital Advisors (CRO for Debtor) **[A]** | $0 | $0 | $0 | ($416,667) | $0 | $0 | $0 | ($416,667) | $0 | $0 | $0 | ($416,667) | $0 | $0 | $0 | $0 | ($500,000) | **($1,250,000)** | **($1,750,000)** |
| Osborn Maledon (Appellate Counsel) | $0 | $0 | $0 | ($50,000) | $0 | $0 | $0 | ($95,000) | $0 | $0 | $0 | ($65,000) | $0 | $0 | $0 | $0 | ($65,000) | **($210,000)** | **($275,000)** |
| Counsel for DIP Lender | ($100,000) | $0 | $0 | ($200,000) | $0 | $0 | $0 | ($150,000) | $0 | $0 | $0 | ($200,000) | $0 | $0 | $0 | $0 | ($150,000) | **($650,000)** | **($800,000)** |
| Unsecured Creditors' Committee | $0 | $0 | $0 | ($6,250) | $0 | $0 | $0 | ($6,250) | $0 | $0 | $0 | ($6,250) | $0 | $0 | $0 | $0 | ($6,250) | **($18,750)** | **($25,000)** |
| Angeion (Noticing Agent) | $0 | $0 | $0 | ($25,000) | $0 | $0 | $0 | ($25,000) | $0 | $0 | $0 | ($25,000) | $0 | $0 | $0 | $0 | ($25,000) | **($75,000)** | **($100,000)** |
| U.S. Trustee Quarterly Fee | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($45,930) | $0 | $0 | $0 | $0 | ($46,096) | **($45,930)** | **($92,026)** |
| **Total Bankruptcy Fees** | **($160,000)** | **$0** | **$0** | **($1,364,583)** | **($60,000)** | **$0** | **$0** | **($1,359,583)** | **$0** | **($60,000)** | **($125,000)** | **($1,425,513)** | **$0** | **($60,000)** | **$0** | **$0** | **($1,792,346)** | **($4,554,680)** | **($6,407,026)** |
| DIP Interest Expense | $0 | $0 | $0 | ($3,961) | $0 | $0 | $0 | $0 | ($22,919) | $0 | $0 | ($23,603) | $0 | $0 | $0 | $0 | ($56,337) | **($50,483)** | **($106,820)** |
| **Total Non-Operating Disbursements** | **($160,000)** | **$0** | **$0** | **($1,368,545)** | **($60,000)** | **$0** | **$0** | **($1,359,583)** | **($22,919)** | **($60,000)** | **($125,000)** | **($1,449,116)** | **$0** | **($60,000)** | **$0** | **$0** | **($1,848,683)** | **($4,605,162)** | **($6,513,846)** |
| **Net Cash Flow** | **($565,234)** | **($20,961)** | **($208,316)** | **($1,384,545)** | **($680,484)** | **($22,292)** | **$55,972** | **($1,327,353)** | **($318,913)** | **($192,809)** | **($571,292)** | **($1,480,803)** | **($268,675)** | **($162,628)** | **($307,792)** | **($30,188)** | **($2,117,358)** | **($6,985,704)** | **($9,603,670)** |
| **CASH BALANCE** | | | | | | | | | | | | | | | | | | | |
| Beginning Book Balance | $94,681 | $94,681 | $94,681 | $94,681 | $94,681 | $94,681 | $94,681 | $150,653 | $182,883 | $182,883 | $182,883 | $182,883 | $182,883 | $182,883 | $182,883 | $182,883 | $182,883 | | |
| Operating Disbursements | ($405,234) | ($20,961) | ($208,316) | ($16,000) | ($620,484) | ($22,292) | $55,972 | $32,230 | ($295,994) | ($132,809) | ($446,292) | ($31,688) | ($268,675) | ($102,628) | ($307,792) | ($30,188) | ($268,675) | **($2,380,542)** | **($3,089,825)** |
| Non-Operating Disb. (BK Fees) | ($160,000) | $0 | $0 | ($1,368,545) | ($60,000) | $0 | $0 | ($1,359,583) | ($22,919) | ($60,000) | ($125,000) | ($1,449,116) | $0 | ($60,000) | $0 | $0 | ($1,848,683) | **($4,605,162)** | **($6,513,846)** |
| **Ending Bal. before Mgmt Fees / DIP Borrowings** | **($470,553)** | **$73,720** | **($113,635)** | **($1,289,864)** | **($585,803)** | **$72,389** | **$150,653** | **($1,176,700)** | **($136,030)** | **($9,926)** | **($388,409)** | **($1,297,920)** | **($85,792)** | **$20,255** | **($124,909)** | **$152,696** | **($1,934,475)** | | |
| **MANAGEMENT FEES / DIP BORROWINGS** | | | | | | | | | | | | | | | | | | | |
| Management Fees | $405,234 | $20,961 | $208,316 | $16,000 | $620,484 | $22,292 | $0 | $0 | $295,994 | $132,809 | $446,292 | $31,688 | $268,675 | $102,628 | $307,792 | $30,188 | $268,675 | **$2,468,744** | **$3,178,027** |
| **Total Management Fees** | **$405,234** | **$20,961** | **$208,316** | **$16,000** | **$620,484** | **$22,292** | **$0** | **$0** | **$295,994** | **$132,809** | **$446,292** | **$31,688** | **$268,675** | **$102,628** | **$307,792** | **$30,188** | **$268,675** | **$2,468,744** | **$3,178,027** |
| DIP Borrowings | $160,000 | $0 | $0 | $1,368,545 | $60,000 | $0 | $0 | $1,359,583 | $22,919 | $60,000 | $125,000 | $1,449,116 | $0 | $60,000 | $0 | $0 | $1,848,683 | **$4,605,162** | **$6,513,846** |
| **Total DIP Borrowings** | **$160,000** | **$0** | **$0** | **$1,368,545** | **$60,000** | **$0** | **$0** | **$1,359,583** | **$22,919** | **$60,000** | **$125,000** | **$1,449,116** | **$0** | **$60,000** | **$0** | **$0** | **$1,848,683** | **$4,605,162** | **$6,513,846** |
| **Total Management Fees / DIP Borrowings** | **$565,234** | **$20,961** | **$208,316** | **$1,384,545** | **$680,484** | **$22,292** | **$0** | **$1,359,583** | **$318,913** | **$192,809** | **$571,292** | **$1,480,803** | **$268,675** | **$162,628** | **$307,792** | **$30,188** | **$2,117,358** | **$7,073,907** | **$9,691,873** |
| **Ending Balance** | **$94,681** | **$94,681** | **$94,681** | **$94,681** | **$94,681** | **$94,681** | **$150,653** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | **$182,883** | | |

**Note:**
[A] Baker Hostetler's and SOLIC's fees from Week 14 to Week 17 are subject to budget approval

| | Mgmt Fees | DIP | Total |
|---|---|---|---|
| **13-wks / 3 months** | $2,468,744 | $4,605,162 | **$7,073,907** |
| **17-wks / 4 months** | $3,178,027 | $6,513,846 | **$9,691,873** |

## Exhibit 3

**(Milestones)**

1. As soon as practicable, but in no event later than the date that is three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, in form and substance satisfactory to the DIP Lender, in its sole discretion.
2. As soon as practicable, but in no event later than the date that is 35 Days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order, in form and substance satisfactory to the DIP Lender, in its sole discretion.
3. As soon as practicable, but in no event later than the date that is seven (7) calendar days after the Petition Date, Debtors shall have filed a motion, in form and substance acceptable to the DIP Lender, seeking approval of (a) bid procedures for a sale of substantially all of the Debtors' assets (the "**Sale**"), (b) entry into asset purchase agreement with a stalking horse purchaser, and (c) the sale of substantially all of the Debtors' assets in accordance with the bid procedures (such motion, the "**Bid Procedures Motion**").
4. No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court the Bankruptcy Court shall have entered an order approving the Bid Procedures Motion, which order shall be in form and substance acceptable to the DIP Lender in its sole discretion (the "**Bid Procedures Order**").
5. The Bankruptcy Court shall hold a hearing to approve the winning bid and will enter an order approving the Sale (a "**Sale Order**") in form and substance satisfactory to the DIP Lender in its sole discretion no later than one hundred and twenty (120) days after the Petition Date.
6. If the Sale Order approves the Sale to any buyer that is not the DIP Lender or its designee (such buyer, the "**Other Successful Buyer**"), the Other Successful Buyer shall, within three (3) business days of entry of the Sale Order, either (a) obtain the consent of the DIP Lender to extend the DIP Termination Date, or (b) remit Payment in Full of the then outstanding DIP Obligations to the DIP Lender.
7. The Sale authorized by the Sale Order shall be consummated as soon as reasonably practicable following entry of the Sale Order, but in no event later than one hundred and fifty (150) days after the Petition Date.
8. By no later than November 17, 2026, take whatever actions are necessary to address maturities of project level financing for the land loans for the Ludham Phase I and Phase II project, for which Zom Holding, Inc. is a guarantor.
9. By no Later than December 9, 2026, take whatever actions are necessary to address maturities of project level financing for the loan for the Azola Avery Centre project, for which Zom Holding, Inc. is a guarantor.
10. By no later than January 17, 2027, take whatever actions are necessary to address maturities of project level financing for the land loan for the Carpenter Fire in Cary project, for which Zom Holding, Inc. is a guarantor.
11. By no later than March 25, 2027, take whatever actions are necessary to address maturities of project level financing for the loan for the Hazel & Azure National Landing project, for which Zom Holding, Inc. is a guarantor.

# EXHIBIT B

**Proposed Final Order (to be filed prior to the final hearing on the Motion)**

# <u>EXHIBIT C</u>

## DIP Declaration

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **In Re:**<br><br>**ZOM HOLDING, INC.,**<br>**ZOM ASSOCIATES, INC.,**<br>**ZH DEVELOPMENT I, LLC,**<br><br>**Debtors.**[1] | **Lead Case No.: 6:26-bk-08509-GER**<br>**(Joint Administration Requested)**<br><br>**Case No. 6:26-bk-08511-GER**<br>**Case No. 6:26-bk-08515-GER**<br><br>**Chapter 11** |

**DECLARATION OF NEIL LURIA IN SUPPORT OF THE MOTION FOR APPROVAL OF DEBTOR IN POSSESSION FINANCING AND THE USE OF CASH COLLATERAL**

I, Neil Luria, declare as follows:

1. I am the Chief Restructuring Officer ("CRO") of the Debtors in the above-captioned bankruptcy cases (the "Chapter 11 Cases"), which were filed on October 30, 2026 (the "Petition Date"). I have served in that capacity for ZOM Holding, Inc. ("ZHI") since January 27, 2026. I have served as CRO of ZOM Associates, Inc. ("ZAS") and ZH Development I, LLC ("ZH Dev", together with ZHI and ZAS, the "Debtors") since October 16, 2026.[2]

2. I submit this declaration (the "Declaration") in support of the Debtors' *Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Approving Liens and Superpriority Administrative Expense Status, (IV) Modifying Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Motion").[3]

[1] The Debtors in these Chapter 11 Cases and the last four digits of their EINs are ZOM Holding, Inc. (8703), ZH Development I, LLC (1156), and ZOM Associates, Inc. (0836). The Debtors' address is 1511 East State Road 434, Suite 1005, Winter Springs, FL 32708.

[2] ZHI is the sole shareholder of ZAS and the member and manager of ZH Dev.

[3] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

3. Unless otherwise indicated, the statements in this Declaration are based on my personal knowledge, my review of the Debtors' books and records, discussions with the Debtors' management and advisors, and information provided by personnel working under my supervision. I am authorized to submit this Declaration on behalf of the Debtors. If called to testify, I could and would testify competently to the facts set forth herein.

4. Based on my review of the Debtors' financial condition and projected cash needs, the Debtors require immediate access to postpetition financing and the use of Cash Collateral to pay operating expenses, preserve their assets, and fund the administration of the Chapter 11 Cases. Without access to those funding sources, the Debtors will be unable to meet their day-to-day obligations, which would jeopardize continued operations and diminish value available to creditors.

5. Prior to the Petition Date, the Debtors and their advisors undertook a process to identify potential sources of postpetition financing. As part of that process, my team identified and contacted ten potential financing sources and solicited proposals for financing sufficient to meet the Debtors' anticipated needs. None of the contacted financing sources were able to offer the Debtors the financing needed for these Chapter 11 Cases on more favorable terms.

6. The Debtors, in consultation with their advisors, determined that ZOM Holding, LP or its designee (the "DIP Lender") offered to provide the required funding on the most favorable terms available to the Debtors. Although the DIP Lender is also ZHI's prepetition secured lender and shares some common ownership with ZHI, the Debtors selected the DIP Lender's proposal because of its superior terms and ability to meet the Debtors' financing needs—not because of the DIP Lender's affiliation. Accordingly, I believe that the DIP Facility is the best available financing option for the Debtors and their creditors.

7. The Debtors and the DIP Lender, through their respective counsel and with the assistance of their independent advisors, negotiated the terms of the proposed DIP Facility in good faith and at arm's length. Those negotiations resulted in the proposed DIP Term Sheet and related DIP Documents submitted with the Motion.

8. SOLIC prepared a market analysis of select recent debtor-in-possession financings in the $5 million to $15 million range. The analysis included two groups of comparable financings: financings in bankruptcy cases provided to real estate companies nationwide and financing in bankruptcy cases filed in Florida across various industries. Based on that analysis, the terms of the proposed DIP Facility are reasonable and compare favorably with the rates and fees reflected in the bankruptcy case financings reviewed.

9. In connection with the search for postpetition financing, SOLIC assisted the Debtors and their other advisors in reviewing and refining projected cash forecasts for the Debtors' during these chapter 11 cases. These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on the operations, interest expenses associated with postpetition financing, and professional fees. Prior to the Petition Date, SOLIC reviewed and analyzed the Debtors projected cash needs and prepared a cash budget outlining the Debtors' postpetition needs (as may be amended, modified, or supplemented from time to time, the "DIP Budget"), including detailed line items for categories of cash flows anticipated to be received or disbursed during the period covered by the DIP Budget, and determined the amount of postpetition financing required to administer these chapter 11 cases. The DIP Budget also takes into account management fees the Debtors are paid by Zom Holding, LP ("<u>ZHLP</u>") on account of services the Debtors perform for ZHLP pursuant to the Management Services Agreement among ZHI, ZAS

and ZHLP (the "Management Services Agreement"). Pursuant to the Management Services Agreement, ZHLP pays or reimburses ZHI and ZAS at cost for the management, administrative, back-office and other services ZHI and ZAS provide to ZHLP.

10. I believe the DIP Budget and projections provide an accurate reflection of the Debtors' funding requirements over the identified period, and are fair, reasonable, and appropriate under the circumstances. I believe that the proposed DIP Facility provides the Debtors sufficient incremental liquidity to fund these chapter 11 cases.

11. Based on the foregoing, I believe that the proposed DIP Facility represents the best financing available to the Debtors under the circumstances, that its terms are fair and reasonable when considered as a whole, and that approval of the Motion is in the best interests of the Debtors, their estates, and their creditors. Accordingly, I support approval of the DIP Facility and the use of Cash Collateral on the terms set forth in the Motion and the DIP Documents.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated: October 30, 2026

*/s/ Neil Luria*

Neil Luria